1   William M. Audet (waudet@audetlaw.com)
    Michael McShane (mmcshane@audetlaw.com)
2   Adel A. Nadji (anadji@audetlaw.com)
    AUDET & PARTNERS, LLP
3   221 Main Street, Suite 1460
    San Francisco CA 94105
4   Telephone: 415.982.1776
    Facsimile: 415.568.2556
5
6   *Attorneys for Plaintiffs*
    *and the Class Members*
7
8              UNITED STATES DISTRICT COURT FOR
9           THE NORTHERN DISTRICT OF CALIFORNIA
10
11
12  Chelsea, LLC, Mark Russo, Allen          )   CASE NO.:  C-07-5800-SC
    Loretz, and Ivan Simpson, individually   )
13  and on behalf of all others similarly    )
    situated,                                )   MEMORANDUM OF LAW IN
14                                           )   SUPPORT OF PLAINTIFFS' MOTION
           Plaintiffs,                       )   FOR ORDER TO SHOW CAUSE WHY
15                                           )   A PROTECTIVE ORDER TO
    v.                                       )   SUPERVISE OR OTHERWISE LIMIT
16                                           )   COMMUNICATIONS WITH PUTATIVE
    Regal Stone, Ltd., Hanjin Shipping, Co., )   CLASS MEMBERS SHOULD NOT ISSUE
17  Ltd., Conti Cairo KG, NSB Neiderelbe,    )
    Synergy Maritime, Ltd. *In Personam*;    )   .
18  M/V Cosco Busan, their engines, tackle,  )
    equipment, appurtenances, freights, and  )   Ctrm: 1, 17th Floor
19  cargo *In Rem*,                          )   Hon. Samuel J. Conti
                                             )
20         Defendants.                       )
                                             )
21                                           )
                                             )
22                                           )
                                             )
                                             )

23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  The Class Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.  The So-Called Claims Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.  The Communications To Putative Class Members By Defendants
        And Their Agents Are Abusive And Demand Court Intervention . . . . 11

        1.  Communications to Putative Class Members by Defendants
            Are Misleading and Confusing, At Best . . . . . . . . . . . . . . . . . . . 12

        2.  The Communications To Putative Class Members By
            Defendants And Their Agents Are Coercive . . . . . . . . . . . . . . . 16

    C.  Unless And Until The Court Exercises Its Broad Authority To
        Remedy And Prevent Defendants' Abusive Communication
        Serious Abuse Will Result . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        1.  Abuses Flowing From Misrepresentations And Omissions
            In The Claims Process And Prevention And Remedy Thereof . 18

        2.  Abuse Caused By Coercive Conduct Of Defendants And
            Their Agents And Prevention And Remedy Thereof . . . . . . . . 20

    D.  Proposed Limitations And Remedies Will Not Significantly
        Limit Right of Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1

## TABLE OF AUTHORITIES

2

**Page**

**Cases**

3

4
*Burford v. Cargill, Inc.*,
        No. 05-0283, 2007 WL 81667 (W.D. La. Jan. 9, 2007) . . . . . . . . . . . . . . . 11, 15

5

6
*Central Hudson Gas Co. v. Public Serv. Comm.*,
        447 U.S. 557 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

7
*Collins v. Int'l Dairy Queen*,
        190 F.R.D. 629 (M.D. Ga. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

8

9
*Erhardt v. Prudential Group, Inc.*,
        629 F.2d 843 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

10
*Eshelman v. Orthoclear Holdings, Inc.*,
        No. 07-01428, 2007 WL 2572349 (N.D.Cal. Sep. 4, 2007) . . . . . . . . . . . . . . 9

11

12
*Gulf Oil v. Bernard*,
        452 U.S. 89 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8-10, 18, 21, 23, 24

13
*Hampton Hardware v. Cotter & Company, Inc.*,
        156 F.R.D. 630 (N.D. Tex. 1994) . . . . . . . . . . . . . . . . . . . . 8-10, 12, 16-19, 21, 22

14

15
*In re Currency Conversion Fee Antitrust Litigation*,
        361 F.Supp.2d 237 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . 8-10, 12, 13, 16, 19-22

16
*In re McKesson HBOC, Inc. Securities Litig.*,
        126 F.Supp.2d 1239 (N.D. Cal. 2000) . . . . . . . . . . . . . . . . . 11, 19, 20, 22

17

18
*In re Sch. Asbestos Litig.*,
        842 F.2d 671 (3d Cir. 1988) . . . . . . . . . . . . . . . . . 8, 11, 12, 15, 16, 18, 19, 21

19
*Jenifer v. Del. Solid Waste Auth.*,
        Nos. 98-270/98-565, 1999 WL 117762 (D. Del. Feb. 25, 1999) . . 11, 13, 18, 20

20

21
*Kleiner v. First Nat'l Bank of Atlanta*,
        751 F.2d 1193 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . 9-12, 19, 21, 23

22
*On the House Syndication, Inc. v. Federal Express Corp.*,
        203 F.R.D. 452 (S.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

23

24
*Phillips Petroleum Co. v. Shutts*,
        472 U.S. 797 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

25

26
*Puerto Rico v. M/V Emily S. (In re Metlife Capital Corp.)*,
        132 F.3d 818 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

27
*Ralph Oldsmobile, Inc. v. General Motors Corp.*,
        No. 99-4567, 2001 WL 1035132 (S.D.N.Y. Sept. 7, 2001) . . . 11, 14, 15, 18, 20

28

*Redmond v. Moody's Investor Serv.*,
No. 92 Civ. 9161 (WK), 1995 WL 276159 (S.D.N.Y May 10, 1995) . . . . . . . 14

*Veliz v. Cintas Corp.*,
No. 03-2280, 2004 WL 2623909(N.D. Cal. Nov. 12, 2004) . . . . . . . . 8, 12, 16

*Virginia State Board of Pharmacy v. Virginia Citizens Council*,
425 U.S. 748 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Wang v. Chinese Daily News*,
236 F.R.D. 485 (C.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-22

## Statutes

33 United States Code

§ 2701 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 13

§ 2704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13

§ 2713(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 13

## Rules

Federal Rule of Civil Procedure

Rule 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 12

Rule 23(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## Other Authorities

1 Witkin, Summary of Cal. Law (10th ed. 2005)
Contracts, § 299 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

1    I.    **INTRODUCTION**

2    Plaintiffs in the instant action, *Chelsea, LLC, et al. v. Regal Stone, Ltd, et al.*

3    ("*Chelsea*") with the support of the plaintiffs in the related class action filed in state

4    court, *Tarantino, et al. v. Hanjin Shipping Co., Ltd.*, San Francisco County Superior

5    Court Case No. CGC-07-469379 ("*Tarantino*"), bring this Motion for an Order to

6    Show Cause ("Motion"), respectfully seeking the Court's assistance in preserving the

7    integrity of the class action process and rights of the putative class members of both

8    actions (together "Putative Class Members"). *See* Declaration of William M. Audet in

9    Support of Plaintiffs' Motion for an Order to Show Cause ("Audet Dec."), Declaration

10   of Frank Pitre in Support of Plaintiffs' Motion for an Order to Show Cause ("Pitre

11   Dec."), ¶¶ 2-4, Ex. A (*Tarantino* Complaint).

12   Defendants and their apparent agent, Hudson Marine, without giving notice to

13   any counsel for Class Plaintiffs, have initiated a claims process ("Claims Process")

14   which is rife with pretrial misrepresentations, misleading omissions, and coercion

15   aimed at dissuading Putative Class Members from participating in either class action

16   and otherwise interfering with the relationship between the lead plaintiffs in both

17   actions (together "Lead Plaintiffs") and their counsel. "[Federal] Rule [of Civil

18   Procedure] 23 expresses a policy in favor of having litigation in which common

19   interests, or common questions of law or fact prevail, disposed of where feasible in a

20   single lawsuit." *Gulf Oil v. Bernard*, 452 U.S. 89, 99 n. 11 (1981) (internal quotations

21   omitted). Defendants appear intent on using the Claims Process to frustrate this

22   important policy and thereby avoid their full responsibility for the injuries suffered by

23   Putative Class Members.

24   Plaintiffs respectfully request that the Court exercise its authority under Rule 23

25   to prevent this from occurring by issuing an order that requires Defendants and their

26   agents to conduct the Claims Process in a manner which neither misleads Putative

27   Class Members, coerces their decision regarding what remedies to pursue, nor

28

---

1    interferes with attorney-client relationships. *See id.* at 104. Class Plaintiffs are not

2    requesting that Defendants cease the Claims Process, rather only that they conduct it in

3    a manner which is transparent, fair, and does not prejudice the rights of Putative Class

4    Members or the policies furthered by the class action mechanism.

## II.    BACKGROUND

### A.    The Class Actions

7    On November 7, 2007, the Cosco Busan ("Ship") collided with the Delta Tower

8    of the Bay Bridge tearing a 100-foot long gash in its side, from which 58,000 gallons of

9    highly toxic bunker fuel poured into the Bay ("Oil Spill"). *See Chelsea* Complaint

10   ¶ 20, *Tarantino* Complaint, ¶ 1. Defendants waited approximately one hour before

11   calling spill-containment operators, allowing the spilled fuel to spread unabated across

12   the waters of the Bay. *See Chelsea* Complaint ¶ 21, *Tarantino* Complaint ¶ 5.

13   The damage caused to the ecology of the Bay was exacerbated, and continues to

14   be exacerbated, by the nature of the oil which was spilled. Bunker fuel is both highly

15   toxic and heavy. *See Tarantino* Complaint, ¶¶ 41-50. When spilled, bunker fuel sinks

16   much faster than lighter crude oil. *Tarantino* Complaint, ¶ 50. This not only causes

17   large quantities of spilled bunker fuel to quickly sink to the ocean floor and coat

18   anything upon it, it also prevents water soluble toxins in the fuel from evaporating into

19   the air prior to sinking with those toxins intact. *Tarantino* Complaint, ¶ 50. Thus,

20   while a massive clean-up of the Oil Spill was eventually initiated by federal, state, and

21   local authorities at a cost of millions of taxpayer dollars, the eventual beach openings

22   and apparent lack of bunker fuel on the surface of the Bay paint a deceptive picture of

23   the cleanup's success. Large amounts of the Oil Spill almost certainly made its way to

24   the bottom of the Bay and will likely effect its ecology, and particularly the

25   reproductive health of the marine life which inhabit it, for many years to come.

26   *Tarantino* Complaint, ¶¶ 44-52, 65-77. *See also Chelsea* Complaint.

27

28

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ORDER TO SHOW CAUSE**
Case No. C-07-5800-SC                                                                   2

1    The Oil Spill promises to have both immediate and long-term negative effects

2    upon the livelihoods of the commercial fishermen who depend on the Bay and

3    constitute the Putative Class.  In the short-term, the Oil Spill caused a *de facto* closure

4    of the Dungeness crab fishing season for approximately its first two weeks ("Closure"),

5    a period during which crab fishermen not only traditionally pull in up to 80% of the

6    season's catch, but also get premium prices because of the Thanksgiving holiday.

7    *Tarantino*, ¶¶ 62-64.  Other fisheries, such as the rockfish fishery and the herring

8    fishery were also *de facto* closed following the Oil Spill.  The long-term effects on

9    fishermen's livelihoods could be far more profound as the effects of the Oil Spill are

10   felt, particularly on the reproductive cycles of the Dungeness crabs, herring, and other

11   fish which use the Bay as a nursery.  *Id.*, ¶¶ 47, 50, 66-77.

12   On November 11, 2007, the instant *Chelsea* action was filed in this Court on

13   behalf of a class defined as:

14
15           all commercial fishing operations, crab, shellfish, bottom fish, herring
             fishing, and recreational charter vessel operations, which commercially
16           fish and/or operate in and around the coastal waters of the San Francisco
             Bay Area and adjacent fishing areas grounds.

17   Verified First Amended Complaint ("F.A.C."), ¶ 25.  On November 20, 2007, the

18   *Tarantino* action was filed in the Superior Court of San Francisco on behalf of a class

19   defined as:

20           all commercial fishing operations, including crab, herring, flat fish,
             salmon and other fish, which commercially fish in and around the San
21           Francisco Bay and surrounding ocean areas.

22   *Tarantino* Complaint, ¶ 20.  With some slight differences, both complaints essentially

23   name the same defendants ("Defendants").

24   Both actions seek *inter alia* that compensation be paid to Putative Class

25   Members for both their short-term and long-term economic injuries caused by the Oil

26   Spill, as well as punitive damages.  *See Chelsea* at pp. 11-12; *Tarantino* Complaint at p.

27   33.  The *Chelsea* Complaint further prays for a Court-supervised clean-up program be

28   established.  *Chelsea* at p. 11.  The *Tarantino* Complaint prays for Defendants'

1    establishment of a monitoring trust fund to monitor and ensure the safety and fitness for

2    human consumption of seafood caught in the San Francisco Bay Area. *Tarantino*

3    Complaint at p. 33.

### B.    The So-Called Claims Process

5        Subsequent to the filing of the complaints, an entity known as Hudson Marine

6    (apparently a "claims adjuster" working on behalf of one or more Defendants), initiated

7    a claims process purportedly to "pay" some Putative Class Members, specifically

8    Dungeness crab fishermen,[1] interim "advances."[2]  *See* Fitz Dec., ¶ 3; *Tarantino* Dec.,

9    ¶ 3. Declaration of William Audet in Support of Plaintiffs' Motion for Order to Show

10   Cause ("Audet Dec."),  ¶ 3.

11       Neither Hudson Marine nor any Defendant (or representative thereof) provided

12   any advance information to Plaintiffs' counsel regarding the establishment of the

13   Claims Process. Pitre Dec.,  ¶ 7, Audet Dec., ¶ 3..  Rather, Plaintiffs' counsel learned

14   that the Claims Process had been established through communications with their

15   respective lead plaintiffs and class members.  Pitre Dec., ¶ 8. Investigations have

16   subsequently revealed that the Hudson Marine and/or other agents of Defendants have,

17   in their conduct of the Claims Process, made significant, material misrepresentations to

18   Putative Class Members, failed to disclose critical information to Putative Class

19   Members, and sought to financially "punish" those Putative Class Members who have

20   sought assistance of counsel to pursue remedies through the courts, with the apparent

---

[1]    Apparently other types of commercial fishermen were not included at this point.

[2]    Under the Oil Pollution Act ("OPA"), 33 U.S.C. 2701 *et seq.*, a party responsible for an oil spill is obligated to set up a "claims process." However, the claims process is not a "free for all" that allows a defendant faced with a class action lawsuit to "gut" the class action proceedings.  Indeed, the OPA class process claims process is a voluntary one for injured victims, not a process designed to gain information from injured victims and deny them Court access.  The problem here is that the claims process is without any Court oversight and as a result, has been misused.

1  intent of dissuading similar choices by others, and interfering with those Class

2  Members' relationships with counsel.

3      During a face-to-face meeting in December 2007, two critical representations

4  were made by representatives of Defendant(s) regarding the claims process to induce

5  participation by Putative Class Members which now appear to have been false or at

6  least misleading.  First, Defendant(s) verbally represented that participation in the

7  Claims Process would in no way prejudice a Putative Class Member's rights to bring

8  suit, in any forum, using any process, for damages other than interim damages flowing

9  from the Closure. Audet Dec., ¶ 3. Second, Defendant(s) represented that there would

10 be no cap to the damages which Putative Class Members would be entitled to receive in

11 the claims process. *Id.*.

12     This appears not to be true.  An interim damages claim form distributed by

13 Hudson Marine to a Putative Class Member ("Claim Form") contradicts these

14 representations.

15     Indeed, the Claim Form contains broad ambiguous language that purports to

16 bind signatories to an undefined "process" for the resolution of a large swath of claims.

17 Pitre Dec., ¶¶ 5-6, Ex. B.  It states directly above the signature line:

18
19     I hereby agree to use this process to resolve my past and present claims
       only as it relates to my claimed past and present lost revenue due to the
       oil spill of November 7, 2007.  I also acknowledge this prepayment will
20     be credited against any further amounts, if any.

21 *Id.*, Ex. B. Without definition (which as discussed is misleading in and of itself) there

22 is no way to tell exactly what "this process" consists of.  However, indications suggest

23 that the Claims Process is to be conducted pursuant to the Oil Pollution Act of 1990

24 ("OPA 90"), 33 U.S.C. § 2701 *et seq.*, in which case a signatory would then be legally

25 required to ***exhaust the process*** before he or she could "commence an action in court."

26
27
28

1  33 U.S.C. § 2713(b).[3]   Furthermore, the OPA 90 would also place a *qualified cap on*

2  *the responsible party's liability*, which no Defendant has so far indicated they would

3  waive. 33 U.S.C. § 2704.

4      A cover letter is distributed with the Claim Form ("Cover Letter"). Pitre Dec.,

5  ¶¶ 5-6, Ex. B. However, it does nothing to dispel the ambiguity as the "process" to

6  which the Claim Form purports to bind Putative Class Member signatories. In fact, it

7  states that Putative Class Member signatories **must provide** Hudson Marine with a

8  **laundry list of detailed information** before Hudson Marine will give signatories any

9  information at the places they have agreed to use:

10      Upon receipt of your fully executed Claims Confirmation Form and
11      relevant documents, we will contact you to advise you of the next step in
       our claim process.

12  *Id.* It is not only regarding the Claims Process, that Claim Form and Cover Letter fail

13  to provide any information. They also contain <u>no</u> information regarding putative class

14  members' rights to retain counsel, the existence of class actions which have been filed

15  on their behalf, the identity of class counsel, or any other information which would

16  assist a Putative Class Member decide whether to participate in the Claims Process or

17  pursue other remedies. *See id.*

18      In addition to these stark informational shortcomings, Defendants and their

19  agents have also used the Claims Process as means to punish the Lead Plaintiffs,

20  apparently in order to both dissuade other Putative Class Members from making similar

21  choices, and persuade those Putative Class members to terminate such representation

22  and pursuits. On or about December 8, 2007, Harry Bolton, a claims adjuster working

23  for Hudson Marine informed John Tarantino, lead plaintiff in the *Tarantino*, that Mr.

24  Tarantino could only participate in the Claims Process if he terminated his

25

26  _____

27  [3]   In some ways, this exhaustion requirement could be a best case scenario. It is
   possible that by agreeing "to use this process" that a signatory is giving up <u>all</u> rights to
28  bring an action in court. Without definition, there is no way to know.

1  representation by counsel. Tarantino Dec., ¶ 7. Similarly, on December 13, 2007 a

2  Putative Class Member, Michael McHenry, was informed by the same Mr. Bolton, that

3  because Steven Fitz, the other lead plaintiff in the state court action, was a plaintiff in a

4  court action against Regal Stone Ltd. and others responsible for the Oil Spill, Mr. Fitz

5  could not participate in the Claims Process. Fitz Dec., ¶ 7. The local fishing

6  community that makes up the Putative Class is close-knit and information travels fast

7  through it. Fitz. Dec., ¶ 8. Knowledge of the exclusion of Mr. Tarantino and Mr. Fitz

8  from the Claims Process because of their participation in the *Tarantino* action is now

9  well known among Putative Class Members, and have apparently influenced Putative

10  Class Members to abandon their previous intention of joining the action. Fitz Dec,

11  ¶¶ 9-10. Seeing their fellows get promises of payments and sometimes advances has

12  also shaken their confidence in counsel and interfered with that relationship. Fitz.

13  Dec., ¶ 11.

14      Similarly, on December 14, counsel for Defendant Regal Stone Ltd. *et al.*, at the

15  end of a meeting, informed counsel for plaintiffs in the *Chelsea* action that his clients

16  were also "prohibited" from participating in the Claims Process. Audet Dec., ¶ 4.

17  Counsel for Defendants subsequently essentially stated that because the undersigned

18  filed a class action and filed a motion for a bond, this firm's clients would not be "paid"

19  any advances. The attorney further noted that counsel for plaintiffs in the instant action

20  would soon not have any clients at all, all but admitting that Defendants were excluding

21  certain Plaintiffs and class members from the Claims Process in order to defeat both

22  class action litigations, to say nothing of admitting Defendants' intent to interfere with

23  the relationship between the plaintiffs in the instant action and their counsel. *Id.*

24      Thus, Defendants and their agents have not only distributed false, misleading,

25  and woefully incomplete information to Putative Class Members as part of the Claims

26  Process, they have also conducted the Claims Process so as to coerce Putative Class

27  Members into abandoning class action litigation against Defendants and interfere with

28

1    their relationships with their counsel.  By doing so, Defendants seek to avoid Court

2    supervision over the process by which Bay Area fishermen are compensated for their

3    economic injuries flowing from the Oil Spill and limit Defendants' liability by

4    frustrating the instant action and *Tarantino*.  Plaintiffs respectfully request that the

5    Court prevent this happening by using its authority to ensure that all Putative Class

6    Members receive complete and accurate information and are allowed to participate in a

7    claims process which does not prejudice their rights.

8    ## III.    LEGAL STANDARD

9           In *Gulf Oil v. Bernard*, the Supreme Court recognized that the authority a district

10   court to supervise and limit communications in class actions extends to

11   communications with putative class members made before the class has been certified.

12   452 U.S. 89; *see also, e.g., In re Currency Conversion Fee Antitrust Litigation*, 361

13   F.Supp.2d 237, 252 (S.D.N.Y. 2005) (collecting cases).  This recognition was based on

14   the Court's finding that while "[c]lass actions serve an important function in our system

15   of civil justice[,] [t]hey present opportunities for abuse" which extend into the period

16   preceding a decision on certification.  *Gulf Oil*, 452 U.S. at 99.

17          Because of the potential for abuse, a district court has both the duty and
18          the broad authority to exercise control over a class action and to enter
            appropriate orders governing the conduct of counsel and parties."
19
     *Id.* (emphasis added).

20          The Court further made clear that a district court need <u>not</u> wait for evidence of

21   actual abuse, but rather should act upon a finding of ***"a likelihood of serious abuse."***

22   *Id.* at 104 (emphasis added); *see also, e.g., In re Sch. Asbestos Litig.*, 842 F.2d 671, 683

23   (3d Cir. 1988) ("Rule 23(d) does not, however, require a finding of *actual* harm; it

24   authorizes the imposition of a restricting order to guard against the *'likelihood* of

25   serious abuses.'") (quoting *Gulf Oil*, 452 U.S. at 104; emphasis in original).  Thus, as

26   one of the leading cases on the subject put it, "[t]hat the interests embodied in Rule 23

27   might be hindered is a sufficient finding upon which to base an order limiting

28

---

contacts." *Hampton Hardware v. Cotter & Company, Inc.*, 156 F.R.D. 630, 633 (N.D.

Tex. 1994); *see, e.g., Veliz v. Cintas Corp.*, No. 03-2280, 2004 WL 2623909, *3 (N.D.

Cal. Nov. 12, 2004) (following *Hampton Hardware*). "Rule 23 expresses 'a policy in

favor of having litigation in which common interests, or common questions of law or

fact prevail, disposed of where feasible in a single lawsuit." *Gulf Oil*, 452 U.S. at 99 n.

11. Thus, any communication which creates a likelihood of seriously threatening this

policy triggers the court's authority and duty to limit such communication.

The Court in *Gulf* did, however, caution courts to be cognizant of any first

amendment concerns implicated by the circumstances of any limitation of

communications. It stated:

> "[A]n order limiting communications between should be based on a clear
> record and specific findings that reflect a weighing of the need for a
> limitation and the potential interference with the rights of the parties.
> . . .
> In addition, such weighing-identifying the potential abuses being
> addressed, should result in a carefully drawn order that limits speech as
> little as possible, consistent with the rights under the circumstances.

*Id.* at 101-02 (emphasis added).

While some courts have apparently read this language unconditionally and

applied the requirements therein without analyzing whether the *circumstances* of the

communication at issue justify the requirements' application, *see, e.g., Eshelman v.

Orthoclear Holdings, Inc.*, No. 07-01428, 2007 WL 2572349, *2 (N.D.Cal. Sep. 4,

2007), a better reasoned approach adopted by several courts examines whether the type

of speech in question demands such stringency. These courts have recognized that the

Supreme Court's decision in *Gulf Oil*, and the stringent standard articulated therein,

was animated with first amendment concerns which do not apply with the same force

where the communications in question are "grounded in the 'economic interests of the

speaker and the audience,'" and thus qualify as commercial. *Hampton Hardware*, 156

F.R.D. at 633 (quoting *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1203 n.

22 (11th Cir. 1985)); *see also In re Currency Conversion Fee Antitrust Litig.*, 361

F.Supp.2d at 254.  The 11th Circuit, in *Kleiner*, discussed the issue at length.  It distinguished communications at issue before it between the defendant bank and absent borrower class members intended to persuade them to opt-out of the class action, and the communications at issue in *Gulf Oil*, which were conducted by the NAACP Legal Defense and Education Fund and local counsel with putative class members to encourage their participation in a suit regarding racial discrimination.  *Kleiner*, 751 F.2d at 1203-06.  It noted that because the latter communication involved "protected, non-commercial political expression," restrictions upon it "called 'into play the full panoply of First Amendment safeguards against prior restraint.'"  *Id.* at 1205 (quoting *Gulf Oil v. Bernard*, 604 F.2d 449, 473 (5th Cir. 1979) *affirmed* 452 U.S. 89.).  Prior restraint of this type of speech demanded the heighten scrutiny described by the Supreme Court in *Gulf Oil*, specifically the requirements that such an order be narrowly tailored and "'based on a clear record and specific findings that reflect a weighing of the need for a limitation with the potential interference with the rights of the parties.'"  *Id.* (quoting *Gulf Oil*, 452 U.S. at 101).  Orders restricting commercial speech, such as the solicitation to settle the purely economic dispute at issues in *Kleiner*, on the other hand, demanded only that the order be "grounded in good cause and issued with a 'heightened sensitivity' for first amendment concerns."  *Id.; see also Hampton Hardware*, 156 F.R.D. at 633; *In re Currency Conversion Fee Antitrust Litig.*, 361 F.Supp.2d at 253-54 (rejecting the argument that it "may not restrict [the defendants'] communications with potential class members absent specific findings of abuse by defendants").

The communications at issue here between Defendants and their agents and Putative Class Members are purely commercial in character: they are aimed at lessening Defendants' litigation risk by reducing the number of Putative Class Members and frustrating, overall, Class Plaintiffs efforts to hold them liable in court for all the damages for which they are responsible.  *See Kleiner*, 751 F.2d at 1203 n. 22.  Thus,

1    while the evidence of actual and potential abuses by Defendants and their agents is

2    more than sufficient under the *Gulf Oil* standard to support a detailed order justifying

3    the remedies which Class Plaintiffs seek, this standard need not be met for the Court to

4    take the action requested.[4]

5        Finally, it should be kept in mind that, "as a threshold matter" communications

6    by Defendants and their agents which is "untruthful or misleading" is "speech [that] has

7    no claim to first amendment immunity." *Kleiner*, 751 F.2d at 1204. Much of the

8    communications at issue is both.

9    **IV.    ARGUMENT**

10        The communications made by Defendants and their agents to Putative Class

11    Members have been false, misleading, coercive, and interfered with class counsels'

12    representation of their clients. These communications create a likelihood of serious

13    harm if the Court does not take the preventative and curative actions which Plaintiffs

14    propose. These curative actions do not overly interfere with the rights of the

15    Defendants in the circumstances, considering the nature of the communications in

16    question, Defendants' legitimate interests in the Claims Process, and the threat which

17    the communications pose the class action process.

18    **A.    The Communications To Putative Class Members By Defendants
         And Their Agents Are Abusive And Demand Court Intervention**

19

20        Courts have, generally, found two broad categories of communication with

21    putative class members create a likelihood for abuse and thus demand court

22    intervention:  communications which are false, misleading, or confusing to putative

23    class members, *see, e.g. In re McKesson HBOC, Inc. Securities Litig.*, 126 F.Supp.2d

24    1239,1245 (N.D. Cal. 2000); *In re Sch. Asbestos Litig.*, 842 F.2d at 683; *Burford v.*

25    *Cargill, Inc.*, No. 05-0283, 2007 WL 81667, *2 (W.D. La. Jan. 9, 2007); *Ralph*

26

27    [4]    The *Kleiner* court also held that "it is unnecessary for a trial court to issue
      particularized findings of abusive conduct when a given form of speech is inherently

28    conducive to overreaching and duress." 751 F.2d at 1206. Significant amounts of the
      communication by Defendants or their agents at issue so qualifies.

---

*Oldsmobile, Inc. v. General Motors Corp.*, No. 99-4567, 2001 WL 1035132, *2-3 (S.D.N.Y. Sept. 7, 2001); *Jenifer v. Del. Solid Waste Auth.*, Nos. 98-270/98-565, 1999 WL 117762, at *7 (D. Del. Feb. 25, 1999); and communication that coerces putative class members' choices regarding remedies or undermine their cooperation with or confidence in class counsel, *see, e.g., Veliz*, 2004 WL 2623909, *3; *Kleiner*, 751 F.2d at 1202-03; *In re Currency Conversion Fee Antitrust Litigation*, 361 F.Supp.2d at 254; *Hampton Hardware*, 156 F.R.D. 632-34.   While the communications to Putative Class Members by Defendants and their agents need only fit one of these descriptions to demand the Court's intervention, all of these descriptions apply.

**1.    Communications to Putative Class Members by Defendants Are Misleading and Confusing, At Best**

The communications to Putative Class Members by Defendants and their agents qualify as false, misleading, and, at the very least, confusing and so demand the Court's intervention.

It is well established that, "[o]ne policy of Rule 23 is the protection of class members from 'misleading communications from parties or their counsel.'" *In re Currency Conversion Fee Antitrust Litigation*, 361 F.Supp.2d at 252 (quoting *Erhardt v. Prudential Group, Inc.*, 629 F.2d 843, 846 (2d Cir. 1980)).   The Second Circuit explained:

> Unapproved notices to class members which are ***factually or legally incomplete, lack objectivity and neutrality, or contain untruths*** will surely ***result in confusion and adversely affect the administration of justice.***

*Erhardt*, 629 F.2d at 846; *see also In re Sch. Asbestos Litig.*, 482 F.2d at 683 (affirming district court conclusion quoting *Erhardt*, 629 F.2d at 846).   The applicability of this reasoning to the communications to Putative Class Members by the Defendants and their agents is clear.

Most obvious are the misrepresentations which have been made by Defendants regarding the consequences of participating in the Claims Process.   Defendants represented that participation in the Claims Process would in no way prejudice a

1    Putative Class Member's rights to bring a suit in any forum, using any process, for

2    damages other than interim damages which flow from the Closure. Audet Dec., ¶ 3.

3    However, the Claim Form which must be signed by Putative Class Members in order to

4    receive those damages obliges the signatory to use an undefined "process," exclusively,

5    "to resolve . . . past and present claims . . . [that] relate[] to . . . past and present lost

6    revenue due to the oil spill of November 7, 2007." Pitre Dec., Ex. B. Regardless what

7    the process turns out to be, the fact that Putative Class Members who sign the Claim

8    Form are bound to the process conflicts with the representation that Putative Class

9    Members would be free to use whatever process they choose in order to seek

10    compensation for injuries other than those which flow directly from the Closure.

11    Indeed, indications suggest that the Claims Process is to be conducted pursuant to the

12    OPA 90, in which case a signatory would be legally required to **exhaust the process**

13    before he or she could "commence an action in court." 33 U.S.C. § 2713(b).

14    Furthermore, if these indications are correct (again there is no way to know because

15    neither Claim Form, Defendants, or their agents have defined the Claims Process for

16    Putative Class Members), another representation made to Putative Class Members by

17    Defendants or their agents is false: that there would be no cap to Defendants' liability

18    for Putative Class Members' injuries. Audet Dec., ¶ 3. The OPA 90 places a qualified

19    cap on a responsible party's liability, *see* 33 U.S.C. § 2704, which Defendants have not

20    indicated they are willing to waive.

21        As the foregoing discussion suggests, however, equally misleading and

22    damaging to fair and efficient resolution of Putative Class Members' claims against

23    Defendants which arise out of the Oil Spill are the **omissions from the Claim Form**.

24    There is no question that the "same policy concern" which justify court intervention to

25    prevent or cure overtly false communications to putative class members "applies where

26    a party misleads class members by **omitting** critical information from its

27    communications." *In re Currency Conversion Fee Antitrust Litig.*, 361 F.Supp.2d at

28    252 (emphasis added). As one court put it, "[w]hile [a] defendant may seek to settle

individual claims prior to certification, the putative class members should know what

the essence of the claim they would be giving up" *Jenifer*, 1999 WL 11762, at *7;

*Puerto Rico v. M/V Emily S. (In re Metlife Capital Corp.)*, 132 F.3d 818, 824 (1st Cir.

1997) ("If the responsible party denies liability or the claim is not settled within 90

days, the claimant may proceed against the responsible party in court or present the

claim to the Fund"); *see also Ralph Oldsmobile*, 2001 WL 1035132, at *4 (finding that

defendants' failure to provide sufficient information in the context of release

distributed to putative plaintiffs created "a risk that [putative class members] may sign

the release without knowing what they are releasing. Such an unknowing release

would be abusive and warrant relief."). These observations apply with force to

Defendants' omissions in the Claims Process.

      The Claim Form's most obvious abusive omission is that it purports to bind

Putative Class Members to use a process about which neither the Claim Form nor its

accompanying cover-letter provide any information. *See Pitre Dec., Ex. B.* Indeed, the

cover letter conditions provision of such information to Putative Class Members

signatories on such members first providing Defendants' agent with reams of detailed

information. *Id.* Binding Putative Class Members to a process which could prejudice

their rights to proceed as part of a class, without giving any information as to the nature

of that process not only runs afoul of the interests further by Rule 23, but also basis

notions of fair play. What's more, demanding that Putative Class Member signatories

first submit to comprehensive unilateral discovery subverts the Court's authority to

regulate discovery in the class context and particularly so as to protect absent class

members. *See, e.g., On the House Syndication, Inc. v. Federal Express Corp.*, 203

F.R.D. 452, 455-56 (S.D. Cal. 2001) (wide-ranging discovery from absent class

members undermines the very purpose of class action suits); *Collins v. Int'l Dairy

Queen*, 190 F.R.D. 629, 630-31 (M.D. Ga. 1999) ("absent class action plaintiff is not

required to do anything") quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810

n. 2 (1985); *Redmond v. Moody's Investor Serv.*, No. 92 Civ. 9161 (WK), 1995 WL

1    276159, * 1 (S.D.N.Y May 10, 1995) (discovery of absent class members regarding

2    individual issues is inappropriate).

3         The informational deficiencies of the Claim Form and Cover Letter are not,

4    however, isolated omissions regarding the process to which they purport to bind

5    Putative Class Members. Rather, the Claim Form and Cover Letter are also misleading

6    in their omission of any information about the instant action, the *Tarantino* action, or

7    how to contact either class counsel. Addressing a similar claims form and release, a

8    district court recently held:

> [t]he use of the general receipt and release . . . ***without notification of the***
> ***pending class action is misleading as a matter of law.*** The court further
> finds that such misleading communications are abusive and threaten the
> proper functioning of the instant litigation.

*Burford*, 2007 WL 81667, at *2 (emphasis added). The court in *Jenifer* reached the

same conclusion:

> Some potential plaintiffs may wish to participate in the action and,
> therefore, should be given the necessary information and opportunity to
> choose . . . Before any [putative class member] signs the release . . .,
> [defendant] must give [the putative class members] adequate notice of the
> pendency of this action and that by signing the release they forego their
> rights to this litigation.

1999 WL 117762, at *7; *see also Ralph Oldsmobile*, 2001 WL 1035132, at *5 (finding

that the release should have included with it detailed information regarding the pending

class action, including contact information of the putative class attorneys, and how

signing the release would affect their ability to participate as a class member).

         Finally, the communications which have come from Hudson Marine are

misleading by virtue of Defendants' and Hudson Marine's refusal to specifically clarify

their relationship with one another. *See* Audet Dec, ¶ 5. In *In re School Asbestos

Litig.*, the Third Circuit recognized that communications to putative class members

which fail to identify their true authorship can be misleading. 842 F.2d at 683. In the

particular case before it, the Third Circuit affirmed the district court's finding that by

failing to identify the relationship between the defendants and the publisher of an

informational booklet sent to putative class members urging them to take certain

1    actions which would have reduced defendants' liability in the class action, the booklet

2    was "misleading as to its objectivity and neutrality." 842 F.2d 671 (quoting lower court

3    opinion); *see also generally Hampton Hardware*, 156 F.R.D. at 634 (discussing court's

4    duty to "protect[] potential class members from making decisions based on one-sided

5    information from an interested party"). Here, as well, by not informing Putative Class

6    Members what Hudson Marine's relationship is with the Defendants, Putative Class

7    Members are unable to accurately evaluate information given to them by Hudson

8    Marine including any offers of settlement by them[5].

9            ## 2.    The Communications To Putative Class Members By
             Defendants And Their Agents Are Coercive

10           The communications to Putative Class Members are also coercive and thus

11    require the Court's intervention. The Third Circuit has recognized as "blatant

12    misconduct" demanding court intervention communication with putative class members

13    which seeks "either to affect class members' decisions to participate in the litigation or

14    to undermine class plaintiffs' cooperation with or confidence in counsel." *In re Sch.*

15    *Asbestos Litig.*, 482 F.2d at 682; *see also Veliz*, 2004 WL 2623909, *3; *In re Currency*

16    *Conversion Fee Antitrust Litigation*, 361 F.Supp.2d at 252-53; and, *Hampton*

17    *Hardware*, 156 F.R.D. 632-34. By refusing to allow the lead plaintiffs to participate in

18    the Claims Process, regardless whether they were willing to sign the release demanded

19    by Defendants and their agents, and communicating that prohibition to other Putative

20    Class Members, Defendants have sent a powerful message to the Putative Class as a

21    whole that if they seek the assistance of counsel and participate in either class action

22

23    ---

24    [5]    It should be noted, the fact that some of the communications in question did not
       directly address the class actions filed in this Court or state court does inoculate those
25    communications from the Court's authority to protect from threats "the integrity of the
       class and the administration of justice generally." *In re Sch. Asbestos Litig.*, 842 F.2d at
26    683. The district court in *In re Sch. Asbestos Litig.* rejected the defendant asbestos
       manufacturers' argument that communications which encouraged school administrators
27    not to remove asbestos but did not mention pending class actions escaped the court's
       supervisory authority under Rule 23. *Id.* at 682. The Third Circuit affirmed: "Such
28    communications are not, in fact, litigation-neutral; as the district court concluded they
       seek to protect defendants' pecuniary interests by influencing decisions which will
       determine defendants' ultimate liability in the litigation." *Id.* at 682-83.

1    they would be denied money which others are receiving, in the same manner, have

2    undermined the lead plaintiffs' relationship with their respective counsel.

3        One of the lead plaintiffs in the *Tarantino* action, John Tarantino, was told by a

4    Hudson Marine representative that Mr. Tarantino could not participate in the claims

5    process unless he terminated his representation by counsel (and thus logically his role

6    as lead plaintiff in the action). Tarantino Dec., ¶ 7. Similarly, Michael McHenry, a

7    Putative Class Member, was told by the same representative of Hudson Marine that

8    because Steven Fitz, the other lead plaintiff in the *Tarantino* action, was named

9    plaintiff in an action against Regal Stone Ltd. *et al.*, Mr. Fitz could not participate the

10   Claims Process. Fitz Dec., ¶ 7. The latter statement was made to Mr. McHenry at the

11   same time that Mr. McHenry signed the Claim Form to participate in the Claims

12   Process and received an advance payment. *Id.* Thus, the message to Mr. Henry, Mr.

13   Fitz, Mr. Tarantino, and other Putative Class Members was clear: if you get an attorney

14   and participate in a class action you get nothing, but if you don't, you get paid. *See* Fitz

15   Dec., ¶¶ 8-10.

16       In *Hampton Hardware*, the court found similar communications from the

17   defendant to putative class members which warned of the economic costs of

18   participating in the litigation were obviously intended to influence the members'

19   decisions whether to participate:

20           Regardless of the stated purpose of the letters . . . any common sense
             reading of them reveals they are an attempt to prevent member
21           participation in the class action.

22   156 F.R.D. at 632. Here too, Defendants are "attempting to reduce the class members

23   participation" in the lawsuit based on threats to their pocketbooks. *Id.* at 633. The fact

24   that the mechanism slightly differs, denying those who participate a benefit offered to

25   others, is immaterial.

26       Indeed, Defendants have all but admitted that it is their intent to use inequitable

27   treatment of lead plaintiffs in the Claims Process, and communication thereof to

28   Putative Class Members, to not only dissuade other Putative Class Members from

1  joining the class actions, but also to disrupt the relationships between Lead Plaintiffs

2  and their respective counsel.  In a meeting between counsel for Regal Stone Ltd. *et al.*

3  and counsel for plaintiffs in the instant action, counsel for Regal Stone Ltd. *et al.* went

4  so far as to say, after rejecting counsel's request that his clients be allowed to fairly

5  participate in the Claims Process: that soon you will not have any clients "at all."

6  Audet Dec., ¶ 4.  It is without question that this conduct runs directly against the

7  policies embodied in Rule 23 and recognized by the Court in *Gulf Oil*, 452 U.S. at 99,

8  n. 11.

9  **C.    Unless And Until The Court Exercises Its Broad Authority To**
   **Remedy And Prevent Defendants' Abusive Communication Serious**
10  **Abuse Will Result**

11  The Court need only find that the communications to Putative Class Members by

12  Defendants and their agents present the "likelihood of serious abuses" to trigger its

13  "duty and broad authority to exercise control over a class action and enter appropriate

14  orders governing the conduct of counsel and parties." *Gulf Oil*, 452 U.S. at 104, 101;

15  *see also In re School Asbestos Litigation*, 842 F.2d at 671; *Hampton Hardware*, 156

16  F.R.D. at 633.  Nonetheless, there is already evidence of actual harm caused by these

17  communications and associated conduct.  Thus, Plaintiffs respectfully request that the

18  Court perform this duty and exercise this broad authority in the manner requested

19  below.

20  **1.    Abuses Flowing From Misrepresentations And Omissions In**
   **The Claims Process And Prevention And Remedy Thereof**
21

22  Defendants and their agents have induced, and seek to continue inducing,

23  Putative Claims Members to participate in the Claims Process by misrepresenting to

24  them the consequences of their participation, omitting any description on the Claim

25  Form or Cover Letter of the consequences or operation of the Claims Process, and

26  omitting any information on the Claim Form or Cover Letter regarding either class

27  action.  This is in addition to the coercive conduct and communications discussed

28

1    below also aimed at inducing Putative Class Members to choose participation in the

2    Claims Process over litigation.

3        Many courts have recognized that communications regarding a release of claims

4    in the context of a class action which do not full describe the consequences of the

5    release result in "potentially unknowing waivers of rights" by putative class members.

6    *Ralph Oldsmobile*, 2001 WL 1035132, at *3; *see also, e.g. Jenifer*, 1999 WL 117762,

7    at *7. That danger is exponentially heightened here, where Defendants and their agents

8    have not simply omitted information regarding either class action or how participation

9    in the Claims Process would impact a Putative Class Members ability to participate in

10   either action. Rather, Defendants have also failed to inform Putative Class Members

11   regarding the nature the Claims Process they are binding themselves to use, while

12   affirmatively misleading Putative Class Members as to the consequences of that

13   process. Thus, the conduct of Defendants and their agents have created the strong

14   likelihood that Putative Class Members will not only unknowingly waive their rights to

15   participate in either class action but also rights that they may have had independent of

16   the class actions which are affected by their participation in the Claims Process.

17       However, while "[t]he damage from [Defendants' and their agents']

18   misstatements could well be irreparable," it can be mitigated. *Kleiner*, 751 F.2d at

19   1203. As Judge Whyte found necessary in *McKesson*, Class Plaintiffs respectfully

20   submit that the Court could take actions "(1) to remedy any misleading statements that

21   have already been made; and (2) to prevent any repetition of the conduct." 126

22   F.Supp.2d at 1246. These actions are:

23       1.    Immediately enjoin the Claims Process and associated communications
24             by Defendant or their agents, until a Revised Claim Form and Revised
               Cover Letter, as described below, is drafted and approved by the Court.
25             *See, e.g., Hampton Hardware*, 156 F.R.D. at 634.

26       2.    Order Defendants, in cooperation with Plaintiffs and subject to Court
               approval, to redraft, and submit for Court approval, a Revised Claim
27             Form and Revised Cover Letter, which Defendants and their agents will
               be required to exclusively use on communication with Putative Class
28             Members, that includes:

---

(a)    The following proposed language above the signature line on the Revised Claim Form which aligns the actual consequences of participation in the Claims Process with the descriptions thereof that have been provided to Putative Class Members: "Acceptance of any payment is without prejudice to pursuit of any legal action in a court of law. Any payment through the Claims Process will be credited against any recovery by compromise, trial or other adjudication of past, present or future claims arising out of the incident of November 7, 2007." *See, generally, Currency Conversion Fee Antitrust Litigation*, 361 F.Supp.2d at 257.

(b)    A complete description of the Claims Process, including the identity of Hudson Marine and its employer, without conditions. *See, e.g. In re Sch. Asbestos Litig.*, 842 F.2d at 684.

(c)    Complete information regarding both class actions, including status of actions and contact information of counsel for plaintiffs in both class actions. *See, e.g., Ralph Oldsmobile*, 2001 WL 1035132, at *5; *Jenifer*, 1999 WL 117762, at *7.

3.    Order Defendants to distribute, in cooperation with Plaintiffs and subject to Court approval, a Curative Notice with the Revised Claim Form and Revised Cover Letter to every Putative Class Member who has already signed any claim form with Defendants, Hudson Marine or *any* other agent of the defendant, *see, e.g., Ralph Oldsmobile*, 2001 WL 1035132, at *5; *Jenifer*, 1999 WL 117762, at *7, which informs such members of their right to rescind their former agreement with Defendants, Hudson Marine, or any other agent of the Defendants and enter, if they choose, the agreement embodied in the Revised Claim Form. *See, e.g. McKesson*, 126 F.Supp.2d at 1246; *Currency Conversion Fee Antitrust Litigation*, 361 F.Supp.2d at 257; *Ralph Oldsmobile*, 2001 WL 1035132, at *7; *Wang v. Chinese Daily News*, 236 F.R.D. 485, 489 (C.D. Cal. 2006).[6]

If these actions are not taken, the overt misrepresentations and omissions which Defendants and their agents have made regarding the Claims Process will almost certainly lead Putative Class Members to unknowingly forego their rights and bind themselves to a process about which they have little truthful information and will leave un-remedied such unknowing waivers which have already occurred. Such a result would be wholly inconsistent with the policies underlying Rule 23. Plaintiffs

---

[6]    Arguably, as Putative Class Members' decisions to sign the Claim Form were induced by misrepresentation, the agreements are void and there is no need for rescission. *See* 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 299 (and cases cited therein). However, it is most appropriate in the class context to give each Putative Class Member an explicit choice whether to reform, rescind, or maintain the agreement they have entered into.

1    respectfully request the Court's intervention to both prevent and cure these serious

2    abuses.

3

4        **2.    Abuse Caused By Coercive Conduct Of Defendants And Their**
              **Agents And Prevention And Remedy Thereof**

5            By excluding Lead Plaintiffs from participation in the Claims Process and

6    communicating that result to other Putative Class Members, Defendants seek to coerce

7    Putative Class Members, including Lead Plaintiffs, into foregoing pursuit of class

8    action litigation in favor of the Claims Process as well as disrupt the relationship

9    between Lead Plaintiffs and their respective counsel. This has already caused, and

10   threatens to cause further, very significant damage to the class action process.

11           In *Hampton Hardware*, the court stated unequivocally that "attempting to reduce

12   the class members participation in the lawsuit based on threats to their pocket book" is

13   coercive and runs "directly against the principle" animating Rule 23, namely "'a policy

14   in favor of having litigation in which common interests, or common questions of law or

15   fact prevail disposed of where feasible in a single lawsuit'." 156 F.R.D. at 633

16   (quoting *Gulf Oil*, 452 U.S. at 99 n. 11); *accord In re Sch. Asbestos Litig.*, 842 F.2d at

17   682. By denying payment of interim damages to those who are named in class action

18   lawsuits against Defendants, Defendants are attempting to achieve just this result. The

19   disparate treatment serves "no legitimate purpose," but rather seems aimed only at

20   sending a message: (1) to other Putative Class Members that if they choose the join the

21   class action, they too will suffer; and (2) to the Lead Plaintiffs themselves that they

22   would be better off if they abandoned the lawsuit. *Hampton Hardware*, 156 F.R.D. at

23   634.

24

25           The danger of Defendant's succeeding in this coercive strategy is increased by

26   the close-knit quality of the local fishing community that make up the Putative Class.

27   *See* Fitz Dec., ¶ 8. It is well recognized that the coercive quality of a particular

28   communication is often in part the product of the context in which it is delivered. *See,*

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ORDER TO SHOW CAUSE**
**Case No. C-07-5800-SC**                                                                  21

*e.g. Kleiner*, 751 F.2d at 1202, 1206-07; *Wang*, 126 F.R.D. at 488-89. *In re Currency Conversion Fee Antitrust Litigation*, 361 F.Supp.2d at 253 (collecting cases); *Hampton Hardware*, 156 F.R.D. at 633. Here, the close-knit quality of the local fishermen who make up the putative class almost guarantees distribution of the information of the disparate treatment throughout the putative class's entirety. Indeed, the information that the *Tarantino* lead plaintiffs were not going to get any money from the Claims Process while other Putative Class Members would quickly circulated through the local fishing community. *See* Fitz Dec., ¶ 9. The coercive effect on Putative Class Members was quickly perceivable, it became common knowledge among the putative class that if you joined either class action Defendants and their agents would not talk to you and you would not get paid. *Id.*, ¶ 12. This not only caused other Putative Class members to forsake participation in the class action," but also made the Lead Plaintiffs reconsider their decision to have pursued class action litigation. Fitz Dec., ¶ 1;

This, in turn, has interfered with, and threatens to further interfere with, Lead Plaintiffs' relationship with their counsel and confidence therein. Lead Plaintiffs see all their friends getting paid and they get nothing because they are represented by counsel in a class action. This caused Lead Plaintiffs' confidence in their counsel to waiver, and threaten the relationship between them. *See* Fitz Dec., ¶ 11. It is clear from the words of Hudson Marine's claims adjuster to John Tarantino, *see* Tarantino Dec., ¶ 7, and counsel for Regal Stone Ltd. *et al.* to plaintiffs' counsel in the instant action, *see* Audet Dec., ¶ 4, that this is precisely the result Defendants seek.

Fortunately, the same close-knit quality of the putative class which has made the Defendants coercive tactics so effective also creates an opportunity for a remedy thereof. Specifically, Class Plaintiffs respectfully request that the Court order Defendants to open the Claims Process to ***all*** commercial fishermen with injuries flowing from the Oil Spill including Lead Plaintiffs. There is "no legitimate purpose" to excluding Lead Plaintiffs from the Claims Process and it serves only to punish the

1    Lead Plaintiffs for their choice to sue Defendants and coerce their choice of remedies

2    and that of other Putative Class Members. *Hampton Hardware*, 156 F.R.D. at 634. It

3    is only by ordering the Defendants to open up the Claims Process that the Court can

4    inoculate the Putative Class from the effect of this coercion and thereby maintain the

5    integrity of the class action process which the Defendants have attacked. *See,*

6    *generally, Wang*, 236 F.R.D. at 489 (invalidating opt-outs gained through coercion); *In*

7    *re Currency Conversion Fee Antitrust Litigation*, 361 F.Supp.2d at 254 (voiding certain

8    arbitration agreements gained through coercion); *McKesson*, 126 F.Supp.2d at 1246.

9    **D.      Proposed Limitations And Remedies Will Not Significantly Limit
              Right of Defendants**

10   As discussed in some detail *supra*, because the misleading and coercive

11   communication by Defendants and their agents at issue here is commercial in nature,

12   the first amendment concerns which animated *Gulf Oil* and its requirement that

13   court-ordered limitations be narrowly tailored do not apply here. *See infra* pp 9-11.

14   Rather any limits imposed by the Court must be "grounded in good cause and issued

15   with a 'heightened sensitivity' for First Amendment concerns." *Hampton Hardware*,

16   156 F.R.D. at 633 (quoting *Kleiner*, 751 F.2d at 1203 n. 22). While the limitations and

17   curative remedies which Class Plaintiffs respectfully request the Court impose easily

18   meet this lesser standard, they also satisfy the more stringent standard.

19

20   First, Defendants can make no argument that an order requiring that Defendants

21   and their agents cease making untruthful and misleading communications and take

22   actions to cure those which they have already made infringes on their rights improperly.

23   "As a threshold matter, untruthful or misleading speech has no claims on first

24   amendment immunity." *Kleiner*, 751 F.2d at 1204 (citing *Central Hudson Gas Co. v.*

25   *Public Serv. Comm.*, 447 U.S. 557, 566 (1980); *Virginia State Board of Pharmacy v.*

26   *Virginia Citizens Council*, 425 U.S. 748, 771 (1976)). Basic tenants of fairness, not to

27   mention the policies underlying Rule 23, demand that Defendants deal with Putative

28   Class Members honestly and with adequate disclosures. *See supra*. There simply can

1   be no claim of right to mislead class members as to the consequences of participating in

2   the Claims Process or seek to bind Putative Class Members to a process about which

3   they are given no information.

4          Second, requiring that Defendants open up the claims process to all commercial

5   fishermen affected by the Oil Spill actually furthers Defendants' legitimate interests in

6   the efficient resolution of claims against them.  If the Defendants goal in initiating the

7   Claims Process is, as they have represented, to quickly get yearly 2007 damages "off

8   the books," letting as many commercial fishermen as possible participate in Claims

9   Process would actually conform with Defendants' interests.  Fitz Dec., ¶ 13.  Excluding

10  the Lead Plaintiffs only serves the Defendants interest by sending a powerful message

11  to the Lead Plaintiffs and other Putative Class Members that if they choose to pursue

12  their common claims a single class through the courts, they will be punished.  This runs

13  directly contrary to the policies underlying Rule 23, and thus cannot be considered an

14  interest or right about which the Court must be cognizant in crafting relief.  *See Gulf*

15  *Oil*, 452 U.S. at 99 n. 11.

16  **V.     CONCLUSION**

17         Based on the foregoing, Class Plaintiffs respectfully request the Court:

18  1.     Immediately enjoin the Claims Process and associated communications
           by Defendant or their agents, until a Revised Claim Form and Revised
19         Cover Letter, as described below, is drafted and approved by the Court.

20  2.     Order Defendants, in cooperation with Plaintiffs and subject to Court
           approval, to redraft, and submit for Court approval, a Revised Claim
21         Form and Revised Cover Letter which Defendants and their agents will
           be required to exclusively use in communication with Putative Class
22         Members that includes:

23         (a)    The following proposed language: "Acceptance of any payment is
                  without prejudice to pursuit of any legal action in a court of law.
24                Any payment through the Claims Process will be credited against
                  any recovery by compromise, trial or other adjudication of past,
25                present or future claims arising out of the incident of November 7,
                  2007."
26

27         (b)    A complete description of the Claims Process, including the
                  identity of Hudson Marine and its employer, without conditions.
28

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ORDER TO SHOW CAUSE**
Case No. C-07-5800-SC                                                                    24

1

&copy;    Complete information regarding both class actions, including status of actions and contact information of counsel for plaintiffs in both class actions.

2

3    4.    Order Defendants to distribute, in cooperation with Plaintiffs and subject to Court approval, a Curative Notice with the Revised Claim Form and Revised Cover Letter to every Putative Class Member who has already signed any claim form with Defendants, Hudson Marine, or *any* other agent of the defendant, which informs such members of their right to rescind their former agreement with Defendants, Hudson Marine, or any other agent of the Defendants and enter, if they choose, the agreement embodied in the Revised Claim Form.

4

5

6

7

8    5.    Order Defendants to open the Claims Process to all commercial fishermen with claims arising out of the Oil Spill.

9    Class Plaintiffs respectfully submit that without these actions there is a strong

10 likelihood that Defendants will frustrate the class action process and avoid their

11 responsibility for the injuries they have caused members of the putative class, and they

12 request the Court's assistance in preventing this from happening.

13

14

15 Dated: January 17, 2008    AUDET & PARTNERS, LLP

16

17    William M. Audet
18    Michael McShane
    Adel A. Nadji
19    221 Main Street, Suite 1460
    San Francisco CA 94105
20    Telephone: 415.568.2555
    Facsimile: 415.568.2556
21    E-mail: waudet@audetlaw.com

22    *On Behalf of Plaintiffs and the Class*

23 Affiliated Counsel

24 Law Offices of Anthony M. Urie
    18025 17th Ave. N.W.
25 Shoreline, WA 98177

26

27

28