1   FRANK M. PITRE (SBN 100077)
    fpitre@cpmlegal.com
2   NANCY L. FINEMAN (SBN 124870)
    nfineman@cpmlegal.com
3   NIKI B. OKCU (SBN 229345)
    nokcu@cpmlegal.com
4   STUART G. GROSS (SBN 251019)
    sgross@cpmlegal.com
5   **COTCHETT, PITRE & McCARTHY**
    San Francisco Airport Office Center
6   840 Malcolm Road, Suite 200
    Burlingame, CA 94010
7   Telephone: (650) 697-6000

8   *Attorneys for Plaintiffs Steven F. Fitz,*
    *John Tarantino, and the Class*

9

10              **UNITED STATES DISTRICT COURT FOR**

11             **THE NORTHERN DISTRICT OF CALIFORNIA**

12

13

14  **CHELSEA, LLC, MARK RUSSO,**          )   CASE NO.:   C-07-5800-SC
    **ALLEN LORETZ, and IVAN**             )
15  **SIMPSON, individually and on**       )
    **behalf of all others similarly**     )   **DECLARATION OF FRANK M.**
16  **situated,**                          )   **PITRE IN SUPPORT OF MOTION**
                                           )   **FOR ORDER TO SHOW**
17              **Plaintiffs,**            )   **CAUSE WHY A PROTECTIVE**
                                           )   **ORDER TO SUPERVISE AND**
18                                         )   **LIMIT COMMUNICATIONS WITH**
                                           )   **PUTATIVE CLASS MEMBERS**
19          **v.**                         )   **SHOULD NOT ISSUE**
                                           )
20  **REGAL STONE, LTD., HANJIN**          )
    **SHIPPING, CO., LTD., CONTI**         )
21  **CAIRO KG, NSB NEIDERELBE,**          )
    **SYNERGY MARITIME, LTD. In**          )
22  **Personam; M/V COSCO BUSAN,**         )
    **their engines, tackle, equipment,**  )
23  **appurtenances, freights, and cargo** )
    **In Rem,,**                           )
24              **Defendants.**            )
                                           )
25  _____   )

26

27

28

---

Declaration of Frank Pitre ISO Plaintiffs' Ex Parte Motion for Order to Show Cause re:
Protective Order to Supervise and Limit Communications with Putative Class Members
Case No. C-07-5800-SC

## DECLARATION OF FRANK M. PITRE

I, FRANK M. PITRE, HEREBY DECLARE AS FOLLOWS:

1.     I am an attorney licensed to practice before all of the Courts of this State and am admitted to practice before the Northern District of California. I am a member of the law firm of Cotchett, Pitre & McCarthy, counsel for John Tarantino; Steven F. Fitz, dba Fitz-Buskirk, Inc.; and Others Similarly Situated. I have personal knowledge of the matters stated herein and if called as a witness, I could and would competently testify to the following:

2.     On November 20, 2007, John Tarantino; Steven F. Fitz, dba Fitz-Buskirk, Inc.; and Others Similarly Situated, filed a class action suit against Hanjin Shipping Co., Ltd.; Regal Stone, Ltd.; Synergy Maritime; John J. Cota; and Does 1-100 in the State of California, in the County of San Francisco, titled *Tarantino, et al. v. Hanjin Shipping Co., Ltd.*, San Francisco County Superior Court Case No. CGC-07-469379 ("*Tarantino*"). On January 3, 2008, the complaint was amended to replace the defendant fictitiously named as Doe 1 with Fleet Management Ltd.

3.     Attached hereto as Exhibit A is a true and correct copy of Plaintiffs' Class Action Complaint filed in *Tarantino*.

4.     I submit this declaration to verify that class members in the *Tarantino* State action have been subject to the same practices outlined by class members in the instant *Chelsea* action, which are more specifically set forth in the Motion for Order to Show Cause, and that the corrective actions prayed for therein are warranted and appropriate.

5.     On or about December 19, 2007, my office received a copy of a claim form ("Claim Form") and cover letter ("Cover Letter") given by Hudson Marine to putative class members in *Tarantino* for the purpose of processing putative class members' claims ("Claims Process") for interim damages arising

---

Declaration of Frank Pitre ISO Plaintiffs' Ex Parte Motion for Order to Show Cause re:
Protective Order to Supervise and Limit Communications with Putative Class Members
Case No. C-07-5800-SC

1

1  out of the November 7, 2007 collision of the Cosco Busan with the San Francisco
2  Bay Bridge and resulting oil spill.

3        6.    Attached hereto as Exhibit B is a true and correct copy of the Claim
4  Form and Cover Letter.  Personal information of a putative class member
5  originally included on the Claim Form and Cover Letter has been redacted.

6        7.    Neither Hudson Marine nor any defendant in *Tarantino*, or any
7  representative thereof, informed me or any of my colleagues regarding the nature,
8  scope or extent of the proposed Claims Process; nor the attendant consequences
9  of submitting any claim for presentation to Hudson Marine.

10        8.    My colleagues and I were informed of the establishment of the
11  Claims Process by the lead plaintiffs in *Tarantino*.

12
13        I declare under penalty of perjury under the law of the State of California
14  that the foregoing is true and correct.  Executed this 9th day of January 2008, at
15  Burlingame, California.

16
17
18
19
20  By: _____
21        FRANK M. PITRE
      *Attorneys for Plaintiffs Steven F. Fitz,*
      *John Tarantino, and the Class*
22
23
24
25
26
27
28

Declaration of Frank Pitre ISO Plaintiffs' Ex Parte Motion for Order to Show Cause re:
Protective Order to Supervise and Limit Communications with Putative Class Members
Case No. C-07-5800-SC      2

# Exhibit A



1  FRANK M. PITRE (SBN 100077)
   NANCY L. FINEMAN (SBN 124870)
2  STUART G. GROSS (SBN 262323)
   NIKI B. OKCU (SBN 229345)
3  **COTCHETT, PITRE & McCARTHY**
   San Francisco Airport Office Center
4  840 Malcolm Road, Suite 200
   Burlingame, CA 94010
5  Telephone: (650) 697-6000

6  *Attorneys for Plaintiffs*

ENDORSED
F I L E D
San Francisco County Superior Court

NOV 2 0 2007

GORDON PARK-LI, Clerk
BY:_____PARAM NATT_____
                    Deputy Clerk

7

8        **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9            **IN AND FOR THE COUNTY OF SAN FRANCISCO**

10

11  JOHN TARANTINO; STEVEN F.           CASE NO.  CGC-07-469379
12  FITZ, dba FITZ-BUSKIRK, INC.;
    and others similarly situated,
13                                       **CLASS ACTION**
                                         **COMPLAINT FOR DAMAGES**
14                                       **BASED UPON:**

15              **Plaintiffs,**          1.    **VIOLATION OF THE**
                                               **LEMPERT-KEENE-**
16        v.                                   **SEASTRAND OIL SPILL**
                                               **PREVENTION AND**
17  HANJIN SHIPPING CO., LTD.;                 **RESPONSE ACT**
    REGAL STONE, LTD.;                         [Gov't Code §§ 8670, *et seq.*];
18  SYNERGY MARITIME;
    JOHN J. COTA; and            2.    **STRICT LIABILITY - ULTRA**
19  DOES 1-100,                          **HAZARDOUS ACTIVITY;**

20              **Defendants.**          3.    **NEGLIGENCE;**

21                                       4.    **PUBLIC NUISANCE**
                                               [Civ. Code §§ 3479 *et seq*];
22
                                         5.    **PRIVATE NUISANCE**
23                                             [Civ. Code §§ 3479 *et seq*]; and

24  CASE MANAGEMENT CONFERENCE SET       6.    **ENVIRONMENTAL**
                                               **MONITORING.**
25

26       APR 1 8 2008 - 9:00 AM               **JURY TRIAL DEMANDED**

27    DEPARTMENT 212

28

─────────────────────────────────────────
                    **COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.  PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

   A.   The Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

   B.   The Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

   C.   The DOE Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

   D.   Agency, Employment And Joint Venture . . . . . . . . . . . . . . . .  6

III. JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

IV.  CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . .  7

V.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

   A.   Timeline Of The Collision And Spill . . . . . . . . . . . . . . . . . . .  9

   B.   Construction, Ownership, Management, Operation, And Control Of the Ship . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

      1.   Construction Of the Ship . . . . . . . . . . . . . . . . . . . . .  13

      2.   Ownership, Leasing, Management, Operation, Charter, And Control Of the Ship . . . . . . . . . . . . . . . . . . . . .  14

   C.   Bunker Fuel - The Contaminant Involved . . . . . . . . . . . . . . .  14

      1.   Toxicity Of Bunker Fuel . . . . . . . . . . . . . . . . . . . . . .  14

      2.   Consequences of Bunker Fuel Spills . . . . . . . . . . . . . .  15

   D.   Extent Of Damages To Plaintiffs And The Class . . . . . . . . . . .  18

      1.   The San Francisco Bay Area Dungeness Crab Fishery . . . .  18

         a.   Development Of The Fishery . . . . . . . . . . . . . . . .  18

         b.   San Francisco Dungeness Crab Season . . . . . . . . . .  19

         c.   Immediate Effects Of The Oil Spill On The Dungeness Crab Fishery . . . . . . . . . . . . . . . . . . .  20

         d.   Long-term Effects On The Dungeness Crab Fishery . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

      2.   The San Francisco Bay Area Flat Fish Fishery . . . . . . . . .  24

      3.   Other Fisheries Of The San Francisco Bay . . . . . . . . . . .  24

VI.    CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

     FIRST CAUSE OF ACTION
         (Strict Liability - Lempert-Keene-Seastrand Oil Spill
         Prevention Act, Gov't Code §§ 8670 *et seq.*) . . . . . . . . . . . . . . . . 25

     SECOND CAUSE OF ACTION
         (Strict Liability - Ultra Hazardous Activity) . . . . . . . . . . . . . . . . 27

     THIRD CAUSE OF ACTION
         (Negligence) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

     FOURTH CAUSE OF ACTION
         (Negligent Entrustment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

     FIFTH CAUSE OF ACTION
         (Public Nuisance  - Civ. Code §§ 3479 *et seq.*) . . . . . . . . . . . . . 30

     SIXTH CAUSE OF ACTION
         (Private Nuisance - Civ. Code §§ 3479 *et seq.*) . . . . . . . . . . . . . 31

     SEVENTH CAUSE OF ACTION
         (Declaratory Relief And Request for Monitoring of
         Contamination) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## I.    INTRODUCTION

1.    This action is the byproduct of reckless indifference, inattention, and mismanagement among those responsible for the control of a 68 thousand ton container ship called the COSCO BUSAN (hereinafter "the Ship"), which smashed into the Delta Tower of the Bay Bridge at 8:37 a.m. on November 7, 2007. The collision tore a horizontal gash in the side of the Ship 100 feet long, 12 feet wide, and 3 feet deep, shown in the photo below which appeared in the San Francisco Chronicle. Approximately 58,000 gallons of highly toxic fuel oil poured into the San Francisco Bay, befouling for years one of the most beautiful and productive bodies of water in the world (hereinafter "the Spill").



2.    The polluting of the San Francisco Bay and its marine life was a direct and foreseeable consequence of a combination of wrongful acts and

1   omissions by those who owned, operated, maintained, managed, chartered, leased
2   and/or exercised control over the Ship; hereinafter identified as Defendants
3   HANJIN SHIPPING CO., LTD. (hereinafter "HANJIN"); REGAL STONE, LTD.
4   (hereinafter "REGAL"); SYNERGY MARITIME (hereinafter "SYNERGY");
5   and JOHN COTA (hereinafter "COTA").

6       3.      On the day of the accident, Defendant COTA was the pilot
7   navigating the Ship through the San Francisco Bay. COTA was navigating with
8   the assistance of Captain Mao Cai Sun, and a crew comprised of agents,
9   employees, servants and/or joint venturers of the Defendants HANJIN, REGAL,
10  and/or SYNERGY.

11      4.      Defendant COTA, who had a history of accidents, piloted the
12  enormous Ship out of the Bay and through the towers of the Bay Bridge despite:
13  (1) the presence dense fog; (2) concerns regarding the accuracy of navigational
14  equipment; and (3) no functional ability to communicate with the Ship's Captain
15  and crew. Predictably, the 131-foot wide Ship veered off course and broadsided
16  the Delta Tower.

17      5.      The reaction of the Ship's crew, Captain Mao and Defendant COTA
18  to the bridge collision and Spill displayed a conscious indifference for the
19  environmental consequences. Instead of urgently assessing the true extent of
20  highly toxic bunker fuel which had spewed from the ruptured side of the Ship into
21  the Bay, the Ship's crew reported, without any reliable basis, that only 140
22  gallons had spilled. The United States Coast Guard relied on the grossly
23  inadequate assessment for the purpose of mounting a response, and did not learn
24  that the true amount was 400 times greater for another eight hours.
25  Incomprehensibly, Captain Mao also waited approximately one hour before
26  contacting private spill-containment operators, allowing the bunker fuel to spread
27  from the gash unabated.

28

6.    The magnitude of this calamity has triggered consequences of immediate and long-term proportion to the environmental health of the Bay and its marine life.  Plaintiffs herein have suffered profound economic losses to their livelihood as a direct, legal and foreseeable result of public health concerns over the short and long-term safety of crab and other seafood for human consumption and the damage caused to the productivity of the Bay.

## II.    PARTIES

### A.    The Plaintiffs

7.    **JOHN TARANTINO:**  Plaintiff JOHN TARANTINO (hereinafter "TARANTINO") is, and at all relevant times herein was, an individual residing in the City of Corte Madera, County of Marin, California.  TARANTINO has earned a living as a commercial fisherman in the San Francisco Bay Area for many years.  For much of that time, TARANTINO served as the owner and skipper of the fishing vessel "The Crown Royal," berthed at the Wharf in San Francisco, where he is actively engaged in fishing for crab, as well as various vertebrate fish.  TARANTINO receives more than 25% of his earnings from the fishing of these species during the applicable seasons for each.  Plaintiff TARANTINO has suffered economic injury, harm and/or damages to his livelihood as a commercial fisherman as a direct, legal and foreseeable consequence of the wrongful acts and/or omissions of Defendants, and each of them, more particularly set forth herein.

8.    **STEVEN F. FITZ:** Plaintiff STEVEN F. FITZ (hereinafter "FITZ") is, and at all relevant times herein was, an individual residing in El Granada, County of San Mateo, California.  FITZ has earned a living as a commercial fisherman for over 35 years, the last 27 of which he has spent in the San Francisco Bay Area.  Since 1989 Fitz has served as the owner and skipper of the fishing vessel "Mr. Morgan" depicted in the photo below, berthed in Pilar Point Harbor in Half Moon Bay where he is actively engaged in fishing for crab, as well

1  as "flat fish," including species more commonly known as Petrale, English sole,

2  Skate, and Sand Dabs, under the name Fitz-Buskirk, Inc.  FITZ receives more

3  than 25% of his earnings from the fishing of these species during the applicable

4  seasons for each.  Plaintiff FITZ, dba Fitz-Buskirk, Inc., has suffered economic

5  injury, harm and/or damages to his livelihood as a commercial fisherman as a

6  direct, legal and foreseeable consequence of the wrongful acts and/or omissions

7  of Defendants, and each of them, more particularly set forth herein.



22  **B.    The Defendants**

23    9.    **HANJIN**: Plaintiffs are informed and believe, and thereupon allege,

24  that HANJIN is the owner, operator, lessee, and/or charterer by demise of the

25  Ship.  HANJIN is, and at all times herein mentioned was, a corporation,

26  association, partnership, joint venture, and/or sole proprietorship organized and

27  existing under the laws of Republic of Korea and/or headquartered at Hanjin

28  Shipping Building, 25-11, Yoido-Dong, Youngdeungpo-Gu, Seoul Korea.

1   HANJIN is part of the Hanjin Group, a South Korean conglomerate, which

2   includes, in addition to HANJIN, Hanjin Logistics and Korean Air (KAL).

3   Holding a majority interest in the Senator Lines, Hanjin-Senator is the seventh

4   largest container transportation and shipping company in the world, and is

5   Korea's largest carrier, operating some 60 liner and tramper services transporting

6   on 200 containerships, bulk carriers and LNG carriers, more than 100 tons of

7   cargo all over the world, including California and/or the San Francisco Bay Area.

8       10.   **REGAL:** Plaintiffs are informed and believe, and thereupon allege,

9   that REGAL is the owner, operator, lessee, and/or charterer by demise of the

10  Ship. REGAL is, and at all times herein mentioned was, a corporation,

11  association, partnership, joint venture, and/or sole proprietorship organized and

12  existing under the laws of the Peoples Republic of China and/or is based in Hong

13  Kong, and transacts business throughout the world, including California and/or

14  the San Francisco Bay Area.

15      11.   **SYNERGY:** Plaintiffs are informed and believe, and thereupon

16  allege, that SYNERGY is the owner, operator, lessee, and/or charterer by demise

17  of the Ship. SYNERGY is, and at all times herein mentioned was, a corporation,

18  association, partnership, joint venture, and/or sole proprietorship organized and

19  existing under the laws of the Republic of Cyprus and/or is headquartered in

20  Cyprus, and transacts business throughout the world, including California and/or

21  the San Francisco Bay Area.

22      12.   **COTA:** Plaintiffs are informed and believe, and thereupon allege,

23  that COTA was piloting the Ship at the time of the collision and discharge of

24  58,000 gallons of bunker fuel into the San Francisco Bay. COTA is a fifty-nine

25  year old individual residing in Petaluma, California. COTA has been a local pilot

26  for more than 25 years.

27      13.   In the past 14 years COTA has had several "incidents" requiring an

28  investigation by the State Board of Pilot Commissioners. On several occasions,

1  the Commissioners have "counseled" COTA regarding his piloting activities on
2  the Bay.  For example, in July 2006 COTA was reprimanded after it was
3  determined that he had allowed the bulk freighter Pioneer to move out of the
4  channel and run aground when it was approaching a dock at Antioch four months
5  earlier.  The report on the incident stated:  "Capt. COTA had not realized that the
6  vessel was going off track and did nothing to prevent it."  COTA was also
7  involved in an incident in the San Francisco Bay in 2003 involving a Navy
8  aircraft carrier, for which he received a "letter of concern."

9        C.    **The DOE Defendants**

10       14.    The true names and capacities, whether individual, corporate,
11 associate or otherwise of the Defendants DOES 1 through 100 are unknown to
12 Plaintiffs who therefore sue said Defendants by such fictitious names pursuant to
13 Code of Civ. Proc. § 474.  Plaintiffs further allege that each said fictitious
14 Defendant is in some manner responsible for the acts and occurrences hereinafter
15 set forth.  Plaintiffs will amend this Complaint to show the true names and
16 capacities of these DOES Defendants when the same are ascertained, as well as
17 the manner in which each fictitious Defendant is responsible.

18       D.    **Agency, Employment And Joint Venture**

19       15.    At all relevant times, each of the Defendants was an agent,
20 employee, servant, partner, alter ego, and/or joint venturer of each of its/his/her
21 co-Defendants in the operation, management and control of the Ship and was at
22 all times proceeding, during, and following the Spill, acting within the course and
23 scope of said agency, employment, service, partnership, conspiracy, alter ego
24 status, and/or joint venture

25 **III.   JURISDICTION AND VENUE**

26       16.    This Court has jurisdiction over this action pursuant to Code of Civil
27 Procedure Section 410.10.  Plaintiffs seeks damages and injunctive relief on

28

1    behalf of themselves and all others similarly situated under the statutory and

2    common laws of the State of California.

3        17.    Venue is proper in this Court because the principal acts, occurrences,

4    and injuries alleged herein giving rise to this action occurred within the County,

5    the Defendants transact business within the County, and/or Plaintiff

6    TARANTINO is a resident of the County.

7        18.    This Court has jurisdiction over the Defendants because they transact

8    business in California, and the principal acts, occurrences, and injuries alleged

9    herein giving rise to this action occurred in California.

10        19.    Plaintiffs' class action complaint only asserts causes of action under

11    the statutory and common law of the State of California.

12    **IV.    CLASS ACTION ALLEGATIONS**

13        20.    Plaintiff brings this action on his own behalf and as representative of

14    a class consisting of:

15        **"all commercial fishing operations, including crab, herring, flat**

16        **fish, salmon and other fish, which commercially fish in and**

17        **around the San Francisco Bay and surrounding ocean areas."**

18        21.    The class is so broad and numerous that joinder of all members is

19    impracticable.  Although its exact number is unknown, it is estimated that there

20    are more than 1000 class members.

21        22.    Plaintiffs are members of the class, and their claims are typical of the

22    claims of all members.

23        23.    Plaintiffs will fairly and adequately protect the interests of all of the

24    class, and the interests of each are coincident and not antagonistic with those of

25    the remainder of the class.

26        24.    Plaintiffs are represented by counsel experienced with class and

27    complex litigation and in the prosecution of violations of law arising out of large

28    spread environmental pollution.

---

1    25.    There are common questions of law and fact common to the class in

2  relation to their claims against Defendants, including, but not limited to:

3    (a)    Whether the Defendants are strictly liable for the economic

4            damages caused to Plaintiffs and the class which are the direct

5            and legal result of the discharge of 58,000 gallons of bunker

6            fuel from the Ship under the Lempert-Keene-Seastrand Oil

7            Spill Prevention and Response Act, Gov't Code §§ 8670, *et*

8            *seq.*;

9    (b)    Whether the transport of 58,000 gallons of highly toxic bunker

10            fuel through the San Francisco Bay constitutes an ultra-

11            hazardous activity, and thus whether Defendants are strictly

12            liable for any harm flowing from such activity;

13    (c)    Whether Defendants were negligent, reckless, willful, wanton

14            or malicious in their conduct which resulted in the discharge

15            of 58,000 gallons of bunker fuel into and upon the San

16            Francisco Bay;

17    (d)    Whether Defendants have created a public and/or private

18            nuisance by causing or contributing to the discharge of 58,000

19            gallons of highly toxic bunker fuel into and upon the San

20            Francisco Bay and surrounding ocean areas;

21    (e)    Whether such violations of law are the direct and proximate

22            cause of the economic injuries suffered by the Plaintiffs and

23            the class;

24    (f)    Whether the wrongful acts and/or omissions of Defendants

25            warrant creation of a monetary fund for future monitoring,

26            testing, evaluation and assessment of the safety and/or fitness

27            of seafood caught for human consumption from the San

28            Francisco Bay and surrounding ocean areas; and

---

1          (g)      Whether injunctive or other equitable relief for the benefit of
2                   the class is appropriate.

3      26.    These and other common questions of law and fact predominate over
4  questions affecting only individual members.

5      27.    A class action is superior to other methods of adjudication for a fair
6  and efficient administration of this controversy.  Prosecution of these claims
7  within the procedural device of a class action will reduce the possibility of
8  repetitious litigation and conflicting results, while producing redress for claims
9  too small to support the expense of individual, complex litigation.

10     28.    Individual adjudications of class member claims, which would as a
11 practical matter be dispositive of the interests of other members not parties to the
12 action, might substantially impair or impede the ability of the absent members to
13 protect their interests, particularly in regard to claims against defendants for
14 punitive damages.

15     29.    Individual adjudications of class member claims would also create
16 the possibility of conflicting results, particularly on issues related to the
17 apportionment of fault and responsibility amongst the Defendants, and thus be
18 detrimental to the interests of the Defendants.

19 **V.    FACTS**

20     **A.    Timeline Of The Collision And Spill**

21     30.    On or about October 23, 2007, the Ship initiated its voyage from
22 Shanghai, China to Busan, South Korea; and thereafter to Long Beach,
23 California, arriving in Long Beach on November 3, 2007.  The Ship
24 subsequently sailed from Long Beach to Oakland, California, arriving in Oakland
25 the afternoon of November 6, 2007.

26     31.    On the morning of November 7, 2007, the Ship left Oakland to
27 return to Buson, South Korea, carrying 2,500 20-foot containers for the China

28

1  Ocean Shipping Company (COSCO), one of the world's biggest shipping
2  agencies headquartered in Shanghai, China.

3      32.    As COTA, Captain Mao, and the Ship's crew attempted to navigate
4  the Ship out of Oakland Harbor through the San Francisco Bay and into the open-
5  ocean, the Ship collided with the Delta Tower of the Bay Bridge, tearing a large
6  gash in its fuel tanks and discharging approximately 58,000 gallons of toxic
7  bunker fuel into and upon the Bay. This was the *first ever collision between a*
8  *vessel and a Bay Bridge tower* in the bridge's seventy-year history.

9      33.    The sequence of events culminating in the collision and Spill played
10 out over a fifteen-hour period on November 7, 2007 as set forth below (all times
11 are approximate):

12         (a)    6:00 a.m. – COTA boarded the Ship at berth 55, Oakland
13                 Inner Harbor. COTA at first decided the fog was too thick and
14                 waited for it to lift.

15         (b)    7:30 a.m. – COTA notified the Coast Guard Vessel Traffic
16                 Service that the fog had sufficiently lifted and he intended to
17                 sail. COTA told Vessel Traffic Service he intended to use the
18                 Delta-Echo span of the Bay Bridge. The Ship was assisted by
19                 the tug Revolution.

20         (c)    7:30 to 8:20 a.m. – The Ship's radar allegedly failed as the
21                 Ship was passing Yerba Buena Island in the fog. Defendant
22                 COTA was then allegedly forced to rely on an "electronic
23                 chart" and its interpretation by Captain Mao as to the center of
24                 the 2,210-foot Delta-Echo span through which the 131-foot
25                 Ship was to pass. During the interchange between Defendant
26                 COTA and the Ship's Captain, an incorrect heading was
27                 allegedly supplied directing the Ship *at Delta Tower*, instead
28                 of the center of the Delta-Echo span.

(d) 8:20 - 8:27 a.m. – The Coast Guard Vessel Traffic Service advised Defendant COTA that the Ship was off course. In an effort by Defendant COTA and/or the Ship's Captain and crew to quickly readjust course, the Ship smashed into the fender of Delta tower tearing a horizontal gash near the front of the Ship measuring 100 feet long, 12 feet wide and 3 feet deep.

(e) 8:30 a.m. – Defendant COTA reported to Vessel Traffic Service that the Ship had hit Delta Tower. The collision had ruptured two of the Ship's fuel tanks, and the bunker fuel contained therein poured out into the Bay. Neither Captain Sun nor Defendant COTA requested the services of private spill-containment operators for another hour.

(f) 8:52 a.m. – Personnel on a pilot boat sent from Pier 9 in San Francisco noticed that "a substantial flow of oil" was coming from the Ship.

(g) 9:03 a.m. – The Coast Guard dispatched its first vessel to the scene.

(h) 9:30 a.m. – Captain Mao finally contacted a private spill-containment operator for assistance cleaning up the discharged bunker fuel.

(i) 9:46 a.m. – The Marine Spill Response Corp. ("MSRC"), private spill-containment operator, dispatches its first vessel to the scene.

(j) 11:00 a.m. – Five MSRC skimming boats designed to contain and mop oil arrived on the scene.

(k) 12:15 p.m. – The Coast Guard reports the oil spill at 140 gallons based on information provided by the Defendants. The

1   Ship is moved to anchorage south of the Bay Bridge, trailing
2   an oil slick.
3       (l)    4 p.m. – Oil booms were set up at Aquatic Park and
4           Fisherman's Wharf in San Francisco.
5       (m)    4:49 p.m. – Contrary to earlier assessments provided by the
6           Defendants, the Coast Guard realizes the spill was
7           approximately 58,000 gallons.
8       (n)    8:58 p.m. – The Coast Guard notifies the public of the true
9           extent of spill.
10      34.    The graphic below, which appeared in the San Francisco Chronicle,
11  shows in stark contrast the correct course, as opposed to the actual course of the
12  Ship on the morning of November 7th.
13
14


**Off course**

This diagram shows the heading of the Cosco Busan at 235 degrees when the ship was contacted by the Coast Guard Vessel Traffic Service. The correct course from the Oakland Bar Channel to the channel between the D and E towers of the Bay Bridge is 310 degrees. The pilot turned the ship right to 280 degrees when he hit the D tower.

Sources: Chronicle reporting; ESRI, TeleAtlas              The Chronicle

**B.**    **Construction, Ownership, Management, Operation, And Control Of the Ship**

**1.    Construction Of the Ship**

35.    The Ship, built in 2001 by Hyundai Heavy Industries Ltd. Co. is a cargo ship, shown below in a picture which appeared in the San Francisco Chronicle.  Unlike modern tanker ships and other recently built cargo ships, the Ship's fuel tanks are arrayed along the sides of the ship behind a single hull, commonly called "winged" tanks.  In 2006, the International Maritime Organization, a United Nations agency, banned winged fuel tanks along the hull in ships being built or significantly modified beginning in 2010.  The agency determined that these container ships should not carry fuel directly behind a single layer hull, like that of the Ship. Instead, the new ships should have their fuel tanks located deeper inside the ship and behind two walls to make their puncture and subsequent discharge less likely.



2.    **Ownership, Leasing, Management, Operation, Charter, And Control Of the Ship**

36.    On December 19, 2001, Defendant HANJIN publicly announced that it had acquired the Ship in a 12-year charter from the German company Conti Rederei, and launched the ship under the name Hanjin Cairo.

37.    The Ship was subsequently re-christened the COSCO Busan.

38.    Shortly after the Spill, HANJIN issued a press release alleging: "Synergy Marine fully operates the ship as well as manages the entire crew including the captain . . . "

39.    On the day of Spill, Darrell Wilson, an employee of MTI Network, who claimed to be speaking on behalf of REGAL publicly alleged that the Ship was managed by Fleet Management Ltd. of Hong Kong and its crew and technical support was provided by Synergy Management Services of Hong Kong. Mr. Wilson said REGAL "is stepping up to the plate. It's their ship. They own it. It's fully insured."

40.    On November 10, 2007, REGAL issued a news advisory via PR Newswire, in which they acknowledged REGAL's designation as the "responsible party for the spill clean-up and response."

C.    **Bunker Fuel - The Contaminant Involved**

41.    Bunker fuel is also known as "heavy oil", "#6 oil", "resid", "Bunker C", "blended fuel oil", "furnace oil" and other often locally used names. Bunker fuel is technically any type of fuel oil used aboard ships. It gets its name from the containers (known as Bunker Tanks) on ships and in ports in which it is stored. The heavy fuel oil mainly consists of residual refinery streams from the distillation or "cracking units" in the refineries.

1.    **Toxicity Of Bunker Fuel**

42.    Bunker fuel is an extremely toxic substance. The heavy fuel oil making up the bulk of bunker fuel is classified as carcinogenic, harmful and

dangerous for the environment according to the European Union Dangerous Substances Directive.

43.    Bunker fuel contains polycyclic aromatic compounds ("PCA") which have been shown to cause anemia, disorders of the liver, bone marrow and lymphoid tissues in rats during dermal application.  Other organs and tissues that may be damaged from bunker fuel exposure are:  blood, kidneys, liver, central nervous system and the lens or cornea of the eye.  Additionally, it has been demonstrated that certain PCA components from the heavy fuel oil are found in the urine of persons who have been exposed to the heavy fuel oil on the skin.

## 2.    **Consequences of Bunker Fuel Spills**

44.    Because of its high toxicity, bunker fuel contamination can have an overwhelmingly detrimental effect on human and marine life with which it comes into contact.

45.    During spills, bunker fuel can release Hydrogen Sulfide which is a highly flammable gas which can be fatal to humans if it is inhaled at certain concentrations.  The exhaust fumes have been reported to be an occupational hazard due to NIOSH-reported potential carcinogenic properties.  Bunker fuel can cause irritation to the eyes, skin irritation and damage to the respiratory system.  Authorities advise people to avoid liquid mist and vapor contact because it can enter the lungs, causing prolonged damage and even death.  This mist can also be absorbed through the skin, and should be avoided at any cost.  In non-vaporized liquid form, bunker fuel is less easily absorbed in the skin but loses none of its toxic and carcinogenic properties.

46.    Spilled bunker fuel can also have a devastating effect on marine life.  Bunker fuel is significantly more toxic to marine life than the crude oil that was spilled in the Exxon Valdez case.  It is heavier than crude oil, and adheres to the bodies of marine life with which it comes into contact, with equal or greater force than crude oil.

47.     Jonna Mazet, drawing on results of her laboratory experiments and other research at the University of California, Davis, Veterinary School of Medicine, stated regarding bunker fuel and crude oil: "If you compare the two, bunker oil is more toxic." In particular, exposure to bunker fuel poses a significantly greater risk of damage to the reproductive systems of exposed marine life. Research also suggests that the toxic components of bunker fuel can be taken up the aquatic food chain, as prey pass contaminants to predators.

48.     The most obvious and immediate marine life victims of a bunker fuel spill are marine mammals and birds which come into contact with the fuel while it is floating on the water. Once in contact with spilled bunker fuel, their bodies can become coated with a thick layer of the toxic fuel. Over time, the fuel becomes stickier, or "weathers," causing it to adhere to exposed animals with greater strength. Because spilled bunker fuel can appear to some species of fish like floating food, they can be attracted to it which can result in their contact with it. This can further endanger sea birds, which are attracted to schools of fish and may dive through thick oil slicks to get to them.

49.     In addition to the long-term damage which the toxicity of bunker fuel can cause in birds and marine mammals are the short-term, often fatal effects of bunker fuel coating. The coating can significantly reduce or destroy the insulation and waterproofing properties of feathers and fur, leading to hypothermia. Coated birds can also become easier prey because of their diminished ability to fly caused by the coating. Moreover, when animals and birds ingest the oil by accident, which often happens while attempting to clean themselves, they often develop ulcers or bleeding in their stomachs. Further exacerbating the situation for such animals is the reduced availability of food sources which usually accompanies a spill.

50.     Less obvious are the deleterious effects on under water marine life which occur as the oil condenses, mixes with, and drops through the water layer

to the ocean floor. Documented effects have included: a decrease in the thickness of the fish eggs; damage to fish eggs, larvae and young fish; damage to estuaries, coral reefs, seagrass and mangrove habitats which are the breeding areas of many fish and crustaceans, interference with their breeding; and tainting of fish, crustaceans, molluscs and algae. Because of the heavy density of bunker fuel, a far greater amount generally sinks than lighter crude oil. This not only causes more of it to collect on the sea floor, but also allows for those parts which are water soluble to dissolve and disperse as opposed to evaporate into the atmosphere, as generally happens when lighter crude oil spills and forms longer-lasting slicks. As described in more detail below, crab, because of their feeding and reproductive habits are particularly susceptible to these dangers.

51.    An informative example of the impact which a large discharge of oil has on marine environments is the Exxon Valdez spill of 1989 off the coast of Alaska. Thousands of animals died immediately; the best estimates include: 250,000-500,000 seabirds; 2,800-5,000 sea otters; approximately 12 river otters; 300 harbor seals; 250 bald eagles; and 22 orcas; as well as the destruction of billions of salmon and herring eggs. Due to a thorough cleanup, little visual evidence of the event remains, but the effects of the spill continue to be felt today. In the long-term, reductions in population have been seen in various ocean animals, including stunted growth in pink salmon populations. Almost 19 years after the spill, a team of scientists at the University of North Carolina have found that the Exxon Valdez spill effects are lasting far longer than expected. The team estimates some shoreline habitats may take up to 30 years to recover.

52.    Though smaller than the Exxon Valdez spill, because of the greater toxicity and density of bunker fuel than crude oil, the Spill may have an even greater long-term impact on San Francisco Bay marine life.

**D.    Extent Of Damages To Plaintiffs And The Class**

     **1.    The San Francisco Bay Area Dungeness Crab Fishery**

          **a.    Development Of The Fishery**

53.    The Dungeness crab, along with its smaller relatives the rock crabs, have always been plentiful along the pacific coast. However, it wasn't until the early twentieth century that an anonymous enterprising fisherman, in the small fishing village of Dungeness, Washington at the tip of the Olympic Peninsula, decided to catch and sell the big meaty crabs.

54.    In a matter of a few years, the prolific Dungeness crab became one of the premier commercial fisheries on the west coast. Shortly after the turn of the century, Sicilian fishermen began plying the waters outside San Francisco's golden gate bridge in search of the Dungeness crab. The men would fish the tides during the day then return in time to sell their crabs at the Meiggs wharf wholesale market. Fishmongers from the teeming Chinatown markets, Onataro's in the Fillmore and the popular Crystal palace in the mission, renown for its four giant fish markets, all gathered at Meiggs wharf around midnight to vie for the days catch. The area known as Meiggs wharf was set aside by state legislature in 1925 for the sole use of the fishermen in the city, it then became known as Fisherman's Wharf as it is called today.

55.    The newly founded crab fishery was a welcome boon to once poor fishermen, even the great depression and the infamous San Francisco crab war of the 1930's when crab sold for 5 cents, each was ameliorated by the seemingly endless demand of crabs. As time passed, some fishermen began to sell their catch directly to the public from their boats or they set up small stalls on the sidewalk. The Dungeness crab became the gold of the 1920's, 30's and 40's.

56.    By 1940 with the implementation of the modern day crab pot and larger, diesel powered boats the crab catch rose dramatically. *There seemed to be and endless profusion of crabs, fortunes were made and Fisherman's Wharf,*

*San Francisco was propelled to national prominence as the capital of the Dungeness crab.* The Dungeness crab created an unforgettable scene which attracted visitors from around the world.

57.    The Port of San Francisco became the center of Northern California's fishing industry and home to most of the Bay Area's leading commercial seafood companies. The Fisherman's Wharf Processing Center, located at Pier 45, supplies the highest quality seafood to local, regional and world markets and serves as a model for modern fish processing facilities throughout the United States.

58.    Looking at the 2006 California Department of Fish and Game statics for crab landings alone at the San Francisco Port and others affected by the Spill make clear the productivity of the Bay Area's fisheries.

| PORT | SPECIES | POUNDS | VALUE |
|------|---------|--------|-------|
| San Francisco | Dungeness Crab | 2,249,814 | $4,385,813 |
| Princeton-Half Moon Bay | Dungeness Crab | 1,477,999 | $3,063,763 |
| Berkeley | Dungeness Crab | 8,769 | $21,525 |
| Sausalito | Dungeness Crab | 9,975 | $26,046 |
| Emeryville | Dungeness Crab | 5,686 | $14,299 |
| Alameda | Dungeness Crab | 12,262 | $23,897 |
| Oakland | Dungeness Crab | 8,713 | $15,809 |
| **TOTAL** | | **3,773,218** | **$7,551,152** |

### b.    San Francisco Dungeness Crab Season

59.    Much of catching and selling of Dungeness crab each year in the San Francisco Bay Area occurs in the first two weeks of the season. Dungeness crab season is usually from mid-November to mid-June. This year, the Dungeness crab season officially opened November 15th in San Francisco Bay. There is always a host of activity on the opening day of the season. Visitors come from all over the globe for some of the best crab on the West Coast, the best crab

restaurants in the US, and some of the world's best crab markets and crab festivals. The crab season is a source of income for many parts of San Francisco.

60.    The streets of Chinatown, for instance, are swarming with grocery stalls that sell live fish during crab season along with some of the most freshly-caught crab. San Francisco also plays host to the country's best crab festivals. The San Francisco Crab Festival and Fisherman's Wharf Crab Festival are both well-established celebrations. The North Beach Crab Crawl gives the city's crab an Italian flavor. The Union Square Crab Fest is well-known for attracting A-list celebrities and offering world-class seafood restaurants.

61.    About 150 boats set out from San Francisco, Half Moon Bay and Bodega Bay minutes after owners agree on a price with the processors. In the tradition of their ancestors, crabbers equipped with 100-300 crab traps or pots are set out. Each 90-pound trap will be baited with squid and/or mackerel, dropped to the ocean floor and marked by buoys. When the first catches of the season are brought in, you see thousands of pounds of crabs waiting to be unloaded.

62.    For Bay Area crab fishermen the first 15 days of the season, from November 15th to December 1st are by far the most important economically. In this short period, the fishermen not only pull in fully 80% of their total annual catch, they also receive a significant premium in price. Crab on Thanksgiving is a San Francisco Bay tradition, and people in the area are willing to pay more for crabs at this time, especially after not having them since June. What's more, the crab fisheries north of Mendocino don't open until December 1st which puts further pressure on supply and increasing the price.

c.    **Immediate Effects Of The Oil Spill On The Dungeness Crab Fishery**

63.    Following the Spill, crabbers stayed off the water amid health concerns. Crab buyers at Fisherman's Wharf refused to buy crab based on crab market concerns over the public health risk of crabs contaminated with bunker fuel from the Spill. Max Boland, director of sales at Alber Seafoods, a wholesaler

on the wharf, said, "It just takes one crab and you'll have a problem. It's a lawsuit waiting to happen." Assemblyman Mark Leno, D-San Francisco said, "It's extremely disappointing and I think potentially reckless . . . I don't want to be an alarmist, but we don't know for certain that this is safe."

64.    Public concern over the safety of local crab was exacerbated by wording of the Executive Order signed by Governor Arnold Schwarzenegger soon after the Spill which prohibits the operation of holding tanks that pump in water within the closed fishing area, which includes all of San Francisco Bay. Nearly all local crab boats use live-well holding tanks. Thus, the order effectively prohibits crab fishermen from offloading their catch to the wholesalers in San Francisco, regardless of where the crabs were caught. The impact of this calamity is graphically depicted in the photograph below which reveals a graveyard of crab pots abandoned by fishermen in a parking lot adjacent to Pillar Point Harbor.



1
#### d.  Long-term Effects On The Dungeness Crab Fishery

2    65.    The San Francisco Bay, however, is not only important to crab and

3  other fishermen as place to catch and sell fish.  It is also fundamentally important

4  for fishermen's future livelihoods, supplying the fish which fishermen depend on

5  in the future.  The Spill severely threatens the Bay's functionality in this regard,

6  and thus the future livelihoods of Bay areas fishermen who depend upon it.

7    66.    Of all the estuaries on the Pacific Coast - of North and South

8  America - none is as important biologically as San Francisco Bay.  It is the

9  gateway between the Sierras, provides spawning habitat for Pacific herring, and is

10  *the largest nursery area for Dungeness crab* in a broad area of the coast.

11    67.    Dungeness crabs mate from spring through fall.  Fertilization of the

12  egg does not occur at the time of the mating.  The female crab stores the sperm

13  until her eggs are fully developed.  The eggs are fertilized when the female

14  extrudes them under her abdomen where they are carried until hatching.  A large

15  female crab can carry 2.5 million eggs.

16    68.    After hatching, young crab are planktonic, or free swimming, in the

17  water column for about four months, when they pass through five larval stages,

18  known as "zoea."  These shrimp-like larvae are primarily transported by currents

19  throughout the entire bay.  In the next and last larval stage, termed the

20  "megalops," the larva becomes more recognizable as a young crab, with claws

21  and legs, but still with a shrimp-like abdomen.  It takes about 2 years for a crab to

22  reach maturity after a megalopae settles to the bottom and moults to a juvenile

23  crab.  Females become mature at a shell-width of about 90mm, while males reach

24  maturity at a shell-width of about 150mm.  Males reach legal size (165mm, or 6.5

25  inches, in shell-width) after a little over 2 years.  After maturing, females grow

26  slower because most of their accumulated energy is being devoted to egg-

27  production rather than body growth.  California state law only allows the

28  commercial and sport catching of male Dungeness crabs.

69.     The Spill threatens to become a poison pill for the species, as the bunker fuel which is not cleaned from the surface or pulled out to sea becomes neutrally buoyant or breaks down and sinks to the bottom of the Bay and into the Dungeness crab nursery.

70.     Many predict that crab, as well as shrimp, clams, oysters and other molluscs, which come into contact with the bunker fuel will die quickly from acute toxicity and/or tainting of the flesh. Not only does this threaten the adult male crabs which would have been otherwise available for fishermen to catch. It also severely threatens future generation of crabs.

71.     At the most immediate level, it can be expected that many of the more vulnerable immature crabs which have not yet developed a hard outer shell will be quickly killed, eliminating crabs that otherwise would have been available for harvest in the coming one to two years. It can also be predicted that mature, egg-carrying females will also be among those killed, eliminating with them the often millions of eggs (and thus future crabs) which they carry.

72.     Less directly, with each death of a mature female crab, the breeding stock for future generations is severely diminished. Dungeness crab males will often breed with several females in a season. Accordingly, by law, only males may be caught by commercial and port fishermen, thereby protecting the productivity of the fishery. A massive die off of the female Dungeness crab in the Bay could destroy this balance. Furthermore, as discussed above, bunker fuel has been demonstrated to cause reproductive harm in marine life exposed to it, additionally threatening the future of the Bay's Dungeness crab fishery.

73.     Finally, the long-term risks of the Spill to the Bay's Dungeness crab population is exacerbated by their eating habits. Crabs are described as "opportunistic omnivores," meaning that they eat almost anything they can catch, and will attempt to feed on oil, oiled prey, and oiled sediments. Thus, even though heavy oils are not normally considered to be biologically available to most

1  marine organisms, the benthic scavenging of crabs put them at greater and

2  continuing risk from the effects of the Spill.

3          **2.    The San Francisco Bay Area Flat Fish Fishery**

4          74.    The Spill is also expected to have a huge impact on flat fish,

5  including species more commonly known as Petrale, English sole, Skate, and

6  Sand Dabs, all of which are bottom-feeding fish.  Much of the high density

7  bunker fuel is expected to sink, smothering and killing the bottom feeders and

8  their food.  Furthermore, as it sinks, the water soluble elements of the fuel, which

9  generally would evaporate from a slick caused by the spill of a lighter density oil,

10  will likely dissolve.  This would further exacerbate the Spill's impact on water-

11  column organisms, such as flat fish:  bunker fuel is often high in aromatics, which

12  is the primary source of both acute and chronic toxicity to aquatic organisms, and

13  many of these aromatics are water soluble.

14          **3.    Other Fisheries Of The San Francisco Bay**

15          75.    The Spill is also likely to have severe short and long-term effects on

16  other fisheries of the San Francisco Bay.  The San Francisco Bay fishery is the

17  largest for herring south of British Columbia and is presently the United States'

18  only "urban commercial fishery."  During the herring season, herring boats can be

19  seen near the shores of Sausalito, along the walkways of the Embarcadero and

20  near the Emeryville mudflats.

21          76.    San Francisco Bay herring spawn around the quarter moon, when

22  there is the least swing in height between the low and high tides.  The females

23  swim in with approximately 45,000 eggs in their bellies until they are able to

24  release them on the now sticky surface.  Because of the sheen of the bunker fuel

25  that is now spread throughout the surface of the ocean, a vast majority of the eggs

26  will be killed off before they are even given a chance to hatch.

27          77.    Furthermore, herring are particularly sensitive to environmental

28  factors, which play a much greater role in determining the size of their schools

than the success of the fishing fleets.

78.    More than 4,000 tons of herring are pulled out of the Bay each year with a market value to fishermen of about $2.7 million annually. Herring caught off the California coast can net as much as $10 million in annual gross profits for the fishing industry.

79.    As a result of the Spill, the livelihoods of fishermen who depend on this fishery are also at risk.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### (Strict Liability - Lempert-Keene-Seastrand Oil Spill Prevention Act, Gov't Code §§ 8670 et seq.)

80.    Plaintiffs hereby incorporate by reference all paragraphs above as if fully set forth in detail herein.

81.    Defendants REGAL, HANJIN, SYNERGY, and/or Does 1-50, at the time of the Ship's collision with the Bay Bridge and discharge of 58,000 gallons bunker fuel into the San Francisco Bay, were the owners, operators, lessees, and/or charters by demise of the Ship.

82.    Defendants REGAL, HANJIN, SYNERGY, and/or Does 1-50, are "responsible parties," under Gov't Code § 8670.3(w), and therefore "absolutely liable without regard to fault for any damages incurred by any injured party which arises out of, or are caused by, the discharge or leaking of oil into or onto marine waters." Gov't Code § 8670.56.5.

83.    The San Francisco Bay and surrounding ocean areas are "marine waters." Id., § 8670.3(i).

84.    The bunker fuel discharged by the Ship into the San Francisco Bay is "oil," as used in § 8670.56.5. Gov't Code § 8670.3(n).

85.    The contamination legally caused by the discharge of bunker fuel by the Ship into or upon the San Francisco Bay injured, destroyed, and/or caused to be lost, natural resources on which Plaintiffs and the class depend for their livelihood, including but not limited to, the local populations of Dungeness crab,

flat fish, herring, and salmon. Plaintiffs and the class dependence on these natural resources constitute at least 25% of their earnings during the respectively applicable seasons for such resources.

86. The injury, destruction and loss of these natural resources has caused Plaintiffs and the class to lose profits, and will cause future losses of profits by Plaintiffs and the class and/or impairment of their earning capacities.

87. The injury, destruction and loss of these natural resources has also caused, and will cause, Plaintiffs and the class losses of net profits.

88. The discharge of bunker fuel by the Ship into the San Francisco Bay has also caused Plaintiffs and the class economic losses in the form of the costs and expenses of actions taken by Plaintiffs and the class to test, evaluate, access and/or monitor the extent of the contamination of the San Francisco Bay and surrounding marine area in order to determine the extent of any contamination to marine life, including but not limited to, Dungeness crabs, flat fish, herring, and salmon, and/or the safety and fitness for human consumption of such marine life.

89. The likely long-lasting effects of the contamination of the discharge of bunker fuel into the San Francisco Bay by the Ship on the marine life on which Plaintiffs' and the class' livelihoods depend, especially but not limited to, the Dungeness crab, flat fish, herring, and salmon populations, requires that Plaintiffs and the class continue future monitoring and testing activities in order to ensure that such marine life is not contaminated and is safe and fit for human consumption.

90. In doing the acts herein alleged, Defendants, and each of them, acted willfully, wantonly, with oppression, fraud, and/or malice, and with a conscious disregard of the rights and safety of others, such that Plaintiff requests that the trier of fact, in the exercise of its sound discretion, award Plaintiff additional damages for the sake of example and sufficient to punish said Defendants for their despicable conduct, in an amount reasonably related to Plaintiff's actual damages and Defendants' wealth, yet sufficiently large enough to be an example

1    to others and to deter Defendants and others from engaging in similar conduct in

2    the future.

3            WHEREFORE, Plaintiffs pray for relief as set forth below.

4                          **SECOND CAUSE OF ACTION**

5                  **(Strict Liability - Ultra Hazardous Activity)**

6            91.    Plaintiffs hereby incorporate by reference all paragraphs above as if

7    fully set forth in detail herein.

8            92.    Defendants REGAL, HANJIN, SYNERGY, COTA and/or Does 1-

9    50, in transporting approximately 1 million gallons of highly toxic bunker fuel

10   through the San Francisco Bay, were engaged in an abnormally dangerous and

11   ultra-hazardous activity.

12           93.    Defendants' conduct served as a direct and legal cause of the

13   discharge and dispersion of 58,000 gallons of bunker fuel from the Ship into the

14   San Francisco Bay and surrounding ocean areas, which is the kind of harm to be

15   anticipated as a result of the risk created by the ultra hazardous activity.

16           94.    As a direct and/or legal result of the wrongful acts and/or omissions

17   of the Defendants, and each of them, Plaintiffs have suffered and/or will suffer

18   significant past and future economic loss, including but not limited to, injuries

19   flowing from:

20           (a) Plaintiffs inability to harvest and sell Dungeness crabs during the most

21           productive and lucrative period of the 2007-08 Dungeness crab season;

22           (b) the reduced physical size and quantity of future populations of

23           Dungeness in the San Francisco Bay area as a result of destruction of, and

24           injury to, San Francisco Bay Dungeness crab estuary;

25           (c) the damage done to populations of other commercial fish species,

26           including but not limited to flat fish, herring, and salmon, affected by

27           contamination of San Francisco Bay caused by the discharged bunker fuel;

28

(d) the damage done to short, middle, and long-term reputation of San Francisco Bay fishery resulting from the public perception of contamination to the fishery and related safety of fish caught there; and (e) the cost already incurred, and to be incurred in the future, in order to monitor the effects of the contamination of the San Francisco Bay and surrounding ocean areas on marine species, including, but not limited to, Dungeness crab, flat fish, herring, salmon, in order to ensure their safety and fitness for human consumption.

95.     As a direct and legal cause of the Defendants wrongful acts and/or omissions herein above set forth, Plaintiffs and/or the class have suffered and will suffer economic harm, injury, and/or losses as herein above set forth.

96.     The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as herein above set forth.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CAUSE OF ACTION

### (Negligence)

97.     Plaintiffs hereby incorporate by reference all paragraphs above as if fully set forth in detail herein.

98.     Plaintiffs are informed and believe, and thereupon allege that at all times prior to the collision, the Spill, and the imediate aftermath Defendants HANJIN, REGAL, SYNERGY, COTA, and/or DOES 1-50 negligently, carelessly and/or unlawfully owned, operated, controlled, managed, leased, loaned, borrowed, bailed, chartered, and/or maintained the Ship so as to cause the collision, the Spill and subsequent events herein above described, and legally caused the economic harm, injury, and/or damage to Plaintiffs and/or the class which are herein above set forth.

99.     The acts and omissions of the Defendants described herein were also in violation of various California state laws including but not limited to: (a) the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Gov't Code §§

8670, *et seq.*; (b) the Porter-Cologne Water Quality Control Act, Cal. Water Code §§ 13000, *et seq.* Defendants' violations of these statutes directly and proximately caused, and will cause, injury to Plaintiff and the class of a type which the statutes are intended to prevent. Plaintiff and the class are of the class of persons for whose protection these statutes were enacted.

100.   As a direct and legal cause of the Defendants' wrongful acts and/or omissions, Plaintiffs, the class and the environment have suffered and will suffer as set forth hereunder.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FOURTH CAUSE OF ACTION

### (Negligent Entrustment)

101.   At all times herein mentioned, Defendants HANJIN, REGAL, SYNERGY, COTA, and/or DOES 1-50 negligently, wantonly, carelessly and/or reckless hired, retained, supervised, trained, and/or entrusted the Ship to one another, for the purpose of transporting cargo aboard a container ship filled with bunker fuel through the San Francisco Bay.  Thereafter, the Defendants, and each of them, controlled, navigated, and/o managed the Ship with the knowledge, consent, permission, and/or within the scope of authority confered by Defendants, and each of them.

102.   Plaintiffs are informed and believe that Defendants, and each of them, were at all times mentioned incompetent and unfit to safely own, operate, manage, maintain, lease, charter, or otherwise control the Ship for transport of cargo within the San Francisco Bay.

103.   As a direct and legal cause of the Defendants wrongful acts and/or omissions herein above set forth, Plaintiffs and/or the class have suffered and will suffer economic harm, injury, and/or losses as herein above set forth.

104.   The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as herein above set forth.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FIFTH CAUSE OF ACTION

### (Public Nuisance - Civ. Code §§ 3479 *et seq.*)

105.   Plaintiffs hereby incorporate by reference all paragraphs above as if fully set forth in detail herein.

106.   Defendants, and each of them, have created a condition that affects a substantial number of individuals similarly situated to the Plaintiffs; and a condition which would reasonably annoy and disturb an ordinary person.

107.   The seriousness and/or gravity of the harm out weighs the social utility of Defendants' conduct.

108.   Plaintiffs and/or the class suffered harm and injury to their economic livelihood, which they did not consent to and which is different from the type of harm which is suffered by the general public.

109.   The above acts and omissions also created a public nuisance vis-a-vis the Plaintiffs and the class, interfering with the property rights of Plaintiffs and the class, and rights incidental to those property rights.

110.   The acts and omissions of the Defendants described herein were also in violation of various California state laws including but not limited to: (a) the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Gov't Code §§ 8670, *et seq.*; (b) the Porter-Cologne Water Quality Control Act, Cal. Water Code §§ 13000, *et seq.* Defendants' violations of these statutes directly and proximately caused, and will cause, injury to Plaintiff and the class of a type which the statutes are intended to prevent. Plaintiff and the class are of the class of persons for whose protection these statutes were enacted.

111.   As a direct and legal cause of the Defendants wrongful acts and/or omissions herein above set forth, Plaintiffs and/or the class have suffered and will suffer economic harm, injury, and/or losses as herein above set forth.

112.   The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as herein above set forth.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SIXTH CAUSE OF ACTION

### (Private Nuisance - Civ. Code §§ 3479 *et seq.*)

113. Plaintiffs hereby incorporate by reference all paragraphs above as if fully set forth in detail herein.

114. The above acts and omissions also created a private nuisance vis-a-vis the Plaintiffs and the class, interfering with their use and enjoyment of private property rights and rights incidental to those property rights.

115. As a direct and legal cause of the Defendants wrongful acts and/or omissions herein above set forth, Plaintiffs and/or the class have suffered and will suffer economic harm, injury, and/or losses as herein above set forth.

116. The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as herein above set forth.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SEVENTH CAUSE OF ACTION

### (Declaratory Relief And Request for Monitoring of Contamination)

117. Plaintiffs hereby incorporate by reference all paragraphs above as if fully set forth in detail herein.

118. As a direct and legal result of the acts and omissions of the Defendants, causing or allowing or contributing to the discharge of 58,000 gallons of highly toxic bunker fuel into the San Francisco Bay and surrounding ocean areas, Plaintiffs have been denied the ability to assure themselves and consumers of fish caught in the San Francisco Bay and surrounding ocean areas of the short, middle, and long-term safety and fitness for human consumption of fish caught in the San Francisco Bay and surrounding ocean areas, including, but not limited to, Dungeness crab, herring, flat fish and salmon. This inability to assure themselves and fish consuming public of the safety and fitness for human consumption of fish caught in the San Francisco Bay and surrounding ocean areas has caused, and will cause, severe economic injury to Plaintiffs and the class, who

depend on the sale of fish caught in the San Francisco Bay and surrounding ocean areas for significant portions of their livelihoods. Monitoring and testing procedures exist which make the detection and evaluation of marine life contamination and the safety and fitness of such marine life for human consumption possible and beneficial.

119. Assuring the safety and fitness for human consumption of fish caught in the San Francisco Bay and surrounding ocean areas, including but not limited to, Dungeness crabs, herring, flat fish, and salmon, and thereby repairing and maintaining the short, middle, and long-term reputation of the fisheries of the San Francisco Bay and surrounding ocean areas can only be accomplished by the creation of a marine life contamination monitoring fund to provide a marine life contamination monitoring program, including:

    (a)    Periodic and regular sampling and testing of fish caught in the San Francisco Bay, including, but not limited to, Dungeness crab, herring, flat fish, and salmon by an independent and qualified testing entity; and

    (b)    Widespread publication and dissemination of the results of such sampling and testing to the fish consuming public.

120. Plaintiffs and the class have no adequate remedy at law in that monetary damages alone do not compensate for the continuing nature of the harm to them, and a monitoring program which assures Plaintiffs, the class, and the fish consuming public of the safety and fitness for human consumption of fish caught in the San Francisco Bay and surrounding ocean areas can prevent greater injury to the fish consuming public and the reputations of the fisheries of the San Francisco Bay and surrounding ocean area and serve to repair and maintain those reputations.

121. Without a court-approved monitoring program and a declaration of the rights of the Plaintiffs and the class to such a monitoring program, the safety and fitness for human consumption of fish caught in the San Francisco Bay and

surrounding ocean areas cannot be assured and the reputation with the fish consuming public of the fisheries of the San Francisco Bay and surrounding ocean areas cannot be repaired or then subsequently maintained.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

1.    Enter an order certifying the class requested by Plaintiffs;

2.    Enter a judgment in favor of Plaintiffs and the class, against defendants, jointly and severally, for economic damages sustained by them by reason of Defendants' unlawful conduct;

3.    Enter a judgment awarding Plaintiffs and the class punitive damages for Defendants' willful, reckless and wanton acts;

4.    Enter a judgment in favor of Plaintiffs and the class, against defendants, jointly and severally, for the creation of a fund to monitor contamination of marine life in the San Francisco Bay and surrounding ocean areas in order to assure the safety and fitness for human consumption of fish caught in the San Francisco Bay and surrounding ocean areas;

5.    Award Plaintiffs and the class pre-judgment and post-judgment interest, costs, expenses, including the costs of retaining expert witnesses, and attorneys' fees in this action; and

6.    Grant such other relief as this Court may deem just and equitable.

DATED: November 20, 2007          COTCHETT, PITRE & McCARTHY

By _____
          FRANK M. PITRE
          *Attorneys for Plaintiffs*

1

## JURY DEMAND

2

Plaintiffs demand trial by jury on all issues so triable.

3

4

DATED: November 20, 2007          COTCHETT, PITRE & McCARTHY

5

6

By_____

7

FRANK M. PITRE

8

*Attorneys for Plaintiffs*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**                                    34

# Exhibit B

# Hudson
Marine · Environment · Safety & Security

December 5, 2007

Dear

We are writing to confirm your recent request to submit a claim relating to the discharge of oil from vessel M/V COSCO BUSAN on or about November 7, 2007, in the San Francisco Bay near the San Francisco Bay Bridge.

**A claim has been opened on your behalf and you have been assigned Claim No.** In a few instances during the initial stages of the spill, multiple reporting of the same damage and/or site by varying entities occurred, which resulted in the possibility of more than one Claim Number being assigned for the identical case. Consequently, the Claim Number above may differ from that which you were initially, verbally provided. Accordingly, please ensure that any and all correspondence, documents, photographs, etc., you submit to us in support of your claim, has the above Claim Number clearly referenced on it.

We kindly ask that you fill out the attached Claims Confirmation Form (as applicable to your particular claim), sign it, and return it to the address provided below as soon as possible to confirm our information on record. Please attach any additional information that you believe is pertinent to your claim. Even if you feel you have already provided us this information verbally, we ask that you provide it again to help expedite the processing of your claim.

In order to verify your claim and ensure all supporting data and documentation is of record we respectfully request you provide us with copies of the following (as applicable to your claim):

- Any photographs taken of the damage property such as oiled beaches, shoreline, piers, docks, bulkheads and seawalls, equipment, etc.; or in cases involving vessels, pictures of the affected hulls, mooring attachments and fenders, etc.
- Records substantiating delays, detainments, demurrage, and loss of business and/or revenue such as log entries, letters, written cancellations, and/or closures.
- Invoices supporting incurred operating costs and expenditures.
- Any other supporting and/or amplifying documentation, you believe is relevant to your claim.

Upon receipt of your fully executed Claims Confirmation Form and relevant documents, we will contact you to advise you of the next step in our claim process.

Should you have any questions or concerns, do not hesitate to contact us at our toll free claims number (866-442-9650). We thank you for your patience and we will do our best to expedite your claim as quickly and efficiently as possible.

Kind regards,


**Hudson Marine Management Services**
Claims Department
On behalf of the Insurer for the M/V COSCO BUSAN

Enclosure:  Claims Confirmation Forms

## PREPAYMENT ADVANCE FORM

CLAIMANT _____

COBU _____
CLAIM NUMBER

1. Proof of Boat/Business Ownership

_____

2. SSN or TIN

_____

3. Does Claim include Captain & Crew (Yes / No)
If yes, all names, addresses, SSN obtained? Use back
If necessary

_____

4. Photo ID

_____

5. Calif. F&G tickets for last 5 years obtained
for SF sector

_____

If advance payment on exception basis is requested, please provide all factors for request

```
┌─────────────────────────────────────────┐
│                                           │
│                                           │
│                                           │
│                                           │
│                                           │
└─────────────────────────────────────────┘
```

I hereby agree to use this process to resolve my past and present claims only as it relates to my
claimed past and present lost revenue due to the oil spill of November 7, 2007. I also
acknowledge this prepayment will be credited against any further amounts. If any.

Dated: _____        Signed _____