William M. Audet (waudet@audetlaw.com)
Michael McShane (mmcshane@audetlaw.com)
Adel A. Nadji (anadji@audetlaw.com)
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco CA 94105
Telephone: 415.982.1776
Facsimile: 415.568.2556

*Attorneys for Plaintiffs and
the Class Members*

# UNITED STATES DISTRICT COURT FOR

# THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Allen Loretz, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>Regal Stone, Ltd., Hanjin Shipping, Co., Ltd., Synergy Maritime, Ltd., Fleet Management Ltd., and John Cota, *In Personam*; M/V Cosco Busan, their engines, tackle, equipment, appurtenances, freights, and cargo *In Rem*,<br><br>     Defendants. | Case No. C 07-5800 SC<br>And related cases:<br><br>07-6045 SC, 08-2268 SC, 08-2052 SC, 08-5098 SC, 09-01469 SC<br><br>**DECLARATION OF WILLIAM M. AUDET IN SUPPORT OF MOTION FOR FINAL APPROVAL OF DUNGENESS CRAB SETTLEMENT AND CLASS COUNSELS' MOTION FOR AWARD OF ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS TO THE NAMED PLAINTIFFS** |

I, William M. Audet, declare as follows:

1.     I am an attorney licensed to practice before all of the Courts of this State and am admitted to practice before the Northern District of California.  I am the founding partner at the firm Audet & Partners, LLP ("Audet & Partners") counsel for Plaintiff Allen Loretz, individually and on behalf of all others similarly situated.  I have personal knowledge of the matters stated herein and if called as a witness, I could and would competently testify to the following:

2.     Audet & Partners' practice focuses on complex and class action litigation involving product liability, consumer, employment, financial, securities, environmental, and

1   personal injury matters.  I served as a staff attorney at the Ninth Circuit Court of Appeals.

2   Subsequently, I had the honor to serve as a Law Clerk to the Honorable Fern M. Smith (Judge of

3   the United States District Court for the Northern District of California), and as a Law Clerk to

4   the Honorable Alfonso J. Zirpoli (Judge of the United States District Court for the Northern

5   District of California).

6        3.        Audet & Partners' has extensive experience in the litigation, trial and settlement

7   of class actions in complex economic injury cases.  I have been honored to obtain Court-

8   appointments in a number of similar class actions, including but not limited to: *In re Menu/Pet*

9   *Food Recall Litigation*, MDL No. 1850 (Co-lead Counsel); *In re Planet Toys Recall*, Case No.

10  08-0592; *In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation*,

11  MDL No. 1699 (Plaintiff Steering Committee); *In re Zyprexa Product Liability Litigation*, MDL

12  No. 1596 (Executive Committee); and, *In re Ancure Product Liability Litigation*, N.D. Cal.

13  Master File No: C-03-2774 (Lead Counsel).  Attached hereto as Exhibit 1 is a true and correct

14  copy of Audet & Partners' current firm resume, showing some of the firm's experience in

15  complex and class action litigation.

16       4.        I am the co-author of Handling Federal Discovery (9th Ed.)(James Publishing

17  Company) and was named as the 2005 Champion of Justice by the San Francisco Bar

18  Association (legal foundation) for contributions to the legal community and my *pro bono*

19  activities.

20       5.        The resumes of Class counsel evidence the firm's extensive experience in

21  litigating and resolving complex class and consumer lawsuits.  (*See*, Exhibit 1 attached; *see also*

22  Declaration of Frank M. Pitre in Support of Joint Motion for Final Approval of Settlement, Ex. 1

23  and 2, filed herewith).

24  **<u>Introduction</u>**

25       6.        I am submitting this Declaration in support of Class Counsels' Motions for Final

26  Approval of Dungeness Crab Settlement and for Award of Attorneys' Fees, Costs, and Service

27  Award to the Named Plaintiffs in connection with services rendered in the above-captioned

28  action.

**DECLARATION OF WILLIAM M. AUDET IN SUPPORT OF
MOTION FOR FINAL APPROVAL OF DUNGENESS CRAB SETTLEMENT**

7.     This Declaration sets forth a brief summary of the basis for and background of this Action, and the negotiations that ultimately led to the settlement. Although the following recitation is not all-inclusive, it is intended to illustrate the nature of this action, the efforts expended in its prosecution, and the additional efforts required and risks that would have been present if the action were not settled. We believe these facts demonstrate that the settlement is fair, reasonable and adequate, and should be approved by the Court. These facts further support Settlement Class Counsel's fees, costs, and expenses request filed concurrently with this Declaration. The request for fees, costs and expenses is reasonable and should be approved.

**Procedural History**

8.     This case was filed on This case was filed on November 11, 2007 in this Court on behalf of a class defined as: "[a]ll  commercial fishing operations, including but not limited to crab fishermen, herring fishermen, salmon fishermen, bottom trawl fishermen, shellfish producers, seafood processors, vendors, truckers, unloaders and other distributors of seafood products, and  recreational charter vessel operations and marinas, who have been injured, or otherwise financially harmed, as a result of the COSCO BUSAN Oil Spill of November 7, 2007."  Verified Second Amended Complaint, ¶ 29.  (*See also* Declaration of Frank M. Pitre in Support of Joint Motion for Final Approval of Settlement, regarding the *Tarantino* action filed in the Superior Court of San Francisco).

9.     The federal Complaint was subsequently amended on November 19, 2007 and July 29, 2008.  Attached hereto as Exhibit 2 is a true and correct copy of the Second Amended Complaint in the Federal Action, originally titled *Chelsea, LLC, et al. v. Regal Stone, Ltd., et al*; case no. C-07-5800-SC.

10.     Attached hereto as Exhibit 3 is a true and correct copy of the Second Amended Complaint in the State Action, titled, *John Tarantino, et al. v. Hanjin Shipping Co., Ltd., et al*., case no. CGC-07-469379.

11.     Plaintiffs and Settling Defendants signed a Memorandum of Understanding ("MOU") on October 1, 2009, outlining the terms of the Dungeness Crab Settlement and agreeing to submit the issues of attorneys' fees and costs to the Court.  This Settlement resolves

all Dungeness Crab Settlement Class Claims that were asserted in *Loretz* and *Tarantino* on behalf of the Dungeness Crab Settlement Class Members.  The remaining claims asserted in *Loretz* and *Tarantino* will continue to be prosecuted through *Tarantino* case.

12.    Plaintiffs and Settling Defendants signed the settlement agreement on March 17, 2010.

**Investigation and Discovery**

13.    I began investigating the claims set forth in the Plaintiffs' Complaints on the same day of the oil spill ("CBOS").  I immediately contacted several maritime consultants specialized in the maritime and oil spill related issues.  I have worked diligently for over two-and-a-half years to reach a fair and reasonable settlement of the Class Members' claims.

14.    Based on the consultants' advice, Class Counsel sought and obtained a Court order authorizing issue of warrant of arrest for the *Cosco Busan*.  This warrant helped insure that that all commercial fishery claims are protected after the Ship left the jurisdictional waters of the United States.

15.    Before the settlement discussions began, and during the entire course of discussions I expended significant time, effort and resources developing the case regarding both liability of Settling Defendants and the extent of damages suffered by putative Class Members.

16.    In addition to retaining and utilizing several consultants, during the formal and informal discovery process, Plaintiffs obtained and reviewed documentary information and written discovery responses from Settling Defendants.  The thousands of pages provided by Settling Defendants included information relied upon in preparing Plaintiffs' damages calculations, information relating to the events leading up to CBOS and internal documents regarding the Ship's operation and management.

17.    Prior to the execution of the MOU, Class Counsel also attended the depositions conducted in this and all the related cases.  These depositions included the Ship's crew who were deposed regarding managerial and operational aspects of the Ship.

**DECLARATION OF WILLIAM M. AUDET IN SUPPORT OF**
**MOTION FOR FINAL APPROVAL OF DUNGENESS CRAB SETTLEMENT**

18.     As part of the investigation, Class Counsel have also been in contact with in excess of a hundred Dungeness Crab Settlement Class members and/or commercial fishermen, and who have provided us with information regarding their experiences with CBOS.

19.     All the information obtained from Settling Defendants, Plaintiffs' consultants, government agencies and publicly available sources and Class Members was used in the calculation of damages to Plaintiff's and the Class and in the formulation of the MOU and Settlement Agreement.

**Arms'-Length Settlement Negotiations**

20.     From July 10, 2008 through March 17, 2010, counsel for the parties engaged in a contentious arms-length negotiation process.  In addition to the in-person meetings that occurred in July and December, 2008, January and February of 2009, and March of 2010, arms'-length in-person settlement negotiations continued with telephonic meetings of counsel from then until March 17, 2010.

21.     Significant informal discussions also occurred by telephone and email during the entire course of the arms'-length settlement negotiations.

22.     The negotiations between Settling Defendants and counsel for Plaintiffs were arms'-length and hard-fought at all times. There were material disputes regarding, among other things, the scope of the class, the extent of the damages suffered by putative class members, and even the extent of liability of Settling Defendants. On each of these points, the parties had significant disagreement. As a result, on several instances, the parties came to an impasse and it appeared that a settlement could not be reached without resorting to litigation.

23.     After several rounds of mediations, it became apparent that Defendants wanted to settle only the commercial Dungeness crab claims.  Plaintiffs and Class counsel agreed to settle just the commercial Dungeness crab claims while preserving their - and all Class members' - rights to pursue other claims on behalf of other commercial fisheries.

24.     The significant arms'-length settlement negotiations between counsel for Plaintiffs and Settling Defendants finally culminated in an agreement in principal regarding the settlement of Dungeness crab commercial fishermen claims between the Plaintiffs and Settling Defendants

(with the exception of attorneys' fees and costs), resulting in the execution of the MOU and, ultimately, the Dungeness Crab Settlement Class Claims on March 17, 2010.

25.     The Dungeness Crab Settlement Agreement for which the parties now seek approval is the result of the investigations and negotiations detailed above. There was no collusion and Class Counsel has served the best interests of the Plaintiff Class in all respects.

26.     The settlement negotiations in this case were intense, substantive, and adversarial. They involved attorneys on both sides who are experienced in the prosecution, defense, trial, and settlement of class action litigation. The attorneys were well-versed in the legal and factual issues implicated in this action.

**Class Counsels' Fees and Costs / Incentive Payments to Class Representatives**

27.     The parties did not engage in discussions of Class counsel's attorneys' fees and costs until after reaching a tentative agreement on all other material provisions of the Settlement. The enforceability of the Settlement Agreement is not contingent on the amount of attorneys' fees or costs awarded.

28.     The parties ultimately agreed that Class Counsel would submit the issues of attorneys' fees and costs to the Court.  Such fees and costs are to be paid by Settling Defendants and not out of Class members' recoveries.

29.     The Settlement further provides a modest service award of $7,500 for Class representatives Allen Loretz, John Tarantino, Steven Fitz, John Atkinson and Sean Hodges for the service he provided to all Class members by advancing this case.  (*See* Settlement Agreement, Section X, Subsection D, p. 26.)

30.     In this case, each of the Class representatives performed important services for the benefit of the Class.  (*See* Declarations Allen Loretz, John Tarantino, Steven Fitz, John Atkinson and Sean Hodges, filed herewith.)

31.     The valuable efforts of the Class representatives, their willingness to litigate and pursue their representative claims, and the strength of their claims have resulted in a Settlement that will benefit all Class members.

**DECLARATION OF WILLIAM M. AUDET IN SUPPORT OF**
**MOTION FOR FINAL APPROVAL OF DUNGENESS CRAB SETTLEMENT**

32.    Audet & Partners has performed substantial additional work on behalf of Plaintiffs and the Class throughout the duration of this case, including (but not limited to) the following:

a.    I personally had a primary role in devising all investigation, litigation and settlement strategies.

b.    As described above, the Audet & Partners attorneys and paralegals responded to inquiries from hundreds of individuals, which helped us understand the issues and identify the relevant class.

c.    Audet & Partners engaged Dennis M. King, Ph.D. of King & Associates, Inc., a research director, who conducted background research, data collections, as well as data analysis and report preparation for Audet & Partners.  I worked closely with Dr. King throughout the investigation of the case.

d.    Audet & Partners engaged Marine Lender Services, LLC for the arrest of the *Cosco Busan*, a substitute custodian willing perform custodial services of the Ship, including providing insurance, attending mooring lines, provide locks and security during the custodianship.

e.    Audet & Partners ensured that the short-term claims process established by Defendants Regal/Fleet under the Oil Pollution Act of 1990 ("OPA") and Lempert-Keene-Seastrand Act ("Claims Process") was conducted in a fair, transparent and non-discriminatory manner. Audet & Partners filed a Motion for Order to Show Cause Why a Protective Order to Supervise or Otherwise Limit Communication with Putative Class Members Should Not Issue to limit such communications.  On February 22, 2008, the Court granted Plaintiffs' motion and enjoined Defendants Regal/Fleet from further attempts at limiting putative class members' rights in return for participation under the Claims Process.  (2/22/08 Order (ECF No. 79) and 4/25/08 Order (ECF No. 86)).

7

f.     I played the lead role in the substantive negotiations that resulted in the Settlement, and in that regard participated in multiple telephonic negotiation sessions, as well as numerous in-person meetings. All of the negotiations were at arm's length, and were often contentious.

g.     Audet & Partners participated in the depositions of *M/V Cosco Busan* crewmembers (1) Zhao, (2) Hu (Chief Officer), (3) Zheng, (4) Wang (Third Mate), and (5) Sun (Master) and reviewed the extensive exhibits produced in association therewith;  coordination and information sharing with governmental litigants; and extensive review of scientific and fish stock research materials.

h.     Audet & Partners attorneys played a lead role in drafting the Memorandum of Understanding and the Settlement Agreement.

i.     Audet & Partners attorneys had a lead role in preparing Plaintiffs' motions for preliminary and final approval of the Settlement.

j.     Audet & Partners took a lead role working with Gilardi & Co., LLC ("Claims Administrator") to developing the class notice plan, the claim form, the publication notice, and the class notice.

k.     Throughout the litigation, and on an ongoing basis, Audet & Partners attorneys and paralegals have communicated with Class members regarding the status of the litigation and their rights under the Settlement.

l.     Audet & Partners is maintaining a database of individuals who have opted out or objected to the Settlement, and will continue to do so until the deadline. To date, zero (0) Class members have opted out and zero (0) Class Members have objected. We will provide final opt-out and objection numbers with our reply papers or at the hearing.

33.     On information and belief, classwide notice was disseminated in accordance with the Notice Plan developed by the parties and approved by this Court upon Preliminary Approval of the Settlement.  (*See* Declaration of Rachel Christman, filed herewith.)  The costs of Class

8

1   Notice and claims administration will be paid by Settling Defendants, per the Settlement

2   Agreement.  (*See* Settlement Agreement, p. 24.)

3          34.     All attorneys, paralegals and law clerks at Audet & Partners are instructed to

4   maintain contemporaneous time records reflecting the time spent on this and other matters.

5   According to the firm's time records, Audet & Partners has spent a total of 1955.65 hours on this

6   matter from the inception of the case through May 31, 2010 for a lodestar of $890,185.45.  The

7   names, hourly rates, and hours incurred by each of the Audet & Partners attorneys (including

8   partners and associates), paralegals, and law clerks are attached hereto as Exhibit 4.  Audet &

9   Partners' rates reflect the market rates in the San Francisco market within which Audet &

10  Partners' primary offices are located and from which this matter has been handled.

11         35.     There has been no unnecessary duplication of services for which Audet &

12  Partners now seeks compensation.  In those instances in which two or more attorneys at Audet &

13  Partners participated in any matter, this joint participation was necessary because of the

14  complexity of the problems involved and the time constraints which existed. Tasks were

15  delegated appropriately among senior and junior attorneys and paralegals according to their

16  complexity.

17         36.     As of May 31, 2010, Audet & Partners' accounting department reports that the

18  firm had also expended a total of $40,911.39 in unreimbursed expenses in connection with the

19  investigation, prosecution and settlement of the Dungeness Crab Settlement and litigation, as set

20  forth in the reports attached hereto as Exhibit 5.

21         37.     The expenses listed in Exhibit 5 are reflected in the books and records of Audet &

22  Partners' maintains in the ordinary course of business, which books and records are prepared

23  from expense vouchers and check records.

24         38.     The Plaintiffs signed attorney representation agreements that provide for a

25  contingent fee recovery.  Thus, Class counsel have invested — and continue to invest —

26  substantial time in prosecution of this case with no guarantee of recovery, and have received no

27  compensation to date.

28

**DECLARATION OF WILLIAM M. AUDET IN SUPPORT OF**
**MOTION FOR FINAL APPROVAL OF DUNGENESS CRAB SETTLEMENT**

39.     As evidenced by Exhibit 1, Audet & Partners maintains a very active contingent fee practice.  Every week, Audet & Partners ordinarily receives multiple requests for representation, new case inquiries, and offers to associate with other lawyers and law firms to prosecute complex and class action cases. The fact that Audet & Partners devoted the substantial time and resources reflected on Exhibits 4 and 5 to the present case undoubtedly required the firm to forego other, potentially lucrative, employment.

40.     The claims period will continue well into the next year, and Audet & Partners' commitment of time and labor to this case will continue until (and likely beyond) that date. AUDET & PARTNERS will continue to assist Class members with individual inquiries, will oversee the claims resolution process, and per the Settlement Agreement, Class Counsel will help resolve Class member challenges to the result of their claims submissions. Judging by previous experience, these responsibilities will require many hours of work by Class Counsel over the coming time period.

41.     Based on my extensive professional experience, and taking into consideration the risks of continued litigation (and likely appeals) versus the certain and substantial relief afforded by the Settlement, it is my opinion that the Settlement is fair, adequate and reasonable, in the best interests of the Class, and merits final approval. It is also my view that, in light of the time and costs expended by Class Counsel, the legal standards governing the award of fees and costs in class actions, and the results obtained, the fees and costs requested by Class Counsel are modest, and well-warranted.

**<u>Conclusion</u>**

42.     As counsel for the Class, Class counsel are proud of the proposed settlement.  It provides substantial and certain relief for the Class and avoids protracted and costly litigation and likely appeal of any adverse rulings against it. The relief is fair, adequate and reasonable.

43.     I, on behalf of myself and Class counsel, respectfully request that the Court grant preliminary approval on this substantial and significant settlement.

**DECLARATION OF WILLIAM M. AUDET IN SUPPORT OF
MOTION FOR FINAL APPROVAL OF DUNGENESS CRAB SETTLEMENT**

1       I declare under the penalty of perjury under the laws of the United States and the State of

2   California that the foregoing is true and correct.  Executed this 2nd day of July, 2010 at San

3   Francisco, California.

4

5   _____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF WILLIAM M. AUDET IN SUPPORT OF**
**MOTION FOR FINAL APPROVAL OF DUNGENESS CRAB SETTLEMENT**

# Exhibit 1

Firm Resume

# AUDET & PARTNERS, LLP

Attorneys – at – Law

221 MAIN STREET, SUITE 1460
SAN FRANCISCO, CA 94105
TELEPHONE 415.568.2555
FACSIMILE 415.568.2556

---

*Audet & Partners, LLP,* is a nationally recognized trial law firm based in San Francisco, California, with affiliated offices and associated counsel located throughout the United States. The attorneys at Audet & Partners, LLP, have focused their practice on the prosecution of complex individual, mass tort and class action cases. The firm represents individuals, small businesses and institutional shareholders in product liability, tort, negligence, consumer, construction defect, investment fraud, securities, insider trading, antitrust, environmental, whistle blower, aviation and employment cases. In recognition of their commitment to the legal profession and outstanding abilities to get results for their clients, the firm and its members have been appointed to leadership positions in dozens of class action cases and serve as Court-appointed Plaintiffs' Counsel in federal and state litigation nationwide. Below is a sampling of Audet & Partners LLP's cases:

## Product Defect Litigation

*Galanti v. Goodyear Tire & Rubber Company*, No. 03-209, United States District Court, District of New Jersey. Audet & Partners, LLP partners William M. Audet and Michael McShane served as Court-appointed Class Counsel with pending $300 million settlement involving a defective radiant heating system.

*In re Certainteed Corp. Roofing Shingles Products Liability Litigation,* MDL No. 1817, pending in the United States District Court, Eastern District of Pennsylvania. Audet & Partners, LLP partner Michael McShane serves as Court appointed co-lead counsel on behalf of plaintiffs in a nationwide class action involving claims of a defective roofing product.

*In re Zurn Pex Plumbing Litigation,* MDL 08-MDL-1958, United States District Court, District of Minnesota. Audet & Partners, LLP partner Michael McShane serves as class counsel on behalf of plaintiffs in a nationwide class action involving claims of a defective plumbing product installed in thousands of residences throughout the United States.

*In re Menu/Pet Food Recall Litigation*, MDL No. 1850. Audet & Partners, LLP partner William M. Audet was appointed on of the co-lead counsel in a case involving recalled pet food. The ground braking case resulted in a significant monetary settlement, along with court supervised remedial action to prevent similar recalls of potentially poisoned pet products in the future. Over 100 class action cases were filed and consolidated in New Jersey federal court.

❖

*In re Toy Parts Recall* – the firm was appointed lead counsel in a case involving recall of a well known toy product.  The firm's partner William M. Audet was directly involved in the negotiations and class wide resolution that provided for full refunds for class members, as well as other relief.

*In re Planet Toys Recall*, case no. 08-CV-0592(HB) (SDNY).  The firm was appointed lead counsel in a case involving recall of certain of defendants' toy products.  Despite the fact that the company declared bankruptcy, lead counsel William m. Audet and his co counsel were able to obtain relief and compensation for class members..

*In re Kitec Plumbing Litigation,* pending in numerous District Courts throughout the United States. Audet & Partners, LLP partner Michael McShane serves as Court-appointed lead counsel in a nationwide class action prosecuting claims relating to defective plumbing products.

*In re Uponor Plumbing Litigation*, pending in numerous District Courts.  Audet & Partners, LLP partner Michael McShane acts as class counsel in a nationwide class action alleging claims relating to a defective plumbing product.

*In re Chinese Drywall Litigation*, MDL 2047.  Nationwide class action pending in the Easter District of Louisiana involving claims relating to allegedly defective drywall manufactured in China. Audet & Partners, LLP partner Michael McShane represents putative class of plaintiffs seeking to recover damages as a result of the installation of the drywall in their homes.

*Ross, et al., v. Trex Company, Inc.* Case No. 09-670, United States District Court, Northern District of California. Audet & Partners, LLP partner Michael McShane serves as class counsel in a nationwide class action involving claims of defective composite decking sold by the defendant.

*Williams v. Weyerhaeuser*, San Francisco County Superior Court, California, No. 995787, and *Chambers, et al., v. Weyerhaeuser*, King County Superior Court, Washington, No. 98-2-21084-2 KNT.  Audet & Partners, LLP's attorneys served as one of three counsel in a class action involving allegations of defective siding manufactured by Weyerhaeuser.

*Roy v. Cemwood Corporation*, Contra Costa County Superior Court, California, No.: MSC99-00499.  Audet & Partners, LLP firm attorneys serve as one of four co-lead counsel in a national class action involving allegations of defective roofing products.

❖

*In re Stucco Litigation* (*Ruff v. Parex*) County of New Hanover, North Carolina, No. 96-CVS-0059.  The firm's principal partner, William M. Audet, serves on the Court-appointed Plaintiffs Steering Committee.  The case was filed on behalf of homeowners who had defective synthetic stucco installed in their homes.

*Stuart Hanlon, et al., v. Chrysler Corporation,* United States District Court, Northern District of California, No. C-95-2010 CAL.  The Firm's attorneys worked on a case seeking correction of defective rear hatch door lock failures in nominal impacts for 3,300,000 owners of Chrysler minivans.

### Mass Tort and Other Complex Litigation

*Allen Loretz v. Regal Stone, Ltd.* C 07-5800 SC and *John Tarantino v. Hanjin Shipping Co., Ltd.*, CGC 07 469379 (*In re Cosco Busan Oil Spill Litigation*).  Filed Class and individual claims.  Represented various individuals, corporations and small business groups, including seafood processors, crab and herring fisheries, marinas, and captains/crews of commercial and recreational vessels.  Firm managing partner responsible for seizure of Cosco Busan, voiding waivers obtained by claims administrator and other significant orders that benefitted plaintiffs.  Co-counsel in state case brought under Lampert-Keene Act.

*In Zyprexa Litigation*, MDL 1596, United States District Court, Eastern District of New York.  The firm represents over 300 clients who developed diabetes after ingesting Zyprexa.  Audet & Partners, LLP partner William M. Audet has been appointed a member of the Plaintiffs Executive Committee.

*In Baycol Litigation*, MDL 1431, United States District Court, Minnesota.  William M. Audet serves as Court appointed member of the Plaintiffs Executive Committee relating to the defective drug Baycol.

*In re Metabolife Litigation*, JCCP 4360 (San Diego County, California).  William M. Audet served as a member of the California State Steering Committee in personal injury cases arising out of injuries suffered due to Metabolife products.

*In re Vioxx Litigation*, New Jersey State Court and California State Court.  The firm filed in excess of 100 cases against Defendants Merck & Company arising out of injuries associated with the defective drug Vioxx.  The firm's cases were scheduled for trial.  Susanne Scovern of the Firm played a crucial role in the litigation of the Vioxx cases in New Jersey State Court.  The cases have been settled for in excess of $4 billion.

*In re Bextra Litigation*, MDL No. 1699, United States District Court, Northern District of California.  Audet & Partners, LLP partner William M. Audet serves as a Court appointed member of the Plaintiffs Steering Committee.

❖

*In re Intergel Litigation,* Florida State Court.  The firm filed dozen of cases on behalf of women injured using a Johnson & Johnson product called Intergel.  The firm has recovered millions of dollars for their clients in confidential settlements with the company.  Firm attorney Susanne Scovern served as the principal attorney involved in the cases.

*In re Defective Ancure Products Liability Litigation*, United States District Court, Northern District of California and Santa Clara County Superior Court.  The firm represents dozens of individuals who were implanted with a defective device. Joseph Russell serves as the lead attorney in the cases.

*Table Bluff Reservation (Wiyot Tribe), et al., v. Philip Morris, et al.,* United States District Court for the Northern District of California, San Francisco Division, No. C 99-02621 MHP.  The firm represented Native American Tribes challenging the $200 billion plus state tobacco agreement on the grounds that it violated their civil rights.  The case was argued in the Ninth Circuit Court of Appeals.

*Fen-Phen Product Liability Litigation,* MDL 1203, California State Court.  The firm filed a medical monitoring and punitive damage claim on behalf of California residents.

*In re Baxter Heparin Litigation,* Wisconsin and Illinois State Courts (consolidated with MDL 1953).  The firm represents a number of injured victims and their families arising out of contaminated heparin blood transfusion products imported from other countries.  The firm has filed cases in Illinois and Wisconsin State Court. Audet & Partners, LLP partner/founder William M. Audet serves as court appointed liaison counsel in the Wisconsin cases.  The firm continues to evaluate and file cases for seriously injured clients.

*In re Pfizer Chantix Litigation*, MDL No. 2092.  Audet & Partners, LLP partner William M. Audet serves as a Court appointed member of the Plaintiffs Steering Committee.The firm represents dozens of families who were not properly and fully warned about the safety issues associated with use of Chantix.  The firm has filed, with co-counsel, cases in state and federal court and continues to meet with potential clients who have claims against the defendants for failure to warn.

*In re Glaxo Avandia Litigation*.  The firm represents dozens of families whose loved ones suffered heart attacks and other injuries relating to use of Avandia.  The firm was one of the first plaintiffs' law firms in the United States to uncover the case and file cases against the manufacturer of Avandia.  The firm continues to meet with potential clients about their claims.  Along with William Audet, attorney Susanne Scovern heads up the firm team in reviewing potential cases and assisting in the prosecution of cases against the defendants.

❖

_**Consumer Litigation**_

*In re Google Litigation*, Northern District of California, San Jose Division.  Serving as Court-appointed Liaison Counsel, the firm represents advertisers on Google's web pages who claim to have been overcharged for advertising through a complicated monthly charge program.

*Smith v. Hewlett-Packard*, Santa Clara County Superior Court, CV 776794.  The firm serves as Plaintiffs' Liaison Counsel.  Contrary to HP's representations, the Recorders could only consistently and reliably record less user data than the industry standard.  When attempting to record more, error messages appeared, previously recorded data was lost and the CD became useless.

*In Re Whirlpool Litigation,* class action litigated in nine states including California, Minnesota, Pennsylvania, Ohio and Tennessee.  Audet & Partners, LLP partner Michael McShane served as Court appointed co-lead counsel in a multi-state class action involving claims of breach of warranty and product defect against both Whirlpool Corporation and Sears & Roebuck, Inc.

*Palm Treo Litigation,*  Santa Clara County Superior Court.  Audet & Partners, LLP partner Michael McShane served as class counsel in a nationwide class action involving claims of product defect against Palm, Inc.

*Roberts v. Bausch & Lomb,* United States District Court, Northern District of Alabama, No. CV-94-C-1144-W.  William M. Audet, the firm's principal partner, served on the Plaintiffs' Committee in this nationwide consumer class action.  A settlement against Bausch & Lomb was approved by the Court on August 1, 1996.  Under the settlement, Bausch & Lomb agreed to $68 million in cash and products to 1.5 million buyers of the Company's disposable contact lenses.

*Hilla v. TCI Cablevision,* Santa Clara County Superior Court, No. CV-769105.  The firm represented California residents involving illegal overcharges by the cable company for late fees.

*Plotkin v. General Electric,* United States District Court, Northern District of California, Action No. C-92-4447.  The firm filed a class action against General Electric for defrauding the American public in the sale of Energy Choice Light Bulbs, which were claimed to be energy efficient, required less electricity and would preserve the environment.  General Electric subsequently settled this national class action.

*Afanador v. H&R Block Tax Services, Inc.,* Santa Clara County Superior Court, California, No. CV-767677.  The Firm's attorneys, along with other Plaintiffs' counsel, successfully represent consumers in claims against H&R Block arising out of its "Rapid Refund" program.

❖

*Sears Automotive Center Consumer Litigation,* United States District Court, Northern District of California, No. C-92-2227.  The firm filed a class action on behalf of consumers defrauded by Sears' Auto Centers.  The case was successfully concluded in August 1992.  William M. Audet was appointed to the Plaintiffs' Steering Committee.

*Chamberlain v. Flashcom,* Orange County Superior Court, Case No. 00 CC 04212. In this class action, William M. Audet, principal partner, along with other counsel successfully a remedy against Defendant's unlawful, unfair, and fraudulent business conduct.

*Providian Credit Card Cases,* San Francisco County Superior Court, JCCP No. 4085. The Providian Defendants purported to facilitate the issuance of credit cards to people with damaged credit histories.  The case settled for in excess of $10 million. William M. Audet served as Class Counsel.

*In re Kia Litigation,* Orange County Superior Court.  William M. Audet served as class counsel in a number of jurisdictions in a case involving claims by Kia regarding its automotive products.  The case was settled with a significant monetary and non-monetary recovery for the class.

## Insurance/Healthcare Litigation

*In re Unum Provident Litigation,* United States District Court, Eastern District of Tennessee, MDL No. 1552.  Audet & Partners, LLP firm partners William M. Audet and Michael McShane serve as Court-appointed Lead Counsel in a pending class action on behalf of Plaintiffs alleging the wrongful denial of benefits under long term disability policies.

*In re Industrial Life Insurance Litigation,* United States District Court, Eastern District of Louisiana., MDL Nos. 1371, 1382, 1390, 1391, and 1395. William M. Audet served on the Court-appointed Plaintiffs' Steering Committee.  The class cases involve claims that insurance companies overcharge African-Americans for life and health insurance.

*In re Life of Georgia Insurance Litigation,* Thirteenth Judicial District, Shelby County, Memphis, Tennessee. Reached nationwide class settlement in 2002 on behalf of class of insureds discriminated against in the issuance of life insurance. William M. Audet served as Court-appointed Co-Lead Counsel.

*Thorn v. Jefferson Pilot Insurance Co.,* United States District Court, South Carolina. Nationwide class on behalf of purchasers of life insurance.  Michael McShane of the firm represents the proposed Plaintiffs class alleging racial discrimination in the issuance of life insurance policies

❖

*In re Average Wholesale Price Litigation*, MDL Docket No. 1456. Audet & Partners, LLP partner William M. Audet and Michael McShane of the firm serve as Court appointed members of the Executive Committee, representing Plaintiffs in a nation-wide class action allegedly the manipulation of pricing for prescription drugs.

*In re Tenet Healthcare Litigation*, Los Angeles County, Superior Court, California. Numerous actions coordinated in 2002 by the Judicial Council.  Partners William M. Audet and Michael McShane served among three Court appointed Lead Counsel on behalf of nationwide class of individuals who were allegedly overcharged directly, or through their health insurance for medical services, products and medication.

*Lawson, et al., v. Liberty Life*, Birmingham, Alabama, No. 96-1119.  William M. Audet of the firm, along with four other Plaintiffs' Counsel, represents a proposed class of life insurance policy holders of Liberty Life Corporation who were subjected to unlawful life insurance policy "churning" by Liberty Life.

## Antitrust

*In re PRK/Lasik, Laser Surgery Overcharges Litigation*, Santa Clara County Superior Court, California, Master File No. CV772894.  Audet & Partners LLP attorneys William M. Audet and Joseph Russell served as Court-appointed Liaison Counsel in a nationwide class action case alleging antitrust violations again Visx, Inc. and Summit, Inc.

*Flat Glass Antitrust Litigation*, United States District Court, Western District of Pennsylvania, MDL No. 1200 (and related cases).  Mr. Audet of the firm serves as one of five Court-appointed Discovery Committee members and as Plaintiffs' Counsel in a national class action antitrust case pending against the manufacturers of flat glass.

*Toys "R" Us Antitrust Litigation*, United States District, Northern District of California, No. C-97-3931-TEM.  The firm filed a national class action antitrust complaint on behalf of toy consumers.

*Los Angeles Milk Antitrust Litigation*, Los Angeles County Superior Court, California, No. BC 070661.  William M Audet and other members of the firm, along with other Plaintiffs' Counsel, represents consumers arising out of claims of antitrust violations against Los Angeles supermarkets due to alleged price fixing of milk.

*California Indirect Purchaser Auction House Cases*, San Francisco County Superior Court, No. 310313.  In this case against Christie's, Sotheby's and others, Defendants are charged with conspiring to fix commissions for the sale at auction of art and other items in California.

❖

*Pharmaceutical Antitrust Cases,* San Francisco County Superior Court, California, Judicial Council Coordination Proceeding, No. 2969.  The firm members worked on a case for independent pharmacies pursuing claims against major drug manufacturers for violation of California's price fixing statutes.

*In re Vitamin Antitrust Litigation*, California, North Carolina, Tennessee and Maine.  William M. Audet serves as lead counsel in three states and on the Plaintiffs' Executive Committee in one state (California) in class claims involving alleged price fixing by the manufacturers of vitamin products.

*In re Methionine Antitrust Litigation*, MDL Docket No. 1311.  William M. Audet serves as class counsel in a case involving allegations of price fixing in the Methionine industry.

*In re Bromine Antitrust Litigation*, Docket No. 1310.  The firm serves as class counsel in a case involving allegations of antitrust violations in the Bromine industry.

*In re Carbon Fiber Antitrust Litigation*, C.D. Cal., C 99-11475 RJK.  Manufacturers, sellers, and distributors of carbon fibers were sued by makers of airplanes, spacecraft parts, industrial and sporting equipment for conspiring to maintain an artificially inflated price for their product.  The firm members served as one of Plaintiffs' counsel.

*In re: Terazosin Hydrochloride Antitrust Litigation*, S.D.Fla. MDL 1317.  In this lawsuit Plaintiffs allege a conspiracy to create a monopoly and fix prices of this widely used prescription drug as well as preventing the sale of any generic bioequivalent to Hytrin.  The firm members served as one of Plaintiffs' counsel.

*In re Dram Antitrust*, MDL 1486, Northern District of California.  William M. Audet of the firm serves as class counsel in a class action case to recover money for class members due to antitrust activity in the DRAM industry.

*In re Copper Tubings Litigation*, United States District Court, District of Tennessee.  William M. Audet of the firm was appointed as Co-lead Class Counsel in a case involving an alleged worldwide conspiracy to overcharge customers in the copper tubing industry.

<u>*Securities & Insider-Trading*</u>

*In re CNET Derivative Litigation*, William M. Audet and Michael McShane of the firm filed a case against the corporate Defendants for insider trading and back dating of options.  The case was filed in San Francisco Superior Court, California.

❖

AUDET & PARTNERS, LLP                                                    Page 9

***Adaptec Derivative Litigation***, Santa Clara County Superior Court, California, Master File No. CV 772590.  The firm serves as Liaison Counsel in a derivative action filed on behalf of shareholders of Adaptec, Inc.

*In re Genesis Securities Litigation*, Northern District Court of California.  William M. Audet serves as class counsel on a case filed against Genesis.  After the case was dismissed by the District Court, the firm filed an appeal and ultimately settled the case for $1.5 million.

*Informix Derivative Securities Litigation*, San Mateo Superior Court, California, Case No. 402254.  The firm served as one of the Plaintiffs' Derivative Counsel in a shareholder lawsuit alleging derivative claims on behalf of Informix.

*Solv-Ex Securities Litigation,* Second Judicial District Court, County of Bernalillo, New Mexico, No. CV-96-09869.  The firm serves as Plaintiffs' Class Counsel in a suit alleging securities fraud against Solv-Ex Corporation and other insider defendants.

*Imp, Inc., Securities Litigation,* Santa Clara County Superior Court, California, No. CV762109.  The firm represents shareholders of Imp, Inc. in an action against certain insiders of Imp, Inc., for alleged insider trading of the Company's stock.

*CBT Group Derivative Litigation,* San Mateo County Superior Court, California, No.  406767.  The Firm's founder, William M. Audet served as one of two plaintiffs' counsel representing shareholders of CBT Group, PLC, in a derivative action against officers and directors of the Company.

*Oakley Technology Derivative Litigation,* Santa Clara County Superior Court, California, No. CV75829.  The Firm's members served as one of three Co-lead Counsel in a derivative securities case brought on behalf of shareholders of Oakley Technology, Inc., brought against certain Officers and Directors of the Company.

*Horizon Securities Litigation,* United States District Court for New Mexico, No. 96-0442 BB/LCS.  William M. Audet of the firm serves as one of the Plaintiffs' Class Counsel in a securities case filed against New Mexico-based Horizon Corporation for alleged violation of federal securities laws.

*Bay Networks Securities Litigation* (*Garnier v. Bay Networks*, CV764357; *Greeneway v. Bay Networks*, CV765564), Santa Clara County Superior Court, California.  The firm members served as one of four-plaintiffs' counsel representing shareholders of Bay Networks for alleged securities violations.

*Unison Healthcare Corporation Litigation*, United States District Court of Arizona, Case No. Civ. 97-0583-PHX.  The firm members served as one of the Plaintiffs' Class Counsel representing investors in Unison Healthcare.

*S3 Derivative Litigation*, Santa Clara County Superior Court, California, No. CV770254.  The firm members served as one of the Plaintiffs' Lead Counsel in a derivative action filed on behalf of shareholders of S-3, Inc.

❖

*In re Networks Associates Derivative Litigation*, Santa Clara County Superior Court, Consolidated Case No. CV-781854.  In this case, shareholders sued officers and directors of this leading manufacturer of anti-virus and protocol analyzer software who sold over 800,000 shares of their personal stock for more than $33 million by misleading the public regarding its value.  William M. Audet of the firm served as Liaison Counsel.

*In re Oak Technology Derivative Action*, Santa Clara County Superior Court, No. CV758629.   Shareholders sued directors and officers to recover more than $100 million Defendants made by artificially inflating the company's stock, representing that exceptional demand for the company's products existed.  In fact, the company's shipments of CD-ROM controllers far exceeded what the market could absorb.   Three related derivative cases were filed and subsequently consolidated.  William M. Audet of the firm serves as Lead Counsel in this lawsuit.

*In re Sybase Derivative Litigation*, N.D.Cal., No. C-98-0252-CAL.  The Firm's attorneys served as Plaintiffs' Counsel in this stockholder's derivative action brought on behalf of Sybase against certain of the Company's present and former officers and/or directors for insider trading.

❖

### *About the Attorneys at the Firm*

***William M. Audet*** earned a B.A. from the University of California at Davis in 1981, a Juris Doctor from Golden Gate University School of Law in 1984, where he was the Editor of the Golden Gate University Law Review, and completed his formal legal education with a Masters of Law from the University of Wisconsin School of Law in 1987.  While obtaining his Masters Degree in Law at the University of Wisconsin, Mr. Audet was also a clinical instructor at the faculty of the University of Wisconsin School of Law.  After clerking for the Ninth Circuit Court of Appeals, Mr. Audet clerked for The Honorable Alfonso J. Zirpoli, United States District Judge for the Northern District of California and The Honorable Fern M. Smith, United States District Judge for the Northern District of California.    Mr. Audet's practice focuses on complex litigation, including class and non-class action claims involving mass torts, product liability, antitrust, employment, and consumer litigation.  Mr. Audet is a frequent guest speaker on a variety of topics at professional seminars. Mr. Audet is a co-author of ***Handling Federal Discovery*** (11th Ed.)(James Publishing Company). In 2005, Mr. Audet was awarded the Justice Award from the San Francisco Bar Foundations for his long standing contributions to the legal community and for his *pro bono* work over the years.  Mr. Audet has been appointed to leadership positions in a number of important and groundbreaking cases.

***Michael A. McShane*** earned his B.A. in Philosophy from the University of California at Santa Barbara, before earning his law degree from the University of Oregon in 1986, where he was the Articles Editor for the Journal of Environmental Law and Litigation.  Since his admission to the California Bar, Mr. McShane's practice has been devoted exclusively to prosecuting complex class action litigation throughout the United States. His areas of practice include products liability, consumer claims, antitrust litigation, insurance fraud and medical/pharmaceutical overcharge cases.

***Joseph E. Russell*** earned a B.S. in mathematics from Fresno State College in 1963. Mr. Russell earned his J.D. in 1969. During his law school, Mr. Russell was appointed Editor of Golden Gate's law review, Cal Law, Trends & Developments, and received the San Francisco Bar Association's award as Bay Area Scholar of the Year. In 1970, he received a Masters of Law from Southern Methodist University School of Law. Mr. Russell has tried dozens of cases, focusing on cases involving technical and scientific matters, including anti-trust, unfair business competition, construction and aviation cases. He is a member of the Association of Trial Lawyers of America and Consumer Attorneys of California. Mr. Russell serves as senior Trial Counsel at the firm.

***Susanne N. Scovern*** received a B.A. with highest honors and distinction in Russian/East European Studies and Political Philosophy from the University of Michigan in 1985.  In 1990, Ms. Scovern was awarded a Juris Doctorate from the University of Iowa where she was a member of the *University of Iowa Law Review*.  Over the years, she has practiced a broad range of product liability, mass tort, class action, employment and commercial litigation.  Ms. Scovern is a member of the American Bar Association, the California Bar Association and the San Francisco Bar Association.  She is active in the Science & Technology and Labor and Employment Sections of the ABA and State Bar.  She is

✤

also a member of the Association of Trial Lawyers of America and the San Francisco Trial Lawyers Association.  She is admitted to practice in California and the District of Columbia. Ms. Scovern focuses her work at the firm on defective medical devices and drugs, and is currently heavily involved in the prosecution of the Firm's Vioxx cases.

**Kevin L. Thomason** earned a B.A. in Interdisciplinary Studies from California State University at Dominguez Hill in 1991 and a Juris Doctor from the University of California, Hastings College of the Law in 1994. Kevin has extensive experience in internet and computer technology and has taught MCLE classes on the internet throughout California. He has written extensively for the legal press on these topics. His practice focuses on complex litigation and class actions. Kevin also handles the firm's internet marketing.

**Joshua C. Ezrin** received a B.A. with honors in Sociology from the University of California at Santa Cruz in 1995, and a Juris Doctor from the University of San Francisco School of Law in 2001.  Mr. Ezrin has focused his practice on complex litigation and toxic torts and is currently working on a number of cases, including the Bextra, Vioxx and Zyprexa pharmaceutical litigation for the firm.

**Adel A. Nadji** earned a B.A. in English from the University of California at Berkeley in 1999, and a Juris Doctor from the University of San Francisco School of Law in 2004.  While in law school, he was a member of the *Maritime Law Journal*, and the Vice President of the Public Interest Law Foundation.  Mr. Nadji published an article titled, *A Decade in the Development of NAFTA Chapter 11*, in the USF Graduate Business Journal.  Mr. Nadji is currently focusing his work at the firm on the Vioxx, Guidant and Bextra ligation.

**Jonas P. Mann** earned a B.A., *cum laude* and with high honors, in International Affairs from the George Washington University in 2004.  In 2007, Mr. Mann was awarded a J.D. from Temple University – James E. Beasley School of Law where he was a member of the Temple Political and Civil Rights Law Review.  Prior to joining the firm, Mr. Mann completed a clerkship in the Superior Court of New Jersey where he worked primarily on pharmaceutical products liability, employment discrimination, and environmental litigation.

❖

**Exhibit 2**

William M. Audet (waudet@audetlaw.com)
Michael McShane (mmcshane@audetlaw.com)
Adel A. Nadji (anadji@audetlaw.com)
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco CA 94105
Telephone: 415.982.1776
Facsimile: 415.568.2556

*Attorneys for Plaintiffs and*
*the Class Members*

# UNITED STATES DISTRICT COURT FOR

# THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Chelsea, LLC, Mark Russo, and Allen Loretz, individually and on behalf of all others similarly situated, | Case No. C–07–5800-SC |
| | AT LAW AND IN ADMIRALTY |
| Plaintiffs, | **VERIFIED SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF** |
| v. | |
| Regal Stone, Ltd., Hanjin Shipping, Co., Ltd., Synergy Maritime, Ltd., Fleet Management Ltd., and John Cota, *In Personam*; M/V Cosco Busan, their engines, tackle, equipment, appurtenances, freights, and cargo *In Rem*, | **<u>Jury Trial Demanded</u>** |
| Defendants. | |

## INTRODUCTION

1.     November 7, 2007 was like any other fall day in the San Francisco Bay Area: cold, overcast and foggy.  Vessels were navigating their way through the San Francisco Bay to the Pacific Ocean.  Crab fishermen, among others, were waiting for news of the season to officially open.

2.     Heading north out to the ocean bound for Asia, one container ship — the COSCO BUSAN — failed to heed normal precautions and hit the fender of tower W4 of the San Francisco Bay Bridge.  The impact of the crash tore a huge gash in the side of the vessel and resulted in the spillage of an estimated 58,000 gallons of fuel oil into the fragile San Francisco Bay ecosystem.

3.     This man-made disaster will for years have a profound impact on not only the wildlife of Northern California, but has also immediately impacted the livelihood of thousands and thousands of individuals and small businesses, such as commercial fishers, and crabbers, as well as recreational charter operations.  On November 12, 2007, the Governor of the State of California "halted" all commercial fishing in and around the San Francisco Bay Area.

4.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on its own behalf and as representative of a Class.  Plaintiffs and members of the Class will have incurred significant damages and economic losses and will continue to incur such expenses and losses in the future.

## PARTIES

5.     Individual and Representative Plaintiff Chelsea, LLC.  Plaintiff Chelsea is a member of the class.  Plaintiff is a 60-foot "crab" vessel that prior to the spill caught crab in the San Francisco Bay Area.

6.     Individual and Plaintiff Mark Russo resides in Monterey, California,  Plaintiff Russo is the owner of the vessel *Freeland* and has owned the vessel on or about November 7, 2007  and continues to own said vessel.  The vessel is a duly licensed California Commercial Crab Fishing Vessel.

7.      Individual and Plaintiff Allen Loretz is a hired captain and crewmember aboard the vessel *Freeland*.  Plaintiff Loretz was the captain and crewmember on or about November 7, 2007  and continues to serve as captain.  The vessel is a duly licensed California Commercial Crab Fishing Vessel.

8.      Plaintiffs bring this action on behalf of themselves and on behalf of a class of over 500 fishermen, vessel owners, charterers and operators (the exact number of which is not presently known) who were to participate in, or depend upon, the 2007-2008 California Fisheries for commercial purposes.

9.      Defendant vessel, COSCO BUSAN, their engines, tackle, equipment, appurtenances, cargo, all freights, and any bonds as issued and other earnings (the "Vessel" or "COSCO BUSAN") is now, or will be during the pendency of this action, within the district and jurisdiction of this court.

10.      Defendant Regal Stone, Ltd. ("Regal Stone"), upon information and belief, is a Hong Kong based company that claims ownership of the COSCO BUSAN.

11.      Defendant Hanjin Shipping Co., Ltd. ("Hanjin") is a large Korean-based shipping company that leases or charters the COSCO BUSAN from Defendant Regal Stone, Ltd. or other owners.

12.      Defendant Synergy Maritime, Ltd. ("Synergy") upon information and belief is a manager, owner and the employer of the crew of the vessel COSCO BUSAN.

13.      Defendant Fleet Management Limited ("Fleet Management") upon information and belief is the managing operator or sub-manager of the COSCO BUSAN.

14.      Defendant John Cota ("Cota"), on information and belief, was piloting the COSCO BUSAN at the time of the allision and discharge of the 58,000 gallons of bunker fuel.

## JURISDICTION AND VENUE

15.      This is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and is within this Court's admiralty and maritime jurisdiction under 28 U.S.C. § 1333 and Article III § 2 of the United States Constitution.  Certain causes of action that arise under the laws of California are within this Court's supplemental jurisdiction 28

U.S.C. § 1367. Further, this Court has jurisdiction over this action because this is a class action lawsuit in which over $5,000,000 is at issue and there are more than one hundred putative class members. Further this Court has jurisdiction under the Extension of Admiralty Act.

16. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 in that substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District. The vessel COSCO BUSAN, upon information and belief, is or will be within this District during the pendency of this action.

## **FACTS**

17. On November 7, 2007, at approximately 7:30AM, the COSCO BUSAN, a freighter ship bound for Asia, left the Port of Oakland.

18. Less than thirty minutes later, the COSCO BUSAN crashed into a support piling of the Oakland Bay Bridge.

19. The crash resulted in a huge breach in the ship's hull, where the fuel tanks of the ship are located. The hole on the port side was reportedly at least 70 feet long, 12 feet wide, and 3 feet deep.

20. Unfortunately, instead of immediately notifying the authorities about the magnitude of the problem, the ship's captain initially "estimated" less than "150" gallons of fuel spillage. In reality, the 150 gallons turned into over 58,000 gallons of toxic "bunker oil."

21. As the day wore on, the oil "dispersed" into San Francisco Bay and also into the Pacific Ocean. The ship's pilot has recently reported that the ship's onboard radar malfunctioned and the ship's master may have provided confusing instructions to the captain.

22. The non-economic damage to the San Francisco Bay's fragile ecosystem is beyond dollars and cents. Moreover, because of the negligence of the Defendants, and/or unseaworthiness of the COSCO BUSAN, commercial crabbers and other commercial fishers postponed the short season and as such have and will continue to lose millions of dollars.

23. As of November 13, 2007, the crab season was cancelled and all commercial fishing halted with public safety and health concerns regarding Dungeness crab, and potentially other seafood species.

24.     Recently uncovered evidence revealed that that despite company policy to use two independent means for position fixing and for the posting of additional "lookouts" during poor visibility conditions, at least one of the two radars on board malfunctioned or otherwise needed servicing in Long Beach before the COSCO BUSAN arrived in the San Francisco-Oakland area, and one of the two lookouts left the bow of the ship for a smoke and something to eat prior to the allision (and while the ship was navigating through the foggy waters of the San Francisco Bay).

25.     Further evidence revealed that upon leaving the berth of Port of Oakland, the Chief Officer noted that the COSCO BUSAN was moving "faster and faster," eventually reaching the speed of approximately 15 to 16.5 knots despite the fact that he, as a lookout, was unable to see navigational buoys in the shipping channel.  In fact, the Chief Officer stated that the ship would not be moving in the foggy conditions had the ship been in Chinese port.  In his opinion, the ship was moving "too fast" and in "too much fog."

26.     An "internal audit" conducted subsequently to the Bay Bridge allision revealed a number of egregious deficiencies, including but not limited to: that the speed log was not operational; navigational areas were not segregated; sole lookout was allowed without any evidence of risk assessment and deck logbook entry; manning and un-manning of ship stations were not being logged; there were no contingency plans marked on the navigation chart nor were they mentioned of contingency plans in the passage plan; navigating officers did no complete the bridge team management training; and, navigational warnings were not properly filed.

27.     On that foggy day, Defendants knew of the extremely high risk of catastrophic injury inherent in the navigation of the COSCO BUSAN.  Notwithstanding, Defendants took no action to prevent or otherwise protect Plaintiffs and Class, and demonstrated a callous and reckless disregard for human life, health and safety by departing the Port of Oakland. Defendants acted with such indifference to the consequences of their misconduct, and with such recklessness as to be willful, malicious and oppressive and in disregard of the rights of Plaintiffs thereby meriting an award of punitive or exemplary damages against Defendants.

28.     This lawsuit seeks to economically compensate the victims of the spill.

# CLASS ACTION ALLEGATIONS

29.     Plaintiffs bring this action on their own behalf and as representatives of a class consisting of:  "All  commercial fishing operations, including but not limited to crab fishermen, herring fishermen, salmon fishermen, bottom trawl fishermen, shellfish producers, seafood processors, vendors, truckers, unloaders and other distributors of seafood products, and recreational charter vessel operations and marinas, who have been injured, or otherwise financially harmed, as a result of the COSCO BUSAN Oil Spill of November 7, 2007"."

30.     The Class is so numerous that joinder of all members is impracticable.

31.     There are questions of law and fact common to the Class including, but not limited to:

    a.     Whether Defendants negligently and/or fraudulently acted to cause the spill;

    b.     Whether Defendants conducted adequate supervision to determine whether the spill could be prevented;

    c.     Whether Defendants engaged in unconscionable, deceptive, and/or unreasonable business practices and conduct;

    d.     Whether Defendants knowingly, intentionally, or negligently concealed, suppressed, or omitted material information concerning the safety of their ship from the public;

    e.     Whether the Class has suffered injury by virtue of the Defendants' negligence, recklessness, carelessness, and/or unconscionable and/or deceptive business practices and conduct; and

    f.     Whether Defendants are strictly liable to the Class, by virtue of State and Federal Law.

    g.     Whether the COSCO BUSAN was unseaworthy and such unseaworthiness was a proximate cause of the November 7, 2007 Oil Spill.

32.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

33.     The claims of the named Plaintiffs are typical of the claims of the respective Class they seek to represent.

34.    In the case of the proposed Court-supervised "Clean-Up" Program, the representative Plaintiffs and the Class as a whole will benefit from such relief.

35.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class they seek to represent.

36.    Plaintiffs have retained the undersigned counsel competent and experienced in complex class actions to represent them and the members of the proposed Class.  Accordingly, the interests of the Class will adequately be protected and advanced.  In addition, there is no conflict of interest among Plaintiffs and the members of the proposed Class.

37.    Class certification is appropriate because Defendants have acted on grounds generally applicable to the Class, making appropriate injunctive and/or declaratory relief.

38.    Class certification is also appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because, as set forth above, common issues of law and fact predominate over any individual issues and certification of the claims as class claims is superior to other available methods for the fair and efficient adjudication of these claims.  In addition, there would be enormous economies to the courts and parties in litigating these common issues on a class-wide basis rather in individual trials.  Plaintiffs foresee no difficulties in the management of this action as a class action.

## JOINT AND SEVERAL LIABILITY

39.    On information and belief, Plaintiffs contend that at all material times hereto, the owners, operators, managers and charterers of the COSCO BUSAN were operating the vessel while it was within the navigable waters of San Francisco Bay pursuant to a joint venture agreement with The San Francisco Bar Pilots Association and its members, including Captain John Cota.  That such joint operating agreement creates joint and several liability for all damages arising from the oil spill from the COSCO BUSAN on November 7, 2007.

## CLASS CLAIMS

### FIRST CAUSE OF ACTION

### [Mandatory "Clean Up" Program]

### [Against COSCO BUSAN, Regal Stone, Hanjin, Synergy, and Fleet Management]

40. Plaintiffs hereby restates and realleges each and every allegation set forth above with the same force and effect as if set forth herein and repeated at length.

41. As a direct result of Defendants' actions and omissions, Plaintiffs and Class have been injured. The Bay Area spill requires immediate "clean up" of the toxins. Defendants are responsible for the spill.

42. Accordingly, Defendants should be required to establish a fund and emergency "clean-up" program.

### SECOND CAUSE OF ACTION

### [Strict Liability]

### [Against All Defendants]

43. Plaintiffs hereby restates and realleges each and every allegation set forth above with the same force and effect as if set forth herein.

44. At all times herein, Defendants were the owners, charterers, custodians, and/or operators of the COSCO BUSAN which caused the incident described herein.

45. At all times relevant to this action, Defendants had supervision, custody, navigation and control of the COSCO BUSAN from which the harmful oil spill occurred.

46. At all times herein, Defendants were under a continuing duty to protect Plaintiffs and proposed class from the harm occasioned by the COSCO BUSAN within its custody, navigation and control.

47. The oil spill herein was occasioned by its ruin, vice, unseaworthiness or defect.

48. Defendants knew or, in the exercise of reasonable care, should have known of the ruin, vice, unseaworthiness or defect which caused the oil spill.

49. The injuries sustained by Plaintiffs as a result of the oil spill was the direct and proximate result of the strict liability of the Defendants.

50.     Due to the Defendants strict liability, Plaintiffs and Class members are entitled to recover actual damages.

51.     The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as herein above set forth.

## THIRD CAUSE OF ACTION

### [Negligence]

### [Against All Defendants]

52.     Plaintiffs hereby restate and reallege each and every allegation set forth above with the same force and effect as if set forth herein.

53.     The Defendants owed a duty to Plaintiffs and the Class to exercise reasonable and ordinary care.

54.     The Defendants breached their duty to Plaintiffs and the Class.

55.     The Defendants in the exercise of reasonable care should have known that the ship would or could hit the bridge.

56.     As direct and proximate result of the Defendants' negligence, Plaintiffs and the Class have sustained damages.

WHEREFORE, Plaintiffs on behalf of themselves and all others similarly situated, demands judgment against the Defendants for compensatory damages for himself/herself and each member of the Class, for establishment of a common fund, plus attorneys' fees, interests and costs.

## FOURTH CAUSE OF ACTION

### [Violation of the Unfair Competition Act, Cal. Bus. & Prof. Code § 17200, *et seq.*]

### [Against All Defendants]

57.     Plaintiffs hereby restate and reallege each and every allegation set forth above with the same force and effect as if set forth herein.

58.     As described herein, Defendants' conduct constitutes unfair competition within the meaning of the Unfair Competition Act, Cal. Bus. & Prof. Code § 17200, *et seq.* (the "Act"),

insofar as the Act prohibits "any unlawful, unfair or fraudulent business act or practice" or "unfair, deceptive, untrue or misleading advertising."

59.     Defendants have engaged and continue to engage in unfair competition in violation of the Act.

60.     Defendants' conduct constitutes unlawful business acts or practices under the Act insofar as it violates, *inter alia,* Business and Professions Code §§ 17500 *et seq.* and California Civil Code §§ 1750 *et seq.*

61.     Defendants' conduct constitutes "fraudulent" business practices within the meaning of the Act in that members of the public have been harmed.

62.     Defendants' conduct amounts to "unfair" business practices insofar as the Act forbids all wrongful business activities in any context in which they appear.  Moreover, as described herein, Defendants' practices offend established public policies, and are immoral, unethical, oppressive, and unscrupulous.  The impact of the Defendants' practices is in no way mitigated by any justifications, reasons or motives.  The Defendants' conduct has no utility when compared to the harm done to Plaintiffs and other members of the Class.

63.     Defendants conduct constituted a violation several statutes, ordinances, or regulations including but limited to the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act ("Lempert-Keene Act"), Government Code Section 8670, *et seq.* as well as the Porter-Cologne Water Quality Control Act ("Porter-Cologne Act"), Cal. Water Code Section 13000, *et seq.*, and, Cal. Fish & Game Code Section 5650, *et seq.*

64.     As a direct and proximate result of the Defendants' unfair methods of competition and unfair and deceptive acts or practices, Plaintiffs and the Class have sustained damages.

65.     As a proximate result of their unfair methods of competition and unfair or deceptive acts or practices, the Defendants have been unjustly enriched and should be required to make restitution to Plaintiffs and the Class pursuant to Bus. & Prof. Code §§ 17203 and 17204.

66.     The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as herein above set forth.

# FIFTH CAUSE OF ACTION

**[Strict Liability Under Lempert-Keene-Seastrand**
**Oil Spill Prevention and Response Act, Government Code Section 8670, *et seq.*]**
**[Against COSCO BUSAN, Regal Stone, Hanjin, Synergy, and Fleet Management]**

67.    Plaintiffs hereby restate and reallege each and every allegation set forth above with the same force and effect as if set forth herein.

68.    The Lempert-Keene Act provides that "[a]ny responsible party, as defined in Section 8670.3, shall be absolutely liable without regard to fault for any damages incurred by any injured party which arise out of, or are caused by, the discharge or leaking of oil into or onto marine waters." Cal. Gov. Code Section 8670.56.5 (a).

69.    The San Francisco Bay and surrounding ocean areas are "marine waters," as defined in Section 8670.03 (i).

70.     The "Responsible parties" include "the owner or transporter of oil or a person or entity accepting responsibility for the oil;" and "the owner, operator, or lessee of, or person who charters by demise, any vessel ... or a person or entity accepting responsibility for the vessel ...." Cal. Gov. Code Section 8670.3 (w).

71.     As the owner, operator, lessee, or charterer by demise of the vessel and owner or transporter of the oil of the discharged oil, Defendants Regal Stone Ltd., Hanjin Shipping Co., Ltd., Fleet Management Ltd., Synergy Maritime, Ltd., and COSCO BUSAN are responsible parties that are absolutely liable under the Lempert-Keene Act.

72.    The bunker fuel that was discharged from the vessel is "oil" within the meaning of the Act, which defines "oil" as "any kind of petroleum, liquid hydrocarbon, or petroleum products or any faction or residues therefrom, including ... bunker fuel ...." Cal. Gov. Code Section 8670.3 (n).

73.    On November 7, 2007, defendants discharged or leaked bunker fuel into the San Francisco Bay, and are therefore absolutely liable without regard to fault for all damages that plaintiffs sustained or will sustain.

Audet & Partners, LLP
www.audetlaw.com

74. The Lempert-Keene Act entitles a plaintiff to recover a broad variety of damages, including, without Limitation, the costs of investigation, response, containment, removal and treatment, damages for injury to, or economic losses resulting from destruction of or injury to real or personal property, lost faxes, royalties, rents, or net profit shares caused by the injury, destruction, loss, or impairment of as of real property, and personal property. Cal. Gov. Code Section 8670.56.5 (h).

75. The contamination legally caused by the discharge of bunker fuel by the COSCO BUSAN into or upon the San Francisco Bay injured, destroyed, caused to be lost, and/or impaired the use of natural resources on which Plaintiffs and the class depend for their livelihood, including but not limited to, the local populations of Dungeness crab and herring.

76. The injury, destruction, loss, and/or impairment of usability of these natural resources has caused Plaintiffs and the class to lose profits, and will cause future losses of profits by Plaintiffs and the class and/or impairment of their earning capacities.

77. The likely long-lasting effects of the contamination of the discharge of bunker fuel into the San Francisco Bay by the Ship on the marine life on which Plaintiffs' and the class' livelihoods depend, especially but not limited to, the Dungeness crab and herring fish, requires that Plaintiffs and the class continue future monitoring and testing activities in order to ensure that such marine life is not contaminated and is safe and fit for human consumption.

78. Plaintiffs on behalf of themselves and all others similarly situated, demands judgment against the Defendants for compensatory damages for himself/herself and each member of the Class, for establishment of a common fund, plus attorneys' fees, interest, costs, and additional relief as set forth below.

79. The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as herein above set forth.

## SIXTH CAUSE OF ACTION

### [Negligence Per Se]

### [Against All Defendants]

80. Plaintiffs incorporates by reference all preceding paragraphs as if fully set forth

herein and further alleges as follows:

81.    At all times herein mentioned, Defendants negligently, wantonly, carelessly and/or recklessly hired, retained, supervised, trained, and/or entrusted the COSCO BUSAN to one another, for the purpose of transporting cargo aboard a container ship filled with bunker fuel through the San Francisco Bay.  Thereafter, the Defendants, and each of them, controlled, navigated, and/or managed the COSCO BUSAN with the knowledge, consent, permission, and/or within the scope of authority conferred by Defendants.

82.    Defendants violated several statutes, ordinances, or regulations including but limited to the Lempert-Keene Act, Government Code Section 8670, *et seq*. as well as the Porter-Cologne Act, Cal. Water Code Section 13000, *et seq*., and, Cal. Fish & Game Code Section 5650, *et seq.*

83.    As a direct and legal cause of the Defendants wrongful acts and omissions herein above set forth, Plaintiffs and Class have suffered and will suffer economic harm, injury, and losses.

84.    Plaintiffs' harm resulted from the occurrence of the nature that the Lempert-Keene Act and Porter-Cologne Act were designed to prevent.

85.    Plaintiffs are members of the class of persons for whose protection the Lempert-Keene Act and Porter-Cologne Act were adopted.

86.    The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as herein above set forth.


## SEVENTH CAUSE OF ACTION
### [Public Nuisance]
### [Against COSCO BUSAN, Regal Stone, Hanjin, Synergy, and Fleet Management]

87.    Plaintiffs incorporates by reference all preceding paragraphs as if fully set forth herein and further alleges as follows:

88.    Defendants have created a condition that affects a substantial number of individuals similarly situated to the Plaintiffs; and a condition which would reasonably annoy

and disturb an ordinary person.  The particular conduct constituting a nuisance is the discharge of approximately 58,000 gallons of fuel in the San Francisco Bay.

89.     The seriousness and gravity of the harm outweighs the social utility of Defendants' conduct.

90.     Plaintiffs and Class suffered harm and injury to their economic livelihood, which they did not consent to and which is different from the type of harm which is suffered by the general public.

91.     The above acts and omissions also created a public nuisance vis-a-vis the Plaintiffs and the Class, interfering with the property rights of Plaintiffs and the Class, and rights incidental to those property rights.

92.     The acts and omissions of the Defendants described herein were also in violation of various California state laws including but not limited to the Lempert-Keene Act, Government Code Section 8670, *et seq*., and  the Porter-Cologne Act, Water Code Sections 13000, *et seq*., and Cal. Fish & Game Code Section 5650, *et seq.*

93.     Defendants' violations of these statutes directly and proximately caused, and will cause, injury to Plaintiffs and the Class of a type which the statutes are intended to prevent. Plaintiffs and the Class are of the class of persons for whose protection these statutes were enacted.

94.     As a direct and legal cause of the Defendants wrongful acts and/or omissions herein above set forth, Plaintiffs and the Class have suffered and will suffer economic harm, injury, and losses as herein above set forth.

95.     In  maintaining the nuisance, Defendants are acting with full knowledge of the consequences and damage being caused, and the acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as herein above set forth.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court enter a judgment against the Defendants and in favor of the Plaintiffs and the Class and award the following relief:

A.     That this action be certified as a class action on behalf of the proposed Class described herein and that counsel of record be appointed to represent the Class;

B.     That a comprehensive Court-supervised "Clean-Up" Program be established;

C.     For general damages in an amount to be proven at the time of trial;

D.     For special damages in an amount to be proven at the time of trial;

E.     For pre-judgment and post-judgment interest on the above general and special damages;

F.     For restitution and disgorgement of all profits;

G.     For compensatory and other damages, as the Court may determine;

H.     For any damages or penalties pursuant to the Lempert-Keene Act, and any other applicable law;

J.     Costs, including experts' fees and attorneys' fees and expenses, and the costs of prosecuting this action; and

K.     That the Defendant Vessel be arrested, including all appurtenances, and cargo aboard that the plaintiffs have judgment against them, in amounts to be proven at trial, with additional interest, attorneys' fees, costs, and applicable federal and state penalties to be proven at trial;

L.     That the plaintiffs' claims be determined to be valid maritime claims against the Defendant Vessel, with priority over all other interests, claims or liens, as provided by law;

M.     That the Defendant Vessel be condemned and sold to pay the judgment of the plaintiffs and a lien be created under federal law;

N.     That the plaintiffs have judgment against all *in personam* Defendants for compensatory and exemplary damages, in an amount to be proven at trial, plus interest, attorneys' fees, and costs; and

O.     For such other relief as this court deems just and equitable under the circumstances.

//

## PUNITIVE DAMAGES

P.      For exemplary and punitive damages, to the extent permissible by law and in an amount to be proven at the time of trial, and sufficient to punish Defendants or to deter them and other from repeating the injurious conduct alleged herein or similar conduct.  Defendants knew of the extremely high risk of catastrophic injury inherent in the control, navigation, and management of the COSCO BUSAN.  Notwithstanding, Defendants took no action to prevent or otherwise protect Plaintiffs and Class, and demonstrated a callous and reckless disregard for human life, health and safety.  Defendants acted with such indifference to the consequences of their misconduct, and with such recklessness as to be willful, malicious and oppressive and in disregard of the rights of Plaintiffs thereby meriting an award of punitive or exemplary damages against Defendants and in favor of Plaintiffs for the purpose of deterring them from such future misconduct and to make a public example of their egregious, wrongful and despicable acts. Plaintiffs are not presently aware of the true net worth of Defendants and therefore cannot ascertain an amount which would properly punish them by way of punitive damages, and Plaintiffs pray leave to amend this complaint to insert the same herein when Defendants' true net worth is finally ascertained so that a jury may hear all the evidence and render a full, fair and complete verdict condemning their outrageous misconduct.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demands a jury trial as to all claims triable in this action.


Dated: July 29, 2008                    AUDET & PARTNERS, LLP

                                        /s/ William M. Audet

                                        William M. Audet
                                        Michael McShane
                                        Adel A. Nadji
                                        221 Main Street, Suite 1460
                                        San Francisco CA 94105
                                        Telephone: 415.982.1776
                                        Facsimile: 415.568.2556

                                        *On Behalf of Plaintiffs and*
                                        *the Class*

1  Anthony M. Urie (Cal. State Bar #92363)
   Law Offices of Anthony M. Urie
2  18025 17th Ave NW
   Shoreline, WA, 98177
3

## VERIFICATION

I am the attorney of record for Plaintiffs and class in this action, and make this verification pursuant to Admir. L.R. 2-1;  I have read the forgoing complaint, know the contents thereof, and from information officially furnished to me believe the same to be true.

I verify under penalty of perjury, in accordance with 28 U.S.C. §1746, that the forgoing is true and correct.

Dated:  July 29, 2008

/s/ William M. Audet
William M. Audet

1

## PROOF OF SERVICE

2

## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4        I am employed in the County of San Francisco, State of California; my business address is 221 Main Street, Suite 1460, San Francisco, California 94105.  I am over the age of 18 and not a party to the within action.  On this date I served the following documents:

5

6                        **VERIFIED SECOND AMENDED COMPLAINT**

7    I hereby certify that on July 29, 2008, I electronically the above documents with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record listed on the Electronic Mail Notice List.

8

9    True and complete copies of the above documents were also served on the following counsel and individuals by U.S. Mail:

10

11       John D. Giffin                          David P. Shack
         Keesal, Young & Logan                   K&L Gates
12       Suite 1500                              10100 Santa Monica Blvd., 7th Floor
         Four Embarcadero Center                 Los Angeles, CA 90067
13       San Francisco, CA 94111

14       *Counsel for Regal Stone, LTD; Fleet*   *Counsel for John Cota*
15       *Management Limited; and COSCO*
         *BUSAN, in rem*

16
         Walter G. Coppenrath, Jr.               Eric P. Wise
17       George Jones                            Alecksandrs E. Drumals
         Coppenrath & Associates                 FLYNN, DELICK & WISE LLP
18       400 Oceangate, Ste 700                  One World Trade Center, Suite 1800
         Long Beach, CA 90802                    Long Beach, CA 90831
19

20       *Counsel for John Cota*                 *Counsel for Hanjin Shipping Company, Ltd.*

21

22

23   | X |   Federal: I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

24

25       Executed on this 29th day of July, 2008 at San Francisco, California.

26

27                                              Adrienne C. Brennan

28

PROOF OF SERVICE

# Exhibit 3

1   FRANK M. PITRE (SBN 100077)
    STUART G. GROSS (SBN 251019)
2   DANIEL R. STERRETT (SBN 260290)
    **COTCHETT, PITRE & McCARTHY**
3   San Francisco Airport Office Center
    840 Malcolm Road, Suite 200
4   Burlingame, CA 94010
    Telephone: (650) 697-6000
5   Facsimile: (650) 697-0577
    fpitre@cpmlegal.com; sgross@cpmlegal.com
6   dsterrett@cpmlegal.com

7   WILLIAM M. AUDET (SBN 117456)
    ADEL NADJI (SBN 232599)
8   **AUDET & PARTNERS LLP**
    221 Main Street, Suite 1460
9   San Francisco, CA 94105
    Telephone: (415) 568-2555
10   Facsimile: (415) 568-2556
    waudet@audetlaw.com; anadji@audetlaw.com

11

    *Attorneys for Plaintiffs*

12

            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

13

            **IN AND FOR THE COUNTY OF SAN FRANCISCO**

14

15   **JOHN TARANTINO; STEVEN F. FITZ,** )
    **dba FITZ-BUSKIRK, INC.; JOHN** )
16   **ATKINSON; SEAN M. HODGES;** )
    **ERNIE KOEPF; SAU A. PHANG; KIU** )
17   **A. PHANG SIN; NICK RELOBA; JOHN** )
    **P. TARANTINO and others similarly** )
18   **situated,** )

19

20                   **Plaintiffs,** )

21           **v.** )

22   **HANJIN SHIPPING CO., LTD.; REGAL** )
    **STONE, LTD.; FLEET** )
23   **MANAGEMENT, LTD.; JOHN J.** )
    **COTA; and DOES 2-100,** )
24             **Defendants.** )

25

26

27

28

    **CASE NO.  CGC-07-469379**

    **CLASS ACTION**
    **SECOND AMENDED COMPLAINT FOR**
    **DAMAGES BASED UPON:**

1.   **VIOLATION OF THE LEMPERT-
      KEENE-SEASTRAND OIL SPILL
      PREVENTION AND RESPONSE
      ACT [Gov't Code §§ 8670, *et seq.*];**

2.   **STRICT LIABILITY - ULTRA
      HAZARDOUS ACTIVITY;**

3.   **NEGLIGENCE;**

4.   **PUBLIC NUISANCE
      [Civ. Code §§ 3479 *et seq*];**

5.   **PRIVATE NUISANCE
      [Civ. Code §§ 3479 *et seq*]; and**

6.   **ENVIRONMENTAL
      MONITORING.**

          **JURY TRIAL DEMANDED**

ENDORSED
F I L E D
Superior Court of California
County of San Francisco

MAR 2 3 2010

CLERK OF THE COURT
BY: _____ WESLEY RAMIREZ
              Deputy Clerk

BY FAX

---

**SECOND AMENDED CLASS ACTION COMPLAINT**
**Case No. CGC-07-469379**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page No.**

I.     INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    PARTIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.    The Plaintiffs.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       B.    The Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       C.    The DOE Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

       D.    Agency, Employment And Joint Venture.. . . . . . . . . . . . . . . . . 10

III.   JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.    CLASS ACTION ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       A.    Timeline Of The Collision And Spill.. . . . . . . . . . . . . . . . . . . 13

       B.    Construction, Ownership, Management, Operation, And Control Of
             the Ship.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

             1.    Construction Of the Ship. . . . . . . . . . . . . . . . . . . . . . . . 16

             2.    Ownership, Leasing, Management, Operation, Charter, And
                   Control Of the Ship. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       C.    Bunker Fuel - The Contaminant Involved . . . . . . . . . . . . . . . . 18

             1.    Toxicity Of Bunker Fuel. . . . . . . . . . . . . . . . . . . . . . . . 18

             2.    Consequences of Bunker Fuel Spills. . . . . . . . . . . . . . . . 18

       D.    Extent Of Damages To Plaintiffs And The Class.. . . . . . . . . . . . 21

             1.    The San Francisco Bay Area Dungeness Crab Fishery.. . . . . 21

                   a.    Development Of The Fishery.. . . . . . . . . . . . . . . . 21

                   b.    San Francisco Dungeness Crab Season.. . . . . . . . . . 23

                   c.    Immediate Effects Of The Oil Spill On The
                         Dungeness Crab Fishery. . . . . . . . . . . . . . . . . . . 24

                   d.    Long-term Effects On The Dungeness Crab Fishery. . 25

             2.    The San Francisco Bay Area Flat Fish Fishery. . . . . . . . . . 27

             3.    Other Fisheries Of The San Francisco Bay. . . . . . . . . . . . 28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

VI.   CAUSES OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

FIRST CAUSE OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

SECOND CAUSE OF ACTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

THIRD CAUSE OF ACTION.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

FOURTH CAUSE OF ACTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

FIFTH CAUSE OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

SIXTH CAUSE OF ACTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

SEVENTH CAUSE OF ACTION.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

JURY DEMAND.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## I. <u>INTRODUCTION</u>

1.      This action is the byproduct of reckless indifference, inattention, and mismanagement among those responsible for the control of a 68 thousand ton container ship called the COSCO BUSAN (hereinafter "the Ship"), which smashed into the Delta Tower of the Bay Bridge at 8:37 a.m. on November 7, 2007.  The collision tore a horizontal gash in the side of the Ship 100 feet long, 12 feet wide, and 3 feet deep, shown in the photo below which appeared in the San Francisco Chronicle.  Approximately 58,000 gallons of highly toxic bunker fuel poured into the San Francisco Bay, befouling for years one of the most beautiful and productive bodies of water in the world (hereinafter "the Spill").



2.      The polluting of the San Francisco Bay and its marine life was a direct and foreseeable consequence of a combination of wrongful acts and omissions by those who owned, operated, maintained, managed, chartered, leased

and/or exercised control over the Ship and/or the bunker fuel transported therein at the time of the Spill; hereinafter identified as Defendants HANJIN SHIPPING CO., LTD. (hereinafter "HANJIN"); REGAL STONE, LTD. (hereinafter "REGAL"); JOHN COTA (hereinafter "COTA"); FLEET MANAGEMENT LTD. (hereinafter "FLEET"); and/or Does 2-50.

3.    On the day of the accident,  Defendant COTA was the pilot navigating the Ship through the San Francisco Bay.  COTA was navigating with the assistance of Captain Mao Cai Sun, and a crew comprised of agents, employees, servants and/or joint venturers of the Defendants HANJIN, REGAL, FLEET, and/or Does 2-50.

4.    Defendant COTA, who had a history of accidents, piloted the enormous Ship out of the Bay and through the towers of the Bay Bridge despite: (1) the presence dense fog; (2) concerns regarding the accuracy of navigational equipment; and (3) no functional ability to communicate with the Ship's Captain and crew.  Predictably, the 131-foot wide Ship veered off course and broadsided the Delta Tower.

5.    The reaction of the Ship's crew, Captain Mao and Defendant COTA to the bridge collision and Spill displayed a conscious indifference for the environmental consequences.  Instead of urgently assessing the true extent of highly toxic bunker fuel which had spewed from the ruptured side of the Ship into the Bay, the Ship's crew reported, without any reliable basis, that only 140 gallons had spilled.  The United States Coast Guard relied on the grossly inadequate assessment for the purpose of mounting a response, and did not learn that the true amount was 400 times greater for another eight hours.  Incomprehensibly, Captain Mao also waited approximately one hour before contacting private spill-containment operators, allowing the bunker fuel to spread from the gash unabated.

6.    The magnitude of this calamity has triggered consequences of immediate and long-term proportion to the environmental health of the Bay and its

1   marine life.  Plaintiffs herein have suffered profound economic losses to their

2   livelihood as a direct, legal and foreseeable result of public health concerns over

3   the short and long-term safety of crab and other seafood for human consumption

4   and the damage caused to the productivity of the Bay.

5   **II.   PARTIES**

6           **A.   The Plaintiffs**

7           7.   **JOHN TARANTINO**:  Plaintiff JOHN TARANTINO (hereinafter

8   "TARANTINO") is, and at all relevant times herein was, an individual residing in

9   the City of Corte Madera, County of Marin, California.  TARANTINO has earned

10  a living as a commercial fisherman in the San Francisco Bay Area for 35 years.

11  For much of that time, TARANTINO served as the owner and skipper of the

12  fishing vessel "The Crown Royal," berthed at the Wharf in San Francisco, where

13  he is actively engaged in fishing for crab, as well as various vertebrate fish.

14  TARANTINO receives more than 25% of his earnings from the fishing of these

15  species during the applicable seasons for each.  Plaintiff TARANTINO has

16  suffered economic injury, harm and/or damages to his livelihood as a commercial

17  fisherman as a direct, legal and foreseeable consequence of the wrongful acts

18  and/or omissions of Defendants, and each of them, more particularly set forth

19  herein.

20          8.   **STEVEN F. FITZ:** Plaintiff STEVEN F. FITZ (hereinafter "FITZ")

21  is, and at all relevant times herein was, an individual residing in El Granada,

22  County of San Mateo, California.  FITZ has earned a living as a commercial

23  fisherman for over 35 years, the last 27 of which he has spent in the San Francisco

24  Bay Area.  Since 1989 Fitz has served as the owner and skipper of the fishing

25  vessel "Mr. Morgan" depicted in the photo below, berthed in Pilar Point Harbor in

26  Half Moon Bay where he is actively engaged in fishing for crab, as well as "flat

27  fish," including species more commonly known as Petrale, English sole, Skate,

28  and Sand Dabs, under the name Fitz-Buskirk, Inc.  FITZ receives more than 25%

of his earnings from the fishing of these species during the applicable seasons for each.  Plaintiff FITZ, dba Fitz-Buskirk, Inc., has suffered economic injury, harm and/or damages to his livelihood as a commercial fisherman as a direct, legal and foreseeable consequence of the wrongful acts and/or omissions of Defendants, and each of them, more particularly set forth herein.



9.     **JOHN ATKINSON**:  Plaintiff JOHN ATKINSON (hereinafter "ATKINSON") is, and at all relevant times herein was, an individual residing in the City of Corte Madera, County of Marin, California.  ATKINSON has earned a living as a commercial fisherman in the San Francisco Bay Area for over 17 years. Since 1990, ATKINSON has served as the owner and skipper of the fishing vessel "New Rayann," berthed in Sausalito.  ATKINSON is actively engaged in fishing for crab and other fishing activities.  ATKINSON receives more than 25% of his earnings from the fishing of crab during the applicable season.  Plaintiff ATKINSON has suffered economic injury, harm and/or damages to his livelihood

as a commercial fisherman as a direct, legal and foreseeable consequence of the wrongful acts and/or omissions of Defendants, and each of them, more particularly set forth herein.

10. **SEAN M. HODGES**:  Plaintiff SEAN M. HODGES (hereinafter "HODGES") is, and at all relevant times herein was, an individual residing in Novato, County of Marin, California.  HODGES has earned a living as a commercial fisherman in the San Francisco Bay Area for over 15 years.  Since 1996, HODGES has served as the owner and skipper of the fishing vessel "Hog Heaven," berthed in Sausalito.  HODGES is actively engaged in fishing for crab and other fishing activities.  HODGES receives more than 25% of his earnings from the fishing of crab during the applicable season.  Plaintiff HODGES has suffered economic injury, harm and/or damages to his livelihood as a commercial fisherman as a direct, legal and foreseeable consequence of the wrongful acts and/or omissions of Defendants, and each of them, more particularly set forth herein.

11. **ERNIE KOEPF:**  Plaintiff ERNIE KOEPF (hereinafter "KOEPF") is, and at all relevant times herein was, an individual residing in Oakland, County of Alameda, California.  KOEPF has earned a living as a commercial fisherman in the San Francisco Bay Area for over 36 years.  KOEPF is the owner and skipper of the fishing vessels "F/V Ursula B" and the "F/V Betty Jane," which are both berthed at Fisherman's Wharf in San Francisco.  KOEPF is actively engaged in fishing for herring and salmon and receives more than 25% of his earnings from the fishing of these species during the applicable season for each.    Plaintiff KOEPF has suffered economic injury, harm and/or damages to his livelihood as a commercial fisherman as a direct, legal and foreseeable consequence of the wrongful acts and/or omissions of Defendants, and each of them, more particularly set forth herein.  Throughout his career as a Bay Area commercial fisherman, KOEPF has been a leader in the community.  KOEPF is currently serving as:

1   Chair of the Director's Herring Advisory Council; President of the California

2   Herring Fishermen's Association; Director of the Pacific Coast Federation of

3   Fishermen's Associations, California Herring Association;  Member of the

4   California Advisory Council on Salmon and Steelhead Trout; and Project

5   Supervisor/Development of Fishing Families Outreach.

6       12.    **SAU A.  PHANG:**  Plaintiff SAU A. PHANG (hereinafter

7   "PHANG") is, and at all relevant times herein was, an individual residing in the

8   City and County of San Francisco.  PHANG has earned a living as a commercial

9   fishermen, with his partner and wife Kiu A. Phang Sin, in the San Francisco Bay

10  Area for over 20 years.  Since approximately 2002, PHANG has served as the

11  owner and skipper of the fishing vessel "Car Vella," berthed in Oyster Point.

12  PHANG is actively engaged in fishing for rock fish and receives more than 25%

13  of his earnings from the fishing of rock fish during the applicable seasons.

14  Plaintiff PHANG has suffered economic injury, harm and/or damages to his

15  livelihood as a commercial fisherman as a direct, legal and foreseeable

16  consequence of the wrongful acts and/or omissions of Defendants, and each of

17  them, more particularly set forth herein.

18      13.    **KIU A. PHANG SIN:**  Plaintiff KIU A. PHANG SIN (hereinafter

19  "SIN") is, and at all relevant times herein was, an individual residing in the City

20  and County of San Francisco.   SIN has earned a living as a commercial fisherman,

21  with her partner and husband Sau A. Phang, in the San Francisco Bay Area for

22  over 20 years.  Since approximately 2000, SIN has served as the owner and

23  skipper of the fishing vessel "Hop Sang III," berthed in Oyster Point.  SIN is

24  actively engaged in fishing for rock fish and receives more than 25% of her

25  earnings from the fishing of rock fish during the applicable seasons.  Plaintiff SIN

26  has suffered economic injury, harm and/or damages to her livelihood as a

27  commercial fisherman as a direct, legal and foreseeable consequence of the

28

1   wrongful acts and/or omissions of Defendants, and each of them, more particularly

2   set forth herein.

3       14.   **NICK RELOBA:** Plaintiff NICK RELOBA(hereinafter "RELOBA")

4   is, and at all relevant times herein was, an individual residing in Patterson, County

5   of Stanislaus, California.  RELOBA has earned a living as a commercial

6   fisherman, in the San Francisco Bay Area for over 15 years.  For this period

7   RELOBA has been the owner and skipper of the fishing vessel "Junior," which is

8   berthed at the Wharf in San Francisco.  RELOBA is actively engaged in fishing

9   for halibut and surf perch and receives more than 25% of his earnings from the

10  fishing of halibut and surf perch during the applicable seasons.  Plaintiff RELOBA

11  has suffered economic injury, harm and/or damages to his livelihood as a

12  commercial fisherman as a direct, legal and foreseeable consequence of the

13  wrongful acts and/or omissions of Defendants, and each of them, more particularly

14  set forth herein.

15      **15.   JOHN P. TARANTINO:** Plaintiff **JOHN P. TARANTINO**

16  (hereinafter "JP TARANTINO") is, and at all relevant times herein was, an

17  individual residing in the San Rafael in the County of Marin.  JP TARANTINO

18  has earned a living as a commercial fisherman, including as a supplier of live bait,

19  in the San Francisco Bay Area for approximately 20 years.  JP TARANTINO is

20  actively engaged as a commercial fisherman including as a live bait supplier and

21  receives more than 25% of his earnings from the sale of live bait, primarily

22  anchovies, caught by harvesters in and around the San Francisco Bay area waters

23  and sells live bait to sport fish charter operators in the San Francisco Bay.

24  Plaintiff JP TARANTINO has suffered economic injury, harm and/or damages to

25  his livelihood as a commercial fisherman as a direct, legal and foreseeable

26  consequence of the wrongful acts and/or omissions of Defendants, and each of

27  them, more particularly set forth herein.

28  / / /

1

### B.   **The Defendants**

2       16.    **HANJIN**:  Plaintiffs are informed and believe, and thereupon allege,

3  that HANJIN is the owner, operator, lessee, and/or charterer by demise of the Ship

4  and/or the bunker fuel transported therein at the time of the Spill.  HANJIN is, and

5  at all times herein mentioned was, a corporation, association, partnership, joint

6  venture, and/or sole proprietorship organized and existing under the laws of

7  Republic of Korea and/or headquartered at Hanjin Shipping Building, 25-11,

8  Yoido-Dong, Youngdeungpo-Gu, Seoul Korea.  HANJIN is part of the Hanjin

9  Group, a South Korean conglomerate, which includes, in addition to HANJIN,

10  Hanjin Logistics and Korean Air (KAL).  Holding a majority interest in the

11  Senator Lines, Hanjin-Senator is the seventh largest container transportation and

12  shipping company in the world, and is Korea's largest carrier, operating some 60

13  liner and tramper services transporting on 200 containerships, bulk carriers and

14  LNG carriers, more than 100 tons of cargo all over the world, including California

15  and/or the San Francisco Bay Area.

16       17.    **REGAL**:  Plaintiffs are informed and believe, and thereupon allege,

17  that REGAL is the owner, operator, lessee, and/or charterer by demise of the Ship

18  and/or the bunker fuel transported therein at the time of the Spill.  REGAL is, and

19  at all times herein mentioned was, a corporation, association, partnership, joint

20  venture, and/or sole proprietorship organized and existing under the laws of Hong

21  Kong, China and/or is based in Hong Kong, China and transacts business

22  throughout the world, including California and/or the San Francisco Bay Area.

23       18.    **FLEET:**  Plaintiffs are informed and believe, and thereupon allege,

24  that FLEET is the owner, operator, lessee, and/or charterer by demise of the Ship

25  and/or the bunker fuel transported therein at the time of the Spill.  FLEET is, and

26  at all times herein mentioned was, a corporation, association, partnership, joint

27  venture, and/or sole proprietorship organized and existing under the laws of the

28

1   Hong Kong, China and/or is based in Hong Kong, China and transacts business

2   throughout the world, including California and/or the San Francisco Bay Area.

3        19.   **COTA:** Plaintiffs are informed and believe, and thereupon allege,

4   that COTA was piloting the Ship at the time of the collision and discharge of

5   58,000 gallons of bunker fuel into the San Francisco Bay.  COTA is a 59 year old

6   individual residing in Petaluma, California.  COTA has been a local pilot for more

7   than 25 years.

8        20.   In the past 14 years COTA has had several  "incidents" requiring an

9   investigation by the State Board of Pilot Commissioners.  On several occasions,

10  the Commissioners have "counseled" COTA regarding his piloting activities on

11  the Bay.  For example, in July 2006 COTA was reprimanded after it was

12  determined that he had allowed the bulk freighter Pioneer to move out of the

13  channel and run aground when it was approaching a dock at Antioch four months

14  earlier.  The report on the incident stated:  "Capt. COTA had not realized that the

15  vessel was going off track and did nothing to prevent it."  COTA was also

16  involved in an incident in the San Francisco Bay in 2003 involving a Navy aircraft

17  carrier, for which he received a "letter of concern."

18       **C.    The DOE Defendants**

19       21.   The true names and capacities, whether individual, corporate,

20  associate or otherwise of the Defendants DOES 2 through 100 are unknown to

21  Plaintiffs who therefore sue said Defendants by such fictitious names pursuant to

22  Code of Civ. Proc. § 474.  Plaintiffs further allege that each said fictitious

23  Defendant is in some manner responsible for the acts and occurrences hereinafter

24  set forth.  Plaintiffs will amend this Complaint to show the true names and

25  capacities of these DOES Defendants when the same are ascertained, as well as the

26  manner in which each fictitious Defendant is responsible.

27  / / /

28  / / /

1

**D.    Agency, Employment And Joint Venture**

2    22.    At all relevant times, each of the Defendants was an agent, employee,

3  servant, partner, alter ego, and/or joint venturer of each of its/his/her co-

4  Defendants in the operation, management and control of the Ship and was at all

5  times proceeding, during, and following the Spill, acting within the course and

6  scope of said agency, employment, service, partnership, conspiracy, alter ego

7  status, and/or joint venture

8  **III.    JURISDICTION AND VENUE**

9    23.    This Court has jurisdiction over this action pursuant to Code of Civil

10  Procedure Section 410.10.  Plaintiffs seek damages and injunctive relief on behalf

11  of themselves and all others similarly situated under the statutory and common

12  laws of the State of California.

13    24.    Venue is proper in this Court because the principal acts, occurrences,

14  and injuries alleged herein giving rise to this action occurred within the County,

15  the Defendants transact business within the County, and/or Plaintiffs

16  TARANTINO, KOEPF, PHANG, and SIN are residents of the County.

17    25.    This Court has jurisdiction over the Defendants because they transact

18  business in California, and the principal acts, occurrences, and injuries alleged

19  herein giving rise to this action occurred in California.

20    26.    Plaintiffs' class action complaint only asserts causes of action under

21  the statutory and common law of the State of California.

22  **IV.    CLASS ACTION ALLEGATIONS**

23    27.    Plaintiffs bring this action on their own behalf and as representatives

24  of a class consisting of:

25    **"all commercial fishing operations, including crab, herring, flat
    fish, salmon, rock fish, and other fish, which are commercially
26    fished in and around the San Francisco Bay and surrounding
    ocean areas."**

27  / / /

28

---

**SECOND AMENDED CLASS ACTION COMPLAINT**
**Case No. CGC-07-469379**                                                            10

1    28.    The class is so broad and numerous that joinder of all members is

2    impracticable.  Although its exact number is unknown, it is estimated that there

3    are more than 1000 class members.

4    29.    Plaintiffs are members of the class, and their claims are typical of the

5    claims of all members.

6    30.    Plaintiffs will fairly and adequately protect the interests of all of the

7    class, and the interests of each are coincident and not antagonistic with those of

8    the remainder of the class.

9    31.    Plaintiffs are represented by counsel experienced with class action

10   and complex litigation and in the prosecution of violations of law arising out of

11   large scale environmental pollution.

12   32.    There are common questions of law and fact common to the class in

13   relation to their claims against Defendants, including, but not limited to:

14          (a)    Whether the Defendants are strictly liable for the economic

15                 damages caused to Plaintiffs and the class which are the direct

16                 and legal result of the discharge of 58,000 gallons of bunker

17                 fuel from the Ship under the Lempert-Keene-Seastrand Oil

18                 Spill Prevention and Response Act, Gov't Code §§ 8670, *et*

19                 *seq*.;

20          (b)    Whether the transport of 58,000 gallons of highly toxic bunker

21                 fuel through the San Francisco Bay constitutes an ultra-

22                 hazardous activity, and thus whether Defendants are strictly

23                 liable for any harm flowing from such activity;

24          (c)    Whether Defendants were negligent, reckless, willful, wanton

25                 or malicious in their conduct which resulted in the discharge of

26                 58,000 gallons of bunker fuel into and upon the San Francisco

27                 Bay;

28   / / /

(d)   Whether Defendants have created a public and/or private nuisance by causing or contributing to the discharge of 58,000 gallons of highly toxic bunker fuel into and upon the San Francisco Bay and surrounding ocean areas;

(e)   Whether such violations of law are the direct and proximate cause of the economic injuries suffered by the Plaintiffs and the class;

(f)   Whether the wrongful acts and/or omissions of Defendants warrant creation of a monetary fund for future monitoring, testing, evaluation and assessment of the safety and/or fitness of seafood caught for human consumption from the San Francisco Bay and surrounding ocean areas; and

(g)   Whether injunctive or other equitable relief for the benefit of the class is appropriate.

33.   These and other common questions of law and fact predominate over questions affecting only individual members.

34.   A class action is superior to other methods of adjudication for a fair and efficient administration of this controversy.  Prosecution of these claims within the procedural device of a class action will reduce the possibility of repetitious litigation and conflicting results, while producing redress for claims too small to support the expense of individual, complex litigation.

35.   Individual adjudications of class member claims, which would as a practical matter be dispositive of the interests of other members not parties to the action, might substantially impair or impede the ability of the absent members to protect their interests, particularly in regard to claims against defendants for punitive damages.

36.   Individual adjudications of class member claims would also create the possibility of conflicting results, particularly on issues related to the

1    apportionment of fault and responsibility amongst the Defendants, and thus be

2    detrimental to the interests of the Defendants.

3    **V.   FACTS**

4         **A.   Timeline Of The Collision And Spill**

5         37.    On or about October 23, 2007, the Ship initiated its voyage from

6    Shanghai, China to Busan, South Korea; and thereafter to Long Beach, California,

7    arriving in Long Beach on November 3, 2007.  The Ship subsequently sailed from

8    Long Beach to Oakland, California, arriving in Oakland on the afternoon of

9    November 6, 2007.

10        38.    On the morning of November 7, 2007, the Ship left Oakland to return

11   to Buson, South Korea, carrying 2,500 20-foot containers for the China Ocean

12   Shipping Company (COSCO), one of the world's biggest shipping agencies

13   headquartered in Shanghai, China.

14        39.    As COTA, Captain Mao, and the Ship's crew attempted to navigate

15   the Ship out of Oakland Harbor through the San Francisco Bay and into the

16   openocean, the Ship collided with the Delta Tower of the Bay Bridge, tearing a

17   large gash in its fuel tanks and discharging approximately 58,000 gallons of toxic

18   bunker fuel into and upon the Bay.  This was the ***first ever collision between a***

19   ***vessel and a Bay Bridge tower*** in the bridge's seventy-year history.

20        40.    The sequence of events culminating in the collision and Spill played

21   out over a fifteen-hour period on November 7, 2007 is set forth below (all times

22   are approximate):

23              (a)   6:00 a.m. –  COTA boarded the Ship at berth 55, Oakland Inner

24                    Harbor.  COTA at first decided the fog was too thick and

25                    waited for it to lift.

26              (b)    7:30 a.m. – COTA notified the Coast Guard Vessel Traffic

27                    Service that the fog had sufficiently lifted and he intended to

28                    sail.  COTA told Vessel Traffic Service he intended to use the

---

**SECOND AMENDED CLASS ACTION COMPLAINT**
Case No. CGC-07-469379                                                                13

Delta-Echo span of the Bay Bridge. The Ship was assisted by the tug Revolution.

(c) 7:30 to 8:20 a.m. – The Ship's radar allegedly failed as the Ship was passing Yerba Buena Island in the fog.  Defendant COTA was then allegedly forced to rely on an "electronic chart" and its interpretation by Captain Mao as to the center of the 2,210-foot Delta-Echo span through which the 131-foot Ship was to pass.  During the interchange between Defendant COTA and the Ship's Captain, an incorrect heading was allegedly supplied directing the Ship *at Delta Tower*, instead of the center of the Delta-Echo span.

(d) 8:20 - 8:27 a.m. – The Coast Guard Vessel Traffic Service advised Defendant COTA that the Ship was off course.  In an effort by Defendant COTA and/or the Ship's Captain and crew to quickly readjust course, the Ship smashed into the fender of Delta Tower tearing a horizontal gash near the front of the Ship measuring 100 feet long, 12 feet wide and 3 feet deep.

(e) 8:30 a.m. – Defendant COTA reported to Vessel Traffic Service that the Ship had hit Delta Tower.  The collision had ruptured two of the Ship's fuel tanks, and the bunker fuel contained therein poured out into the Bay.  Neither Captain Mao nor Defendant COTA requested the services of private spill-containment operators for another hour.

(f) 8:52 a.m. – Personnel on a pilot boat sent from Pier 9 in San Francisco noticed that "a substantial flow of oil" was coming from the Ship.

(g) 9:03 a.m. – The Coast Guard dispatched its first vessel to the scene.

(h)  9:30 a.m.  – Captain Mao finally contacted a private spill-containment operator for assistance cleaning up the discharged bunker fuel.

(i)  9:46 a.m. – The Marine Spill Response Corp. ("MSRC"), private spill-containment operator, dispatches its first vessel to the scene.

(j)  11:00 a.m. –  Five MSRC skimming boats designed to contain and mop oil arrived on the scene.

(k)  12:15 p.m. – The Coast Guard reports the oil spill at 140 gallons based on information provided by the Defendants. The Ship is moved to anchorage south of the Bay Bridge, trailing an oil slick.

(l)  4 p.m. – Oil booms were set up at Aquatic Park and Fisherman's Wharf in San Francisco.

(m)  4:49 p.m. – Contrary to earlier assessments provided by the Defendants, the Coast Guard realizes the spill was approximately 58,000 gallons.

(n)  8:58 p.m. – The Coast Guard notifies the public of the true extent of spill.

41.  The graphic below, which appeared in the San Francisco Chronicle, shows in stark contrast the correct course, as opposed to the actual course of the Ship on the morning of November 7th.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16



Sources: Chronicle reporting; ESRI, TeleAtlas                    The Chronicle

17   **B.    Construction, Ownership, Management, Operation, And Control Of the Ship**

18          **1.    Construction Of the Ship**

19   42.    The Ship, built in 2001 by Hyundai Heavy Industries Ltd. Co. is a

20   cargo ship, shown below in a picture which appeared in the San Francisco

21   Chronicle.  Unlike modern tanker ships and other recently built cargo ships, the

22   Ship's fuel tanks are arrayed along the sides of the ship behind a single hull,

23   commonly called "winged" tanks.  In 2006, the International Maritime

24   Organization, a United Nations agency, banned winged fuel tanks along the hull in

25   ships being built or significantly modified beginning in 2010.  The agency

26   determined that these container ships should not carry fuel directly behind a single

27   layer hull, like that of the Ship.  Instead, the new ships should have their fuel tanks

28

located deeper inside the ship and behind two walls to make their puncture and subsequent discharge less likely.



### 2. Ownership, Leasing, Management, Operation, Charter, And Control Of the Ship

43.   On December 19, 2001, Defendant HANJIN publicly announced that it had acquired the Ship in a 12-year charter from the German company Conti Rederei, and launched the ship under the name Hanjin Cairo.

44.   The Ship was subsequently re-christened the COSCO BUSAN.

45.   Shortly after the Spill, HANJIN issued a press release alleging: "Synergy Marine fully operates the ship as well as manages the entire crew including the captain . . . "

46.   On the day of Spill, Darrell Wilson, an employee of MTI Network, who claimed to be speaking on behalf of REGAL publicly alleged that the Ship was managed by Fleet Management Ltd. and its crew and technical support was

provided by Synergy Management Services.  Mr. Wilson said REGAL "is stepping up to the plate.  It's their ship.  They own it.  It's fully insured."

47.    On November 10, 2007, REGAL issued a news advisory via PR Newswire, in which they acknowledged REGAL's designation as the "responsible party for the spill clean-up and response."

## C.   **Bunker Fuel - The Contaminant Involved**

48.    Bunker fuel is also known as "heavy oil," "#6 oil," "resid," "Bunker C," "blended fuel oil," "furnace oil" and other often locally used names.  Bunker fuel is technically any type of fuel oil used aboard ships.  It gets its name from the containers (known as Bunker Tanks) on ships and in ports in which it is stored. The heavy fuel oil mainly consists of residual refinery streams from the distillation or "cracking units" in the refineries.

### 1.    **Toxicity Of Bunker Fuel**

49.    Bunker fuel is an extremely toxic substance.  The heavy fuel oil making up the bulk of bunker fuel is classified as carcinogenic, harmful and dangerous for the environment according to the European Union Dangerous Substances Directive.

50.    Bunker fuel contains polycyclic aromatic compounds ("PCA") which have been shown to cause anemia, disorders of the liver, bone marrow and lymphoid tissues in rats during dermal application.  Other organs and tissues that may be damaged from bunker fuel exposure are:  blood, kidneys, liver, central nervous system and the lens or cornea of the eye.  Additionally, it has been demonstrated that certain PCA components from the heavy fuel oil are found in the urine of persons who have been exposed to the heavy fuel oil on the skin.

### 2.    **Consequences of Bunker Fuel Spills**

51.    Because of its high toxicity, bunker fuel contamination can have an overwhelmingly detrimental effect on human and marine life with which it comes into contact.

52.     During spills, bunker fuel can release Hydrogen Sulfide which is a highly flammable gas which can be fatal to humans if it is inhaled at certain concentrations.  The exhaust fumes have been reported to be an occupational hazard due to NIOSH-reported potential carcinogenic properties.  Bunker fuel can cause irritation to the eyes, skin irritation and damage to the respiratory system.  Authorities advise people to avoid liquid mist and vapor contact because it can enter the lungs, causing prolonged damage and even death.  This mist can also be absorbed through the skin, and should be avoided at any cost.  In non-vaporized liquid form, bunker fuel is less easily absorbed in the skin but loses none of its toxic and carcinogenic properties.

53.     Spilled bunker fuel can also have a devastating effect on marine life.  Bunker fuel is significantly more toxic to marine life than the crude oil that was spilled in the Exxon Valdez case.  It is heavier than crude oil, and adheres to the bodies of marine life with which it comes into contact, with equal or greater force than crude oil.

54.     Jonna Mazet, drawing on results of her laboratory experiments and other research at the University of California, Davis, Veterinary School of Medicine, stated regarding bunker fuel and crude oil:  "If you compare the two, bunker oil is more toxic."  In particular, exposure to bunker fuel poses a significantly greater risk of  damage to the reproductive systems of exposed marine life.   Research also suggests that the toxic components of bunker fuel can be taken up the aquatic food chain, as prey pass contaminants to predators.

55.     The most obvious and immediate marine life victims of a bunker fuel spill are marine mammals and birds which come into contact with the fuel while it is floating on the water.  Once in contact with spilled bunker fuel, their bodies can become coated with a thick layer of the toxic fuel.  Over time, the fuel becomes stickier, or "weathers," causing it to adhere to exposed animals with greater strength.  Because spilled bunker fuel can appear to some species of fish like

floating food, they can be attracted to it which can result in their contact with it. This can further endanger sea birds, which are attracted to schools of fish and may dive through thick oil slicks to get to them.

56.    In addition to the long-term damage which the toxicity of bunker fuel can cause in birds and marine mammals are the short-term, often fatal effects of bunker fuel coating.  The coating can significantly reduce or destroy the insulation and waterproofing properties of feathers and fur, leading to hypothermia.  Coated birds can also become easier prey because of their diminished ability to fly caused by the coating.  Moreover, when animals and birds ingest the oil by accident, which often happens while attempting to clean themselves, they often develop ulcers or bleeding in their stomachs.  Further exacerbating the situation for such animals is the reduced availability of food sources which usually accompanies a spill.

57.    Less obvious are the deleterious effects on under water marine life which occur as the oil condenses, mixes with, and drops through the water layer to the ocean floor.  Documented effects have included:  a decrease in the thickness of the fish eggs; damage to fish eggs, larvae and young fish; damage to estuaries, coral reefs, seagrass and mangrove habitats which are the breeding areas of many fish and crustaceans, interference with their breeding; and tainting of fish, crustaceans, molluscs and algae.  Because of the heavy density of bunker fuel, a far greater amount generally sinks than lighter crude oil.  This not only causes more of it to collect on the sea floor, but also allows for those parts which are water soluble to dissolve and disperse as opposed to evaporate into the atmosphere, as generally happens when lighter crude oil spills and forms longer-lasting slicks.  As described in more detail below, crab, because of their feeding and reproductive habits are particularly susceptible to these dangers.

58.    An informative example of the impact which a large discharge of oil has on marine environments is the Exxon Valdez spill of 1989 off the coast of

Alaska.  Thousands of animals died immediately; the best estimates include: 250,000-500,000 seabirds; 2,800-5,000 sea otters; approximately 12 river otters; 300 harbor seals; 250 bald eagles; and 22 orcas; as well as the destruction of billions of salmon and herring eggs.  Due to a thorough cleanup, little visual evidence of the event remains, but the effects of the spill continue to be felt today. In the long-term, reductions in population have been seen in various ocean animals, including stunted growth in pink salmon populations.  Almost 19 years after the spill, a team of scientists at the University of North Carolina have found that the Exxon Valdez spill effects are lasting far longer than expected.  The team estimates some shoreline habitats may take up to 30 years to recover.

59.    Though smaller than the Exxon Valdez spill, because of the greater toxicity and density of bunker fuel than crude oil, the Spill may have an even greater long-term impact on San Francisco Bay marine life.

**D.    Extent Of Damages To Plaintiffs And The Class**

**1.    The San Francisco Bay Area Dungeness Crab Fishery**

**a.    Development Of The Fishery**

60.    The Dungeness crab, along with its smaller relatives the rock crabs, have always been plentiful along the pacific coast.  However, it wasn't until the early twentieth century that an anonymous enterprising fisherman, in the small fishing village of Dungeness, Washington at the tip of the Olympic Peninsula, decided to catch and sell the big meaty crabs.

61.    In a matter of a few years, the prolific Dungeness crab formed the basis of one of the premier commercial fisheries on the west coast.  Shortly after the turn of the century, Sicilian fishermen began plying the waters outside San Francisco's Golden Gate Bridge in search of the Dungeness crab.  The men would fish the tides during the day then return in time to sell their crabs at the Meiggs Wharf wholesale market.  Fishmongers from the teeming Chinatown markets, Onataro's in the Fillmore and the popular Crystal palace in the mission, renown

for its four giant fish markets, all gathered at Meiggs Wharf around midnight to vie for the day's catch.  The area known as Meiggs Wharf was set aside by state legislature in 1925 for the sole use of the fishermen in the city; it then became known as Fisherman's Wharf as it is called today.

62.     The newly founded crab fishery was a welcome boon to once poor fishermen.  The seemingly endless demand for crabs ameliorated even the Great Depression.  The Dungeness crab became the gold of the 1920's, 30's and 40's.

63.     By 1940 with the implementation of the modern day crab pot and larger, diesel powered boats, the crab catch rose dramatically.  ***There seemed to be an endless profusion of crabs, fortunes were made and Fisherman's Wharf, San Francisco was propelled to national prominence as the capital of the Dungeness crab***.  The Dungeness crab created an unforgettable scene which attracted visitors from around the world.

64.     The Port of San Francisco became the center of Northern California's fishing industry and home to most of the Bay Area's leading commercial seafood companies.  The Fisherman's Wharf Processing Center, located at Pier 45, supplies the highest quality seafood to local, regional and world markets and serves as a model for modern fish processing facilities throughout the United States.

65.     Looking at the 2006 California Department of Fish and Game statics for crab landings alone at the San Francisco Port and others affected by the Spill make clear the productivity of the Bay Area's fisheries.

| *PORT* | *SPECIES* | *POUNDS* | *VALUE* |
|--------|-----------|----------|---------|
| San Francisco | Dungeness Crab | 2,249,814 | $4,385,813 |
| Princeton-Half Moon Bay | Dungeness Crab | 1,477,999 | $3,063,763 |
| Berkeley | Dungeness Crab | 8,769 | $21,525 |
| Sausalito | Dungeness Crab | 9,975 | $26,046 |
| Emeryville | Dungeness Crab | 5,686 | $14,299 |

| PORT | SPECIES | POUNDS | VALUE |
|---|---|---|---|
| Alameda | Dungeness Crab | 12,262 | $23,897 |
| Oakland | Dungeness Crab | 8,713 | $15,809 |
| **TOTAL** | | **3,773,218** | **$7,551,152** |

**b.   San Francisco Dungeness Crab Season**

66.    Much of the catching and selling of Dungeness crab each year in the San Francisco Bay Area occurs in the first two weeks of the season.   Dungeness crab season is usually from mid-November to mid-June.  This year, the Dungeness crab season officially opened November 15th in San Francisco Bay.  There is always a host of activity on the opening day of the season.  Visitors come from all over the globe for some of the best crab on the West Coast, the best crab restaurants in the United States, and some of the world's best crab markets and crab festivals.  The crab season is a source of income for many parts of San Francisco.

67.    The streets of Chinatown, for instance, are swarming with grocery stalls that sell live fish during crab season along with some of the most freshly-caught crab.  San Francisco also plays host to the country's best crab festivals. The San Francisco Crab Festival and Fisherman's Wharf Crab Festival are both well-established celebrations.  The North Beach Crab Crawl gives the city's crab an Italian flavor.  The Union Square Crab Fest is well-known for attracting A-list celebrities and offering world-class seafood restaurants.

68.    About 150 boats set out from San Francisco, Half Moon Bay and Bodega Bay minutes after owners agree on a price with the processors.  In the tradition of their ancestors, crabbers equipped with 100-300 crab traps or pots are set out.  Each 90-pound trap will be baited with squid and/or mackerel, dropped to the ocean floor and marked by buoys.  When the first catches of the season are brought in, you see thousands of pounds of crabs waiting to be unloaded.

69.     For Bay Area crab fishermen the first 15 days of the season, from November 15th to December 1st, are by far the most important economically.  In this short period, the fishermen not only pull in fully 80% of their total annual catch, they also receive a significant premium in price.  Crab on Thanksgiving is a San Francisco Bay tradition, and people in the area are willing to pay more for crabs at this time, especially after not having them since June.  What's more, the crab fisheries north of Mendocino don't open until December 1st which puts further pressure on supply and increasing the price.

### c.     Immediate Effects Of The Oil Spill On The Dungeness Crab Fishery

70.     Following the Spill, crabbers stayed off the water amid health concerns.  Crab buyers at Fisherman's Wharf refused to buy crab based on crab market concerns over the public health risk of crabs contaminated with bunker fuel from the Spill.  Max Boland, director of sales at Alber Seafoods, a wholesaler on the wharf, said, "It just takes one crab and you'll have a problem.  It's a lawsuit waiting to happen."  Assemblyman Mark Leno, D-San Francisco said, "It's extremely disappointing and I think potentially reckless . . .  I don't want to be an alarmist, but we don't know for certain that this is safe."

71.     Public concern over the safety of local crab was exacerbated by the wording of the Executive Order signed by Governor Arnold Schwarzenegger soon after the Spill which prohibits the operation of holding tanks that pump in water within the closed fishing area, which includes all of San Francisco Bay.  Nearly all local crab boats use live-well holding tanks.  Thus, the order effectively prohibits crab fishermen from offloading their catch to the wholesalers in San Francisco, regardless of where the crabs were caught.  The impact of this calamity is graphically depicted in the photograph below which reveals a graveyard of crab pots abandoned by fishermen in a parking lot adjacent to Pillar Point Harbor.

/ / /

/ / /



### d.   Long-term Effects On The Dungeness Crab Fishery

72.     The San Francisco Bay, however, is not only important to crab and other fishermen as a place to catch and sell fish.  It is also fundamentally important for fishermen's future livelihoods, supplying the fish which fishermen depend on in the future.  The Spill severely threatens the Bay's functionality in this regard, and thus the future livelihoods of Bay areas fishermen who depend upon it.

73.     Of all the estuaries on the Pacific Coast - of North and South America - none is as important biologically as San Francisco Bay.  It is the gateway between the Sierras, provides spawning habitat for Pacific herring, and is ***the largest nursery area for Dungeness crab*** in a broad area of the coast.

74.     Dungeness crabs mate from spring through fall.  Fertilization of the egg does not occur at the time of the mating.  The female crab stores the sperm until her eggs are fully developed.  The eggs are fertilized when the female

extrudes them under her abdomen where they are carried until hatching. A large female crab can carry 2.5 million eggs.

75. After hatching, young crab are planktonic, or free swimming, in the water column for about four months, when they pass through five larval stages, known as "zoea." These shrimp-like larvae are primarily transported by currents throughout the entire bay. In the next and last larval stage, termed the "megalops," the larva becomes more recognizable as a young crab, with claws and legs, but still with a shrimp-like abdomen. It takes about two years for a crab to reach maturity after a megalopae settles to the bottom and moults to a juvenile crab. Females become mature at a shell-width of about 90mm, while males reach maturity at a shell-width of about 150mm. Males reach legal size (165mm, or 6.5 inches, in shell-width) after a little over two years. After maturing, females grow slower because most of their accumulated energy is being devoted to egg-production rather than body growth. California state law only allows the commercial and sport catching of male Dungeness crabs.

76. The Spill threatens to become a poison pill for the species, as the bunker fuel which is not cleaned from the surface or pulled out to sea becomes neutrally buoyant or breaks down and sinks to the bottom of the Bay and into the Dungeness crab nursery.

77. Many predict that crab, as well as shrimp, clams, oysters and other molluscs which come into contact with the bunker fuel will die quickly from acute toxicity and/or tainting of the flesh. Not only does this threaten the adult male crabs which would have been otherwise available for fishermen to catch, it also severely threatens future generation of crabs.

78. At the most immediate level, it can be expected that many of the more vulnerable immature crabs which have not yet developed a hard outer shell will be quickly killed, eliminating crabs that otherwise would have been available for harvest in the coming one to two years. It can also be predicted that mature, egg-

carrying females will also be among those killed, eliminating with them the often millions of eggs (and thus future crabs) which they carry.

79.     Less directly, with each death of a mature female crab, the breeding stock for future generations is severely diminished.  Dungeness crab males will often breed with several females in a season.  Accordingly, by law, only males may be caught by commercial and port fishermen, thereby protecting the productivity of the fishery.  A massive die off of the female Dungeness crab in the Bay could destroy this balance.  Furthermore, as discussed above, bunker fuel has been demonstrated to cause reproductive harm in marine life exposed to it, additionally threatening the future of the Bay's Dungeness crab fishery.

80.     Finally, the long-term risks of the Spill to the Bay's Dungeness crab population is exacerbated by their eating habits.  Crabs are described as "opportunistic omnivores," meaning that they eat almost anything they can catch, and will attempt to feed on oil, oiled prey, and oiled sediments.  Thus, even though heavy oils are not normally considered to be biologically available to most marine organisms, the benthic scavenging of crabs put them at greater and continuing risk from the effects of the Spill.

## 2.     The San Francisco Bay Area Flat Fish Fishery

81.     The Spill is also expected to have a huge impact on flat fish, including species more commonly known as Petrale, English sole, Skate, and Sand Dabs, all of which are bottom-feeding fish.  Much of the high density bunker fuel is expected to sink, smothering and killing the bottom feeders and their food. Furthermore, as it sinks, the water soluble elements of the fuel, which generally would evaporate from a slick caused by the spill of a lighter density oil, will likely dissolve.  This would further exacerbate the Spill's impact on water-column organisms, such as flat fish:  bunker fuel is often high in aromatics, which is the primary source of both acute and chronic toxicity to aquatic organisms, and many of these aromatics are water soluble.

### 3.   Other Fisheries Of The San Francisco Bay

82.    The Spill is also likely to have severe short and long-term effects on other fisheries of the San Francisco Bay, including, but not limited to, herring, salmon and rock fish.

83.    The San Francisco Bay fishery is the largest for herring south of British Columbia and is presently the United States' only "urban commercial fishery."   During the herring season, herring boats can be seen near the shores of Sausalito, along the walkways of the Embarcadero and near the Emeryville mudflats.

84.    San Francisco Bay herring spawn around the quarter moon, when there is the least swing in height between the low and high tides.  The females swim in with approximately 45,000 eggs in their bellies until they are able to release them on the now sticky surface.  Because of the sheen of the bunker fuel that is now spread throughout the surface of the ocean, a vast majority of the eggs will be killed off before they are even given a chance to hatch.

85.    Furthermore, herring are particularly sensitive to environmental factors, which play a much greater role in determining the size of their schools than the success of the fishing fleets.

86.    More than 4,000 tons of herring are pulled out of the Bay each year with a market value to fishermen of about $2.7 million annually.  Herring caught off the California coast can net as much as $10 million in annual gross profits for the fishing industry.

87.    As a result of the Spill, the livelihoods of fishermen who depend on these fisheries and others are also at risk.

/ / /

/ / /

/ / /

/ / /

SECOND AMENDED CLASS ACTION COMPLAINT
Case No. CGC-07-469379

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Strict Liability - Lempert-Keene-Seastrand Oil Spill Prevention Act, Gov't Code §§ 8670 *et seq.*)**

88.    Plaintiffs hereby incorporate by reference all paragraphs above as if fully set forth in detail herein.

89.    Defendants REGAL, HANJIN, FLEET, and/or DOES 2-50, at the time of the Ship's collision with the Bay Bridge and discharge of 58,000 gallons of bunker fuel into the San Francisco Bay, were the owners, operators, lessees, and/or charters by demise of the Ship and/or the bunker fuel transported therein.

90.    Defendants REGAL, HANJIN, FLEET, and/or DOES 2-50, are "responsible parties," under Gov't Code § 8670.3(w), and therefore "absolutely liable without regard to fault for any damages incurred by any injured party which arises out of, or are caused by, the discharge or leaking of oil into or onto marine waters." Gov't Code § 8670.56.5.

91.    The San Francisco Bay and surrounding ocean areas are "marine waters." *Id.*, § 8670.3(i).

92.    The bunker fuel discharged by the Ship into the San Francisco Bay is "oil," as used in § 8670.56.5. Gov't Code § 8670.3(n).

93.    The contamination legally caused by the discharge of bunker fuel by the Ship into or upon the San Francisco Bay injured, destroyed, caused to be lost, and/or impaired the use of natural resources on which Plaintiffs and the class depend for their livelihood, including but not limited to, the local populations of Dungeness crab, flat fish, herring, rock fish, and salmon. Plaintiffs and the class dependence upon these natural resources constitute at least 25% of their earnings during the respectively applicable seasons for such resources.

94.    The injury, destruction, loss, and/or impairment of usability of these natural resources has caused Plaintiffs and the class to lose profits, and will cause

1
2
future losses of profits by Plaintiffs and the class and/or impairment of their earning capacities.

3
4
5
95.     The injury, destruction, loss, and/or impairment of usability of these natural resources has also caused, and will cause, Plaintiffs and the class losses of net profits.

6
7
8
9
10
11
12
13
96.     The discharge of bunker fuel by the Ship into the San Francisco Bay has also caused Plaintiffs and the class economic losses in the form of the costs and expenses of actions taken by Plaintiffs and the class to test, evaluate, access and/or monitor the extent of the contamination of the San Francisco Bay and surrounding marine area in order to determine the extent of any contamination to marine life, including but not limited to, Dungeness crabs, flat fish, herring, rock fish, and salmon, and/or the safety and fitness for human consumption of such marine life.

14
15
16
17
18
19
20
97.     The likely long-lasting effects of the contamination of the discharge of bunker fuel into the San Francisco Bay by the Ship on the marine life on which Plaintiffs' and the class' livelihoods depend, especially but not limited to, the Dungeness crab, flat fish, herring, rock fish, and salmon populations, requires that Plaintiffs and the class continue future monitoring and testing activities in order to ensure that such marine life is not contaminated and is safe and fit for human consumption.

21
22
23
24
25
26
27
28
98.     In doing the acts herein alleged, Defendants, and each of them, acted willfully, wantonly, with oppression, fraud, and/or malice, and with a conscious disregard of the rights and safety of others, such that Plaintiff requests that the trier of fact, in the exercise of its sound discretion, award Plaintiff additional damages for the sake of example and sufficient to punish said Defendants for their despicable conduct, in an amount reasonably related to Plaintiff's actual damages and Defendants' wealth, yet sufficiently large enough to be an example to others and to deter Defendants and others from engaging in similar conduct in the future.

1

WHEREFORE, Plaintiffs pray for relief as set forth below.

2

## SECOND CAUSE OF ACTION

3

### (Strict Liability - Ultra Hazardous Activity)

4

99.    Plaintiffs hereby incorporate by reference all paragraphs above as if

5

fully set forth in detail herein.

6

100.   Defendants REGAL, HANJIN, FLEET, COTA and/or DOES 2-50, in

7

transporting approximately one million gallons of highly toxic bunker fuel through

8

the San Francisco Bay, were engaged in an abnormally dangerous and ultra-

9

hazardous activity.

10

101.   Defendants' conduct served as a direct and legal cause of the

11

discharge and dispersion of 58,000 gallons of bunker fuel from the Ship into the

12

San Francisco Bay and surrounding ocean areas, which is the kind of harm to be

13

anticipated as a result of the risk created by the ultra hazardous activity.

14

102.   As a direct and/or legal result of the wrongful acts and/or omissions

15

of the Defendants, and each of them, Plaintiffs have suffered and/or will suffer

16

significant past and future economic loss, including but not limited to, injuries

17

flowing from:

18

(a) Plaintiffs inability to harvest and/or sell Dungeness crabs during the

19

most productive and lucrative period of the 2007-08 Dungeness crab

20

season;

21

(b) Plaintiffs inability to harvest and/or sell other commercial fish species,

22

including but not limited to flat fish, herring, rock fish and salmon, in the

23

period following the Spill;

24

(c) the reduced physical size and quantity of future populations of

25

Dungeness crab in the San Francisco Bay area as a result of destruction of,

26

and injury to, San Francisco Bay Dungeness crab estuary;

27

(d) the damage done to populations of other commercial fish species,

28

including but not limited to flat fish, herring, rock fish and salmon, affected

by contamination of San Francisco Bay caused by the discharged bunker fuel;

(e) the damage done to short, middle, and long-term reputation of San Francisco Bay fishery resulting from the public perception of contamination to the fishery and related safety of fish caught there; and

(f) the cost already incurred, and to be incurred in the future, in order to monitor the effects of the contamination of the San Francisco Bay and surrounding ocean areas on marine species, including, but not limited to, Dungeness crab, flat fish, herring, rock fish and salmon, in order to ensure their safety and fitness for human consumption.

103.   As a direct and legal cause of the Defendants wrongful acts and/or omissions herein above set forth, Plaintiffs and/or the class have suffered and will suffer economic harm, injury, and/or losses as herein above set forth.

104.   The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as herein above set forth.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## THIRD CAUSE OF ACTION

### (Negligence)

105.   Plaintiffs hereby incorporate by reference all paragraphs above as if fully set forth in detail herein.

106.   Plaintiffs are informed and believe, and thereupon allege that at all times prior to the collision, the Spill, and the immediate aftermath Defendants HANJIN, REGAL, FLEET, COTA, and/or DOES 2-50 negligently, carelessly and/or unlawfully owned, operated, controlled, managed, leased, loaned, borrowed, bailed, chartered, and/or maintained the Ship so as to cause the collision, the Spill and subsequent events hereinabove described, and legally caused the economic harm, injury, and/or damage to Plaintiffs and/or the class which are hereinabove set forth.

107.   The acts and omissions of the Defendants described herein were also in violation of various California state laws including but not limited to: (a) the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Gov't Code §§ 8670, *et seq.*; (b) the Porter-Cologne Water Quality Control Act, Cal. Water Code §§ 13000, *et seq*. Defendants' violations of these statutes directly and proximately caused, and will cause, injury to Plaintiff and the class of a type which the statutes are intended to prevent. Plaintiff and the class are of the class of persons for whose protection these statutes were enacted.

108.   As a direct and legal cause of the Defendants' wrongful acts and/or omissions, Plaintiffs, the class and the environment have suffered and will suffer as set forth hereunder.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FOURTH CAUSE OF ACTION

### (Negligent Entrustment)

109.   At all times herein mentioned, Defendants HANJIN, REGAL, FLEET, COTA, and/or DOES 2-50 negligently, wantonly, carelessly and/or recklessly hired, retained, supervised, trained, and/or entrusted the Ship to one another, for the purpose of transporting cargo aboard a container ship filled with bunker fuel through the San Francisco Bay.  Thereafter, the Defendants, and each of them, controlled, navigated, and/or managed the Ship with the knowledge, consent, permission, and/or within the scope of authority confered by Defendants, and each of them.

110.   Plaintiffs are informed and believe that Defendants, and each of them, were at all times mentioned incompetent and unfit to safely own, operate, manage, maintain, lease, charter, or otherwise control the Ship for transport of cargo within the San Francisco Bay.

/ / /

/ / /

---

**SECOND AMENDED CLASS ACTION COMPLAINT**
**Case No. CGC-07-469379**

111.   As a direct and legal cause of the Defendants wrongful acts and/or omissions herein above set forth, Plaintiffs and/or the class have suffered and will suffer economic harm, injury, and/or losses as herein above set forth.

112.   The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as herein above set forth.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FIFTH CAUSE OF ACTION

### (Public Nuisance  - Civ. Code §§ 3479 *et seq.*)

113.   Plaintiffs hereby incorporate by reference all paragraphs above as if fully set forth in detail herein.

114.   Defendants, and each of them, have created a condition that affects a substantial number of individuals similarly situated to the Plaintiffs; and a condition which would reasonably annoy and disturb an ordinary person.

115.   The seriousness and/or gravity of the harm outweighs the social utility of Defendants' conduct.

116.   Plaintiffs and/or the class suffered harm and injury to their economic livelihood, which they did not consent to and which is different from the type of harm which is suffered by the general public.

117.   The above acts and omissions also created a public nuisance *vis-a-vis* the Plaintiffs and the class, interfering with the property rights of Plaintiffs and the class, and rights incidental to those property rights.

118.   The acts and omissions of the Defendants described herein were also in violation of various California state laws including but not limited to: (a) the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Gov't Code §§ 8670, *et seq.*; (b) the Porter-Cologne Water Quality Control Act, Cal. Water Code §§ 13000, *et seq.*  Defendants' violations of these statutes directly and proximately caused, and will cause, injury to Plaintiff and the class of a type which the statutes

are intended to prevent. Plaintiff and the class are of the class of persons for whose protection these statutes were enacted.

119.   As a direct and legal cause of the Defendants wrongful acts and/or omissions herein above set forth, Plaintiffs and/or the class have suffered and will suffer economic harm, injury, and/or losses as herein above set forth.

120.   The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as herein above set forth.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SIXTH CAUSE OF ACTION

### (Private Nuisance - Civ. Code §§ 3479 *et seq.*)

121.   Plaintiffs hereby incorporate by reference all paragraphs above as if fully set forth in detail herein.

122.   The above acts and omissions also created a private nuisance *vis-a-vis* the Plaintiffs and the class, interfering with their use and enjoyment of private property rights and rights incidental to those property rights.

123.   As a direct and legal cause of the Defendants wrongful acts and/or omissions herein above set forth, Plaintiffs and/or the class have suffered and will suffer economic harm, injury, and/or losses as herein above set forth.

124.   The acts and omissions of Defendants, and each of them, were done with malice, fraud, and/or oppression as herein above set forth.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SEVENTH CAUSE OF ACTION

### (Declaratory Relief And Request for Monitoring of Contamination)

125.   Plaintiffs hereby incorporate by reference all paragraphs above as if fully set forth in detail herein.

126.   As a direct and legal result of the acts and omissions of the Defendants, causing or allowing or contributing to the discharge of 58,000 gallons of highly toxic bunker fuel into the San Francisco Bay and surrounding ocean

areas, Plaintiffs have been denied the ability to assure themselves and consumers of fish caught in the San Francisco Bay and surrounding ocean areas of the short, middle, and long-term safety and fitness for human consumption of fish caught in the San Francisco Bay and surrounding ocean areas, including, but not limited to, Dungeness crab, flat fish, herring, rock fish and salmon.  This inability to assure themselves and fish consuming public of the safety and fitness for human consumption of fish caught in the San Francisco Bay and surrounding ocean areas has caused, and will cause, severe economic injury to Plaintiffs and the class, who depend on the sale of fish caught in the San Francisco Bay and surrounding ocean areas for significant portions of their livelihoods.  Monitoring and testing procedures exist which make the detection and evaluation of marine life contamination and the safety and fitness of such marine life for human consumption possible and beneficial.

127.   Assuring the safety and fitness for human consumption of fish caught in the San Francisco Bay and surrounding ocean areas, including but not limited to, Dungeness crabs, flat fish, herring, rock fish and salmon, and thereby repairing and maintaining the short, middle, and long-term reputation of the fisheries of the San Francisco Bay and surrounding ocean areas can only be accomplished by the creation of a marine life contamination monitoring fund to provide a marine life contamination monitoring program, including:

(a)   Periodic and regular sampling and testing of fish caught in the San Francisco Bay, including, but not limited to, Dungeness crab, flat fish, herring, rock fish and salmon by an independent and qualified testing entity; and

(b)   Widespread publication and dissemination of the results of such sampling and testing to the fish consuming public.

128.   Plaintiffs and the class have no adequate remedy at law in that monetary damages alone do not compensate for the continuing nature of the harm

to them, and a monitoring program which assures Plaintiffs, the class, and the fish consuming public of the safety and fitness for human consumption of fish caught in the San Francisco Bay and surrounding ocean areas can prevent greater injury to the fish consuming public and the reputations of the fisheries of the San Francisco Bay and surrounding ocean area and serve to repair and maintain those reputations.

129.   Without a court-approved monitoring program and a declaration of the rights of the Plaintiffs and the class to such a monitoring program, the safety and fitness for human consumption of fish caught in the San Francisco Bay and surrounding ocean areas cannot be assured and the reputation with the fish consuming public of the fisheries of the San Francisco Bay and surrounding ocean areas cannot be repaired or then subsequently maintained.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

1.   Enter an order certifying the class requested by Plaintiffs;

2.   Enter a judgment in favor of Plaintiffs and the class, against defendants, jointly and severally, for economic damages sustained by them by reason of Defendants' unlawful conduct;

3.   Enter a judgment awarding Plaintiffs and the class punitive damages for Defendants' willful, reckless and wanton acts;

4.   Enter a judgment in favor of Plaintiffs and the class, against defendants, jointly and severally, for the creation of a fund to monitor contamination of marine life in the San Francisco Bay and surrounding ocean areas in order to assure the safety and fitness for human consumption of fish caught in the San Francisco Bay and surrounding ocean areas;

/ / /

/ / /

1        5.    Award Plaintiffs and the class pre-judgment and post-judgment

2            interest, costs, expenses, including the costs of retaining expert

3            witnesses, and attorneys' fees in this action; and

4        6.    Grant such other relief as this Court may deem just and equitable.

5

6

7    DATED: March 17, 2010        **COTCHETT, PITRE & McCARTHY**

8                            **AUDET & PARTNERS LLP**

9

10                      By:

11                            STUART G. GROSS
                              *Attorneys for Plaintiffs*

12

13

14                       **<u>JURY DEMAND</u>**

15       Plaintiffs demand trial by jury on all issues so triable.

16

17   DATED: March 17, 2010        **COTCHETT, PITRE & McCARTHY**

18                           **AUDET & PARTNERS LLP**

19

20                      By:

21                          STUART G. GROSS
                              *Attorneys for Plaintiffs*

22

23

24

25

26

27

28

---

*TARANTINO, et al. v. HANJIN SHIPPING CO., LTD, et al.*
**SAN FRANCISCO COUNTY SUPERIOR COURT- CASE NO.: CGC-07-469379**

## PROOF OF SERVICE

I am employed in San Mateo County, which is where service of the document(s) referred to below occurred. I am over the age of 18 and not a party to the within action. My business address is Cotchett, Pitre & McCarthy, San Francisco Airport Center, 840 Malcolm Road, Suite 200, Burlingame, California 94010. I am readily familiar with Cotchett, Pitre & McCarthy's practices for the service of documents. On this date, I served a true copy of the following document(s) in the manner listed below:

### CLASS ACTION - SECOND AMENDED COMPLAINT

**✗** **VIA FIRST CLASS MAIL:** I am readily familiar with this firm's practice for collection and processing of correspondence for mailing. Following that practice, I placed a true copy of the aforementioned document(s) in a sealed envelope, addressed to each addressee, respectively, as specified below. The envelope was placed in the mail at my business address, with postage thereon fully prepaid, for deposit with the United States Postal Service on that same day in the ordinary course of business.

### PLEASE SEE ATTACHED SERVICE LIST

_____ **VIA FACSIMILE:** I am readily familiar with this firm's practice for causing documents to be served by facsimile. Following that practice, I caused the aforementioned document(s) to be transmitted to the telephone number(s) of the addressee(s) specified below.

_____ **VIA OVERNIGHT COURIER SERVICE:** I am readily familiar with this firm's practice for causing documents to be served by overnight courier. Following that practice, I caused the sealed envelope containing the aforementioned document(s) to be delivered via overnight courier service to the addressee(s) specified below.

_____ **VIA HAND DELIVERY:** I am readily familiar with this firm's practice for causing documents to be served by hand delivery. Following that practice, I caused the sealed envelope containing the aforementioned document(s) to be hand delivered to the addressee(s) specified below.

_____ **VIA E-MAIL:** My e-mail address is rmanuel@cpmlegal.com. I am readily familiar with this firm's practice for causing documents to be served by e-mail. Following that practice, I caused the aforementioned document(s) to be emailed to the addressee(s) specified below.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct. Executed at Burlingame, California, on March 23, 2010.

RYAN O. MANUEL

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PROOF OF SERVICE FOR PLAINTIFF JOHN ATKINSON'S RESPONSES TO DISCOVERY FROM DEFENDANTS REGAL STONE LIMITED AND FLEET MANAGEMENT, LTD.; CASE NO. CGC-07-469379** 1

*TARANTINO, et al. v. HANJIN SHIPPING CO., LTD, et al.*
**SAN FRANCISCO COUNTY SUPERIOR COURT- CASE NO.: CGC-07-469379**

## SERVICE LIST

*VIA FIRST CLASS MAIL*                    *Plaintiffs' Co-Counsel*
William M. Audet
Adel A. Nadji
**AUDET & PARTNERS, LLP**
221 Main Street, Suite 1460
San Francisco, CA 94010
Tel: (415) 568-2555
Fax: (415) 568-2556

*VIA FIRST CLASS MAIL*                    *Counsel for Defendants Regal*
John Giffin                               *Stone, Ltd. and Fleet Management*
John Cox                                  *Ltd.*
**KEESAL, YOUNG & LOGAN**
450 Pacific Avenue
San Francisco, CA 94133
Tel:  (415) 398-6000
Fax: (415) 981-0136

*VIA FIRST CLASS MAIL*                    *Counsel for Defendants Regal*
Joseph A. Walsh II                        *Stone, Ltd. and Fleet Management*
**KEESAL, YOUNG & LOGAN**                 *Ltd.*
400 Oceangate
Long Beach, CA 90801-1730
Tel: (562) 436-2000
Fax: (562) 436-7416

*VIA FIRST CLASS MAIL*                    *Counsel for Defendant*
Erich P. Wise                             *Hanjin Shipping Co., Ltd.*
**FLYNN, DELICH & WISE, LLP.**
One World Trade Center, Suite 1800
Long Beach, CA 90831-1800
Tel: (562) 435-2626
Fax: (562) 437-7555

*VIA FIRST CLASS MAIL*                    *Counsel for Defendant*
James B. Nebel                            *Hanjin Shipping Co., Ltd.*
Conte C. Cicala
**FLYNN, DELICH & WISE LLP**
One California Street, Suite 350
San Francisco, CA 94111

*VIA FIRST CLASS MAIL*                    *Counsel for Defendant*
Walter G. Coppenrath                      *John J. Cota*
**COPPENRATH & ASSOCIATES
LLP**
400 Oceangate, Suite 700
Long Beach, CA 90802
Tel: (562) 216-2948
Fax: (562) 252-1136

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

**PROOF OF SERVICE FOR PLAINTIFF JOHN ATKINSON'S RESPONSES TO DISCOVERY FROM DEFENDANTS
REGAL STONE LIMITED AND FLEET MANAGEMENT, LTD.; CASE NO.  CGC-07-469379**                    2

**Exhibit 4**

# Audet & Partners, LLP

A t t o r n e y s – a t – L a w

221 Main Street, Suite 1460
San Francisco, CA 94105
Telephone: 415.568.2555
Facsimile: 415.568.2556
Toll Free: 800.965.1461
www.audetlaw.com

**_Loretz v. Regal Stone_**
**Case No. C 07 5800 SC**
**Through May 31, 2010**

| Attorney | Hours | Rate (per hour) | Common Lodestar |
|---|---|---|---|
| William M. Audet (P) | 639.82 | $650.00 | $415,883.00 |
| Michael McShane (P) | 262.75 | $595.00 | $156,336.25 |
| Adel Nadji (A) | 636.36 | $425.00 | $270,453.00 |
| | | | |
| **Attorney Total:** | | | **$842,672.25** |
| | | | |
| **Legal Assistant / Paralegal:** | | | |
| Adrienne Brennan | 93.75 | $110.00 | $10,312.50 |
| A. Bustamante | 1.25 | $100.00 | $ 125.00 |
| Robert Chao | 8.50 | $100.00 | $ 850.00 |
| Andrea Chamberlin | 12.8 | $125.00 | $1,600.00 |
| Ted Chase | 164.25 | $110.00 | $18,067.50 |
| Frank Dessau | 105.30 | $125.00 | $13,162.50 |
| Rita Guarino | 14.15 | $110.00 | $1,556.50 |
| K. Toth | 1.22 | $110.00 | $ 134.20 |
| Hannah Weinberg | 15.50 | $110.00 | $1,705.00 |
| | | | |
| **Legal Assistant / Paralegal Total:** | | | **$47,513.20** |
| | | | |
| | | **Total Hours** | **1955.65** |
| | | **Firm Lodestar** | **$890,185.45** |
| | | | |
| | | | |
| **Audet Firm's requested up to 1.5x multiplier:** | | | **$1,335,278.18** |

**Exhibit 5**

**Audet & Partners, LLP**
**Cost Report - Cosco Spill**
**As of May 31, 2010**

| Description | Amount |
|---|---|
| Court Reporter | 6,153.08 |
| Copy/Scan/Fax | 6,160.80 |
| Expert | 9,400.00 |
| Express Mail | 582.79 |
| Filing Fees | 4,065.50 |
| Investigator | 870.00 |
| Mediation | 5,241.64 |
| Miscellaneous | 234.49 |
| Postage | 540.70 |
| Research | 6,685.29 |
| Telephone | 618.10 |
| Travel | 359.00 |
| **Total Costs Advanced** | **40,911.39** |